UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| SYNQOR, INC. | § | |
|         Plaintiff | § | |
| | § | |
| VS. | § | Case No. 2:14-CV-287-RWS-JBB |
| | § | |
| VICOR CORPORATION | § | |
|         Defendant | § | |

**REPORT AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

The above-referenced cause of action was referred to the undersigned United States Magistrate Judge for pretrial purposes in accordance with 28 U.S.C. § 636. The following motion is pending before the Court:

> **SynQor's Motion for Partial Summary Judgment Finding Vicor's Accused Products and Certain End Customer Products Incorporating Them Meet Undisputed Claim Limitations (Dkt. No. 389).**

The Court, having carefully reviewed the relevant briefing, recommends SynQor's motion for partial summary judgment be **DENIED**.

**I.  BACKGROUND**

This is a patent infringement case originally filed by SynQor, Inc. ("SynQor") in 2011, involving patents directed to power electronics systems. Cause No. 2:11-cv-54 ("'54 case"). In early 2014, SynQor's claims against Vicor Corporation ("Vicor") and Cisco Systems, Inc. ("Cisco") were severed into two newly-created cases—Cause No. 2:14-cv-286 (against Cisco) and Cause No. 2:14-cv-287 (against Vicor) ("'287 case" or "current case"). In the current case, SynQor originally alleged Vicor indirectly infringes four patents relating to unregulated bus

1

converter technology—United States Patent Nos. 7,072,190 (the '190 patent), 7,564,702 (the '702 patent), 8,023,290 (the '290 patent) and 7,272,021 (the '021 patent). Dkt. No. 2, ¶¶ 35-58.

In 2016, shortly before trial in the current case, Vicor sought and obtained a stay of SynQor's claims pending the final resolution of *inter partes* reexaminations Vicor had filed in 2011 and 2012 with the Patent Office. Well over five years later, the Court lifted the stay. Dkt. No. 311. Post-reexamination, the asserted claims are claim 2 of the '190 patent and claims 55 and 67 of the '702 patent.[1] *See* Dkt. No. 548 (Joint final Pre-Trial Order) at 1. The pretrial conference is set before the undersigned October 5, 2022, with jury selection and trial scheduled October 17, 2022 before District Judge Schroeder.

## II.  MOTION FOR PARTIAL SUMMARY JUDGMENT

In its motion for partial summary judgment, which only addresses the asserted '190 and '702 patents, SynQor seeks summary judgment pursuant to Federal Rule of Civil Procedure 56 and Local Rule CV-56 "as to claim limitations not in reasonable dispute for accused Vicor bus converters incorporated into certain end customers' products – i.e., that all the limitations other than the two that Vicor's expert disputes are satisfied by the accused products." Dkt. No. 389 at 1. SynQor does not dispute, for purposes of this motion, that the "in synchronization" and short "transition times" limitations raise fact issues for trial. *Id.* at 5-6. However, SynQor submits these "two disputes are the only genuine ones between the parties. . . ." *Id.* at 6.

---

[1] The asserted claims of the '190 and '702 patents are directed to power converter systems incorporating an isolated stage/converter with particular characteristics that is used to power two or more non-isolated, regulated stages/converters in what is now known as an intermediate bus architecture ("IBA"). *See, e.g.*, '190 patent, claim 2; '702 patent, claim 55; April 11, 2014, Infringement Expert Report of Steven B. Leeb, Ph.D. ("Leeb Rep."), ¶¶ 51, 53; May 2, 2014, First Suppl. Infringement Expert Report of Steven B. Leeb, Ph.D. ("Suppl. Leeb Rep."), ¶¶ 51, 53. According to SynQor, the isolated converters used in the claimed IBA systems are known today as bus converters, and the two or more non-isolated, regulated converters are now commonly known as point-of-load converters.

### III. LEGAL STANDARD

Federal Rule of Civil Procedure 56 requires that summary judgment be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A factual dispute is genuine if the evidence could lead a reasonable jury to find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The applicable substantive law identifies which facts are material. *Id.*

In determining whether a genuine issue for trial exists, a court views all inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. v. Zenith Radio*, 471 U.S. 574, 587 (1986). The moving party bears "the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotations omitted); *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).

Once a party has made that showing, the nonmoving party bears the burden of establishing otherwise by supporting his contentions with some evidence. *Geiserman v. MacDonald*, 893 F.2d 787, 793 (5th Cir. 1990) (citing *Celotex*, 477 U.S. at 324). The non-moving party cannot "rest upon mere allegations or denials of [the] pleading but must set forth specific facts showing there is a genuine issue for trial." *Anderson*, 477 U.S. at 248 (citation omitted). "Summary judgment is appropriate if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to a party's case." *Bluebonnet Hotel Ventures, LLC v. Wells Fargo Bank, N.A.*, 754 F.3d 272, 276 (5th Cir. 2014) (quoting *Celotex*, 477 U.S. at 322).

## IV. DISCUSSION

### A.   Parties' assertions

SynQor attached three appendices to its motion, first asserting – for end products incorporating the accused Vicor bus converters – there is no genuine dispute that: (1) Vicor's accused bus converters identified in Appendix A to the motion meet all of the bus converter limitations of the claims asserted against them highlighted in yellow in Appendix B to the motion; and (2) Alcatel-Lucent ("ALU"), Cisco, IBM, Infinera, Juniper Networks, Micron, and UniTest end products incorporating the accused Vicor bus converters as identified in Appendix A meet all the end product limitations of the claims asserted against them highlighted in green in Appendix B, as well as all the bus converter limitations of the claims asserted against them highlighted in yellow in Appendix B. Dkt. No. 389 at 1-2 & attached proposed order. According to SynQor, in the expert reports of Drs. Steven Leeb and James Dickens[2] and the materials cited therein, SynQor presented detailed evidence demonstrating direct infringement by end products incorporating Vicor bus converters. Specifically, SynQor asserts the evidence shows the accused Vicor bus converters meet all of the bus converter limitations of the claims asserted against them. *See* Dkt. No. 389 at 3 (citing citations included in Appendix A).

SynQor states Dr. Dickens based his analysis on a voluminous evidentiary record showing how the accused Vicor bus converters are designed and operate, including schematics, datasheets

---

[2] Post-stay, SynQor's prior technical expert, Dr. Steven Leeb, is not able to continue as SynQor's expert in this matter. SynQor has retained Dr. James Dickens as a substitute technical expert. On September 2, 2022, the undersigned denied Vicor's motion to strike Dr. Dickens as a substitute expert. *See* Dkt. No. 534.

The Third Supplemental Infringement Expert Report of James Dickens, Ph.D. ("Third Suppl. Dickens Rep.") and Dr. Dickens' Statement Adopting Dr. Steven Leeb's Opinions and Testimony are attached to the Declaration of James Dickens, Ph.D., in Support of SynQor's Motion for Partial Summary Judgment Finding Vicor's Accused Products and Certain End Customer Products Incorporating Them Meet Undisputed Claim Limitations, submitted at Dkt. No. 382. In its motion, SynQor refers generally to Dr. Dickens' analysis as adopted in part through Dr. Leeb's reports. *See* Dkt. No. 389 at 1, n. 1.

and bills of materials for the accused Vicor bus converters, as well as other testimony and evidence (as set forth in his reports and the exhibits thereto), and Dr. Leeb's testing. *Id.* at 4 (citing Leeb Rep. at ¶¶ 207-255, 280-297, 301-303, 328-348, 352-354, App. E, U, V, W, Exs. 11, 13, 19, 21, 31, 33; Suppl. Leeb Rep. at ¶¶ 213-261, 286-303, 307-309, 334-354, 358-360; Second Suppl. Leeb Rep. at ¶¶ 12-39; App. E1, U1, V1, W1, Exs. 11S, 13, 19S, 21S, 31S, 33S). SynQor further asserts Dr. Dickens made a detailed showing that end products from ALU, Cisco, IBM, Infinera, Juniper, Micron, and UniTest incorporating the accused Vicor bus converters meet of all of the limitations of the claims asserted against them, including the end product limitations. *Id.* (citing citations included in Appendix A). According to SynQor, Dr. Dickens based his analysis on a voluminous evidentiary record showing how these end products (and the accused Vicor bus converters incorporated therein) are designed and operate, including schematics, datasheets and various technical documents for these end products that were produced by those companies, bills for materials for the accused Vicor bus converters, and other testimony and evidence (as set forth in his reports and the exhibits thereto), along with Dr. Leeb's testing. *Id.* (citing Leeb Rep. at ¶¶ 268-273, 280-297, 301-303, 316-323, 367-375, App. E, V, Exs. 5, 8, 15, 17, 23, 25, 27, 29, 31, 33, 35, 37; Suppl. Leeb Rep. at ¶¶ 274-279, 286-303, 307-309, 322-329, 373-381, App. E, Exs. 5, 8; Third Suppl. Dickens Rep. at ¶¶ 14-22, App. E3, Exs. 41-46; Fourth Suppl. Dickens Rep. at ¶¶ 2-5).

SynQor claims Vicor, by focusing in its expert reports on two disputes regarding whether the accused Vicor bus converters meet the "in synchronization" and short "transition times" limitations, "concedes that nearly all of the asserted claim limitations are met by end products incorporating the accused Vicor bus converters." *Id.* at 1, 5. SynQor asserts Vicor does not dispute that the many other bus converter limitations in the asserted claims are presented in the accused

Vicor bus converters identified in Appendix A; nor has Vicor disputed (with one exception)[3] that all of the end product limitations shown in Appendix B are present in the accused ALU, Cisco, IBM, Infinera, Juniper, Micron, and UniTest end products incorporating the accused Vicor bus converters. *Id*. at 7-8. According to SynQor, "[r]esolving whether these undisputed claim limitations are satisfied by end products incorporating accused Vicor bus converters in advance of trial will substantially simplify this complex case and reduce the risk of jury confusion by avoiding the time consuming and needless presentation of voluminous undisputed and highly technical evidence." *Id.* at 2.

Finally, SynQor asserts there is no genuine dispute that accused Vicor bus converters with transition times less than or equal to 20% meet the short "transition times" limitations. *Id.* at 9 (citing Leeb Rep., ¶¶ 239, 296, 347, App. U, V, W; Suppl. Leeb Rep., ¶¶ 245, 302, 353; Second Suppl. Leeb Rep., App. U1, V1, W1). Therefore, SynQor also seeks partial summary judgment that Vicor's accused bus converters identified in Appendix C to the motion meet the "transition times which are short relative to the on-state and off-state times of the controlled rectifiers" limitations of the claims asserted against them. *Id.* at 9 & proposed order. SynQor argues there "is no reason for SynQor to be forced to walk through the detailed testing and application of this claim limitation for accused bus converters where Vicor does not dispute the issue." *Id*.

---

[3] Vicor previously opposed a parallel motion for partial summary judgment regarding undisputed claim limitations with respect to ALU, IBM, and Juniper end products also at issue in this motion. *See* Dkt. Nos. 92, 139. According to SynQor, "Vicor tacitly conceded that the ALU and Juniper end products meet all of the end product limitations highlighted green in Appendix B," but disputed that a single IBM product (P7-IH disk enclosure DCCA-DE sub-assembly) uses accused Vicor bus converters in the infringing IBA configuration based on a declaration by a Vicor engineer. Dkt. No. 389 at 8 (citing Dkt. 139 at 2). SynQor asserts Vicor ignored "that IBM's corporate representative specifically testified that a document listing each of the bus converters at issue (VIB0010TFJ, VIZ0053, and VIZ0065) describes 'the quantities of the various Vicor components used in IBA architecture' and he further confirmed that 'all [IBM's] uses of the 350 to 11 or 12 volt out Vicor unregulated bus converters [which include those three part numbers] are in IBA.'" *Id*. (citing Dkt. No. 95 (DeZern Decl.), Ex. 10 (IBM Dep.) at 19:11-14, 78:16-21; Dkt. No. 139, Ex. 1 (IBM Dep. Ex. 14)).

In its response, Vicor asserts SynQor's motion "invites the Court to delve into disputed issues pertaining to individual claim limitations." Dkt. No. 439 at 1. Vicor disputes that all end products incorporating Vicor bus converters satisfy all of the highlighted claim limitations identified in Appendix B to SynQor's motion. *Id.* Additionally, Vicor asserts as follows:

> [T]he claim limitations on which SynQor seeks summary judgment include the requirement for a plurality of non-isolating regulation stages that receive the output of a non-regulating isolation stage or a fixed duty cycle. This limitation can *only* be satisfied (if at all) when accused Vicor converters are incorporated into end-use circuits by Vicor customers. Thus, it is SynQor's burden to provide specific and individualized proof that *each* of the seven Vicor customers cited by SynQor incorporate *all* volumes of *each* of the accused Vicor converters into actually infringing topologies throughout the *entire* infringement period. And, to the extent SynQor cannot make this showing for *any* accused product, for *any* customer, at *any* time, such failure casts doubt on SynQor's ability to satisfy its indirect-infringement burden of proof to show active inducement and absence of any substantial non-infringing uses. Given the shakiness in the evidence that SynQor relies upon for end customer use, summary judgment is inappropriate on this issue as well. In certain cases, SynQor relies on unauthenticated documents, prepared outside of the course of business, and unreliable hearsay declarations that are not admissible at trial. Such questionable evidence cannot entitle SynQor to summary judgment, as a matter of law. Even putting aside the admissibility issues, Vicor disputes the broad inferences that SynQor seeks to draw from its third-party declarations regarding end-customer products which raise issues of material fact.

*Id.* at 1-2 (emphasis original).

Regarding the first main issue (whether SynQor has met its summary judgment burden of demonstrating that the accused Vicor converters satisfy all of the other bus converter limitations besides the "in synchronization" and short "transition times" limitations), Vicor argues its technical expert Dr. Habetler raises genuine disputes regarding whether SynQor has satisfied its burden of proof, including whether SynQor's experts undertook sufficient testing, whether SynQor's experts have established their infringement analysis for "representative" products, and whether SynQor has established infringement for the entire liability period. *Id.* at 1. In his report, Dr. Habetler opines Dr. Leeb's testing approach "lacks any explanation of how [Vicor's] Sine

Amplitude Converter operates" (Habetler Rep., ¶ 205), was "without any analysis whatsoever" (*Id.*, ¶ 206 n.39), was "fundamentally flawed and unreliable" (*Id.*, ¶ 206), and that some of his arguments regarding the controlled rectifiers "make[] no sense" (*Id.* at 133, 134). According to Vicor, these assessments by Dr. Habetler question the reliability of Dr. Leeb's overall testing methodology and speak to the disputed nature of the claims as a whole. Dkt. No. 439 at 2-3.

Vicor also points out that, of the 100-plus accused products in this case, Dr. Leeb only analyzed waveforms for thirty-eight, purportedly finding "Miller-like" plateaus in three. According to Vicor, in his analysis of those three products, Dr. Leeb repeats nearly the exact same language describing the waveform characteristics for each representative product. *Id.* at 3 (citing Supp. Leeb Rep., ¶¶ 237-39, ¶¶ 298-300, and ¶¶ 348-50). Vicor has challenged Dr. Leeb's methodology and analysis of the three products and further asserts the remainder of Dr. Leeb's report (which has been adopted by Dr. Dickens) is "completely lacking in any explanation of how particular waveforms show the required switching in the [CRs]." *Id.* (citing Supp. Leeb Rep., ¶ 230).

Finally, with regard to this first main issue, Vicor argues Dr. Dickens failed to provide sufficient technical support or reasoning to support his assertion that Vicor's products operated in the same, allegedly infringing manner throughout the liability period. According to Vicor, during supplemental discovery, Vicor produced a number of Engineering Change Orders ("ECOs") reflecting changes to the accused products during the pendency of the stay. Vicor states Dr. Dickens opines, in conclusory fashion, that these ECOs "[did] not alter any of [his] analysis or opinions regarding those part numbers." *Id.* at 3 (quoting Dkt. No. 382-13, ¶ 10). Vicor contends Dr. Dickens has not provided sufficient technical support or reasoning to show that any

8

accused bus converter, after the changes in the ECOs, operates in an infringing manner. *Id*. (citing Second Suppl. Habetler Rep., ¶ 13).

Regarding the second main issue (whether SynQor has met its summary judgment burden of demonstrating that all end products from these seven customers satisfy the "end product" limitations), Vicor states Dr. Dickens' assumption – that all accused Vicor bus converters are used in IBA circuits where the output of each bus converter is used to power two or more non-isolated regulation stages – was shown to be incorrect by Dr. Habetler. *Id*. at 4. Vicor points out that SynQor acknowledges Vicor has disputed at least one IBM product that uses its bus converters, stating IBM has incorporated accused Vicor bus converters in non-IBA circuits that do not satisfy all of the "end product" limitations defined by SynQor. *Id.* Additionally, prior to the stay, Cisco replaced its infringing unregulated converters with regulated converters ("New CPNs") from a non-Vicor supplier, casting "doubt on SynQor's assumption that all of Cisco's bus converter purchases from Vicor were utilized in end products that would satisfy the asserted claims, because Cisco had a definitive non-infringing substitute in the New-CPNs that it was able to use in the place of the accused Vicor bus converters at least by 2014." *Id.* at 5-6. Vicor also contends there are issues with the declarations issued by Micron, Infinera, and Unitest "that are troublesome to Dickens' analysis." *Id.* at 6 (further asserting the ALU and Juniper declarations suffer from similar deficiencies). Finally, Vicor argues there are factual issues regarding the timing of when end-customers incorporated Vicor converters into allegedly infringing end-products. *Id.* at 7.

Regarding the third main issue (whether SynQor has met its summary judgment burden regarding Vicor bus converters with transition times less than or equal to 20%), Vicor asserts as follows:

9

> SynQor's former expert, Dr. Leeb, only identified turn-on and turn-off events in three-specific devices and provides no explanation of how waveforms in other CRs show the required switch timing. Ex. 1 ¶ 230. The conclusory opinions set forth by Dr. Dickens adopting those opinions fare no better because Dr. Dickens did not conduct any independent testing and adopted Dr. Leeb's opinions whole-cloth without reading all of the associated materials. This should be considered by the jury when evaluating whether SynQor has carried its burden of proving infringement.

*Id.* at 10.

In its reply, SynQor asserts as follows regarding the first main issue - whether it has met its summary judgment burden of demonstrating that the accused Vicor converters satisfy all of the other bus converter limitations besides the "in synchronization" and short "transition times" limitations:

> **None of Vicor's three purported "issues" precludes partial summary judgment on the identified bus converter limitations:** Vicor's first and second "issues" regarding the bus converter limitations attack SynQor's experts' "testing approach" and alleged deficiencies in their Miller-like plateau (MLP) analysis. Dkt. 439 ("Opp'n") at 2-3, 8. But this testing and analysis is directed at the "in synchronization" limitation, *which SynQor expressly excluded from its motion*. Dkt. 389 ("Mot.") at 7. The actual limitations at issue are component limitations (windings, stages, rectifiers, power MOSFETs, etc.) whose infringement analysis does not depend on that testing, or are limitations like "fixed duty cycle" that Vicor concedes are met by its converters. *See* Mot. App. B; Ex. 1, Montminy 30(b)(6) Tr. at 31:7-24 (Dec. 11, 2013) (conceding fixed duty cycle met).[4] The same is true of the quoted Dr. Habetler criticisms: they too target SynQor's "in synchronization" analysis and are thus beside the point. *See*, e.g., Opp'n Ex. 1 at 133-34 (discussing "conclusions concerning the 'in synchronization' limitation"), ¶ 195 (introducing section discussing "in synchronization" limitation that continues to ¶ 285).

---

[4] During the deposition of Steven Montminy, Vicor's Rule 30(b)(6) representative, SynQor's counsel asked Mr. Montminy to characterize the degree to which the duty-cycle of Vicor's bus converter is fixed. Dkt. No. 469-2 at 31:7-9. Mr. Montminy testified as follows: "We don't design our products with duty-cycle. That's not a key characteristic of our products. Duty-cycle is not a concern." *Id*. at 31:11-13. When further asked whether any of Vicor's bus converters modulate their duty-cycle to control the output towards a predefined value, Mr. Montminy stated no, explaining Vicor is "an unregulated DC-to-DC converter." *Id*. at 31:14-24.

According to Vicor's surreply, rather than Mr. Montminy's above testimony conceding that the fixed duty cycle is met, Mr. Montminy unequivocally replied "no" to the question regarding whether each of "Vicor's bus converters operate at a fixed duty-cycle." Dkt. No. 496 at 1, n. 1 (citing Dkt. No. 469-2 at 30:7-10).

> Vicor's third "issue" is that Dr. Dickens failed to provide "sufficient" technical analysis regarding ECOs for Vicor's accused bus converters that were released during the stay. But Dr. Dickens *did* analyze the ECOs, as Vicor admits, and found that nothing in the ECOs affects his prior infringement analysis. Ex. 2 ¶¶ 9-10; Opp'n at 3. Vicor/Dr. Habetler were free in response to identify any changes that they contend affect the infringement analysis, but neither did—because there are none. *Id.*, Ex. 4 ¶¶ 11-14. Having failed to identify any actual, specific changes in the ECOs and/or actual opinions from Dr. Habetler that they matter, Vicor's third "issue" does not preclude summary judgment. SynQor's motion set forth its *prima facie* evidence regarding the bus converter limitations, Mot. at 3-4, and Vicor has failed to identify any specific evidence in opposition establishing a material factual dispute.

Dkt. No. 469 at 1 (emphasis original) (footnote added). Regarding the third main issue, SynQor asserts partial summary judgment is warranted on the converters listed in appendix regarding the short "transition times" limitation. According to SynQor, Vicor references only "in synchronization" related testing issues, which are "immaterial to this limitation." *Id.*

Regarding the second main issue, SynQor asserts Vicor has not raised a genuine dispute with respect to the end product limitations, noting SynQor moves for summary judgment only with respect to the seven end customers' products for which it has direct evidence of infringement. *Id.* at 2. Specifically, SynQor further contends as follows:

> Dr. Habetler's reports are silent as to whether the products identified in Appendix A use the accused Vicor converters in an infringing IBA topology. Dr. Habetler never says, for example, that what SynQor identifies as a "DC power source" or as "non-isolated" "switching regulators" in a particular end product schematic do not meet those limitations. Vicor's hodge-podge of arguments cannot alter that fundamental evidentiary failing. Opp'n at 4-10.
>
> Further undermining Vicor's position, Cisco conceded that "all" of its end products incorporating the IBC030E01-00, IBC060Q01-B2, and IBC070Q01-01/B2 Vicor bus converters meet the end product limitations at issue here. Case No. 2:14-CV-286, Dkt. 288 at 9-10 & App. A. And while Vicor cites Dr. Dickens' [sic] "concession" that Micron end products may not always use Vicor *BCM* converters in IBA, Opp'n at 5-6, SynQor's motion only addresses Micron's use of accused Vicor *IBC* converters, *not* the BCMs. *See* Mot. App. A at 9-10 (listing IB048E120T40N1-00 only). Similarly lacking is Vicor's contention that *other* unidentified end products preclude summary judgment. Other third-parties' alleged use of the accused converters or Cisco's use of non-Vicor converters says

11

>nothing about the end products at issue in SynQor's motion. Opp'n at 4-6 (citing Ex. 1 ¶¶ 180-183, 366-388). Likewise, Vicor's disparaging characterizations of its customers' declarations and procedural squabbles, Opp'n at 10, do not create genuine factual disputes. Nor does the *number* of infringing end products (Mot. at 1 n.2) – that is a separate issue for trial. In short, Vicor lacks *evidence* raising material disputes, thus warranting summary judgment on these limitations for these end products.

*Id.* (emphasis in original).

In its surreply, Vicor argues Dr. Habetler's critique of Dr. Leeb's "fundamentally flawed" testing "called into question the adequacy of Dr. Leeb's analysis across the board." Dkt. No. 496 at 1. Vicor asserts SynQor does not dispute that Dr. Leeb repeated "identical language for three tested product types and then extrapolate[d] his sweeping conclusions to over one hundred product types." *Id*. (further stating Dr. Dickens failed to conduct any independent testimony of the accused products beyond only two of the accused devices). Specifically regarding SynQor's "transition times" limitation, Vicor contends "SynQor has not provided sufficient evidence by which a jury could conclude that the three tested devices were representative of all the accused products." *Id*. at 2. According to Vicor, even if the testing was adequate, "there are genuine issue of fact as to whether you can extend those test results to all the products that SynQor's experts claim they 'represent.'" *Id.*

**B.     Analysis**

SynQor asserts it is appropriate to grant partial summary judgment with respect to accused products meeting the limitations of certain claims or parts of claims. Dkt. No. 389 at 6-7 (citing *Elantech Devices Corp. v. Synaptics*, *Inc.*, Civil Action No. C 06-01839-CRB, 2008 WL 2008627, at *7-8 (N.D. Cal. Apr. 16, 2008) (granting in part and denying in part patentee's motion for partial summary judgment seeking only a determination that certain elements of the accused

products "meet the limitations of the corresponding claims of Synaptics's patents");[5] also citing *SynQor, Inc. v. Artesyn Techs, Inc.*, Civil Action No. 2:07-cv-497-TJW-CE, Dkt. Nos. 752, 753, 754, 760 (E.D. Tex. Dec. 10, 2010) (partial summary judgment granted on some of the same patents at issue in this motion)). In the '497 case, SynQor filed motions for partial summary judgment against various defendants in that case. The motions were similar to the motions filed in the '286 case and current '287 case.

For example, in its motion for partial summary judgment relating to infringement by the Lineage/Cherokee defendants, SynQor attached three appendices to its motion and argued the case could be "simplified by avoiding the need to present the jury with complex evidence on matters that are not genuinely disputed." '497 case, Dkt. No. 540 at 1. Like in this case, SynQor referred to the detailed evidence contained in the expert report of Dr. Leeb, and the materials and claim charts cited therein, and argued Lineage/Cherokee raised only a limited number of disputes.

In the Lineage/Cherokee defendants' response, the defendants argued the "conclusory nature" of SynQor's motion "leaves it to this Court to wade through SynQor's 200-plus page expert report on infringement (along with the report's 1,500-plus pages of related claim charts and appendices), plus hundreds of pages of other materials, in search of evidence to support the broad relief SynQor requests" in its proposed order, some of which was not even addressed within the motion itself. '497 case, Dkt. No. 605 at 1. Independent of its procedural deficiencies, the defendants asserted SynQor was not entitled to the summary judgment relief it sought.

---

[5] As noted by the court in *Elantech*, a "district court should approach a summary judgment motion on the factual issue of patent infringement with great care." *Elantech Devices Corp. v. Synaptics*, *Inc.*, No. C 06-01839-CRB, 2008 WL 2008627, at *6 (N.D. Cal. Apr. 16, 2008) (citing *Amhil Enterprises Ltd. v. Wawa, Inc.,* 81 F.3d 1554, 1557 (Fed.Cir.1996)). The court further noted that "conflicting expert testimony can create a genuine issue of material fact, compelling the court to deny the motion." *Id.* (citations omitted). According to the court, "summary judgment may be granted if an expert's "unsupported conclusion on the ultimate issue of patent infringement is insufficient to raise a genuine issue of material fact." *Id.* (citing *Arthur A. Collins, Inc. v. Northern Telecom Ltd.,* 216 F.3d 1042, 1048 (Fed.Cir.2000)).

Through a series of short orders, District Judge Ward granted in part and denied in part several motions for partial summary judgment filed by SynQor against various defendants in that case, including SynQor's motion against Lineage/Cherokee. Using the order regarding Lineage/Cherokee as an example, there Judge Ward, noting he would issue a more detailed memorandum opinion at his earliest convenience, denied SynQor's motion as to certain limitations in certain claims and granted SynQor's motion as to other limitations. '497 case, Dkt. No. 574.

In the '286 case against Cisco, District Judge Schneider took a different approach to the issue, which had been referred to Magistrate Judge Craven. As in the '497 case, SynQor filed several motions for partial summary judgment, asserting "Cisco's accused products meet almost all of the claims limitations at issue; all but the few to which Cisco potentially raises a genuine issue of material facts." '286 case, Dkt. No. 195 (Hearing Transcript) at 5:12-16. SynQor argued it filed the motions "to obtain an order that the undisputed limitations are met, so that the parties need not waste trial time addressing all those limitations before the jury." *Id*. at 6:19-24. SynQor's counsel pointed out that Judge Ward, in the '497 case, "granted just such orders, one for each defendant in that case, finding that all the undisputed limitations, as to each defendant, were met. . . ." *Id*. at 6:25-7:3. SynQor further noted that Cisco agreed, in its surreply, that such an order would be proper here. *Id.* at 7:12-14.

SynQor acknowledged at the hearing that Cisco disputed in its briefing "the regulation portion of the multiple, nonisolated regulation stage limitations," and alternatively asserted the court should "still grant summary judgment, as to all the other limitations." *Id.* at 11:9-13. According to SynQor, it would "save a great deal of trial time," and absent such an order, it "would have to spend countless hours at trial, putting on expert testimony, walking through each

of the undisputed claim elements, for each of the many accused products, incorporating old CPNs." *Id.* at 11:15-20. Regarding the asserted claims against Cisco load boards incorporating Vicor new CPNs, SynQor argued Cisco did not raise a genuine dispute as to all but three limitations (the "in sync," "short transition time" and "substantially uninterrupted flow of power" limitations). *Id*. at 14:12-22. According to SynQor, the court should at least grant summary judgment on all the "undisputed limitations and remove those from consideration at trial; otherwise, SynQor [would] be prejudiced, taking up a substantial amount of trial time, walking through each of the undisputed limitations, establish they are met, so that SynQor can establish its record." *Id*. at 16:16-23.

At the hearing, Cisco reiterated it did not have any objection to an order clarifying that certain undisputed limitations were, in fact, undisputed; however, it did have some concerns. *Id.* at 17:9-18:8. Judge Craven asked if this was something the parties could have addressed through stipulation. *Id*. at 18:9-12. Cisco's counsel stated this is "the kind of thing the parties should be able to agree on to clear out the actually disputed terms," noting it had provided SynQor with a list of the undisputed terms which were not the subject of any genuine dispute for validity purposes. *Id.* at 23:7-11. Cisco also requested that the parties should agree on the terms that Cisco would not have to present at trial. *Id*. at 23:12-16.

Judge Craven entered a Report and Recommendation in the '286 case, recommending SynQor's motions be denied. '286 case, Dkt. No. 185. Although she agreed it was appropriate for the parties to simplify the case regarding undisputed claim limitations, she found the issues could have and should have been resolved by joint stipulations by the parties rather than in a motion for partial summary judgment as filed by SynQor. *Id.* at 4. SynQor filed objections to the R&R. Judge Schneider adopted the R&R, noting the decision of whether to grant partial summary judgment

15

on only certain elements of a party's claim in order to simplify issues for trial is left to the discretion of the Court. *See* '286 case, Dkt. No. 213 at 3. Judge Schneider ordered the parties to continue to meet and confer regarding which claims limitations were satisfied by the accused products and to file a joint stipulation as to the undisputed limitations highlighted by SynQor in its hearing handouts. *Id*. at 4.

In the '497 case, SynQor's motions for partial summary judgment were decided directly by the District Judge in anticipation of a trial involving eleven defendants and seventy accused bus converter families including over 400 distinct accused part numbers used in more than 500 unique end products. Here, the case involves one defendant and two remaining patents; thus, the argument for simplification is much less persuasive.

What is more, the Court does not believe that SynQor has met its summary judgment burden. Even if it had, the Court is not convinced Vicor fails to show a genuine issue of material fact in response. Whereas in the '286 case Cisco agreed there were undisputed claim limitations that could be resolved by the parties through stipulations, Vicor disputes SynQor's motion in its entirety. Vicor relies on, among other things, Dr. Habetler's opinions and challenges to the testing and methodology of SynQor's experts. While the disputes concerning the testing center on the "in synchronization" limitation not at issue in this motion, Vicor argues it is entitled to question the adequacy of Drs. Leeb and Dickens' analysis across the board. Even though the Court has denied Vicor's *Daubert* challenges, Vicor is entitled to raise those challenges through cross examination at trial.

With the briefing before the undersigned, it is recommended SynQor's motion for partial summary judgment be denied. However, the Court agrees with SynQor that the parties (and the Court) should know well in advance of trial which claim limitations are in genuine dispute. The

16

Court intends to address the issue at the October 5, 2022 pretrial conference. In order to streamline those discussions, the Court ORDERS the parties to meet and confer, within seven days from the date of entry of this Report and Recommendation, regarding a joint stipulation as to any undisputed limitations highlighted by SynQor in its appendices.[6] The parties shall file a joint status report and joint stipulation on or before October 3, 2022 at 8:30 a.m. Based on the foregoing, it is

**RECOMMENDED** that SynQor's Motion for Partial Summary Judgment Finding Vicor's Accused Products and Certain End Customer Products Incorporating Them Meet Undisputed Claim Limitations (Dkt. No. 389) be **DENIED**.

Objections

Within fourteen (14) days after receipt of the magistrate judge's report, any party may serve and file written objections to the findings and recommendations of the magistrate judge. 28 U.S.C.A. 636(b)(1)(C). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.

A party's failure to file written objections to the findings, conclusions and recommendations contained in this Report within fourteen days after being served with a copy shall bar that party from de novo review by the district judge of those findings, conclusions and recommendations and, except on grounds of plain error, from appellate review of unobjected-to

---

[6] The Court expects a good faith conference, wherein the identified disputed limitations are those that Vicor intends to challenge with either countervailing evidence or specific questions concerning SynQor's proof. Any limitation that is not legitimately and specifically disputed should be stipulated to.

factual findings and legal conclusions accepted and adopted by the district court. *Douglass v. United Servs. Auto. Ass'n.*, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc), superseded by statute on other grounds, 28 U.S.C. § 636(b)(1) (extending the time to file objections from ten to fourteen days).

Further, it is **ORDERED** the parties to meet and confer, within seven days from the date of entry of this Report and Recommendation, regarding a joint stipulation as to any undisputed limitations highlighted by SynQor in its appendices. The parties **SHALL** file a joint status report and joint stipulation on or before **October 3, 2022 at 8:30 a.m**.

SIGNED this the 16th day of September, 2022.

_____
J. Boone Baxter
UNITED STATES MAGISTRATE JUDGE