1              IN THE UNITED STATES DISTRICT COURT

2             FOR THE EASTERN DISTRICT OF TEXAS

3                      MARSHALL DIVISION

4   SYNQOR, INC.,                )(

5       PLAINTIFF,               )(    CIVIL ACTION NO.

6                                )(    2:14-CV-287-RWS

7   VS.                          )(    MARSHALL, TEXAS

8                                )(

9   VICOR CORPORATION,           )(    OCTOBER 25, 2022

10      DEFENDANT.               )(    8:46 A.M.

11              TRANSCRIPT OF JURY TRIAL

12      BEFORE THE HONORABLE ROBERT W. SCHROEDER III

13             UNITED STATES DISTRICT JUDGE

14  FOR THE PLAINTIFF:      Mr. Thomas D. Rein
                            Ms. Stephanie P. Koh
15                          Mr. Paul J. Rogerson
                            Sidley Austin, LLP
16                          One South Dearborn
                            Chicago, Illinois 60603
17
                            Mr. Harry L. "Gil" Gillam, Jr.
18                          Gillam & Smith, LLP
                            303 South Washington Avenue
19                          Marshall, Texas 75670

20  COURT REPORTER:         Ms. Shelly Holmes, CSR, TCRR
                            Official Court Reporter
21                          Honorable Robert W. Schroeder III
                            United States District Judge
22                          Eastern District of Texas
                            Texarkana Division
23                          500 North State Line Avenue
                            Texarkana, Texas 75501
24                          shelly_holmes@txed.uscourts.gov

25  (Proceedings recorded by mechanical stenography, transcript
    produced on a CAT system.)

```
 1    FOR THE PLAINTIFF:        Mr. Michael D. Hatcher
                                Mr. Phillip M. Aurentz
 2                              Mr. Michael L. Roberts
                                Sidley Austin, LLP
 3                              2021 McKinney Avenue
                                Suite 2000
 4                              Dallas, Texas 75201

 5
      FOR THE DEFENDANT:        Mr. Sean S. Pak
 6                              Quinn Emanuel Urquhart &
                                Sullivan, LLP
 7                              50 California Street
                                22nd Floor
 8                              San Francisco, California 94111

 9                              Mr. David A. Nelson
                                Quinn Emanuel Urquhart &
10                              Sullivan, LLP
                                191 N. Wacker Drive
11                              Suite 2700
                                Chicago, Illinois 60606
12
                                Ms. Robin L. McGrath
13                              Quinn Emanuel Urquhart &
                                Sullivan, LLP
14                              1050 Crown Pointe Parkway
                                Suite 500
15                              Atlanta, Georgia 30338

16                              Mr. Patrick T. Schmidt
                                Mr. Lance L. Yang
17                              Quinn Emanuel Urquhart &
                                Sullivan, LLP
18                              865 S. Figueroa Street
                                10th Floor
19                              Los Angeles, California 90017

20                              Mr. Deron R. Dacus
                                The Dacus Firm, PC
21                              821 E.S.E. Loop 323
                                Suite 430
22                              Tyler, Texas 75701

23                              Mr. Eric H. Findlay
                                Mr. R. Brian Craft
24                              Findlay Craft, PC
                                102 N. College Avenue
25                              Suite 900
                                Tyler, Texas 75702
```

1          P R O C E E D I N G S

2          (Jury out.)

3          COURT SECURITY OFFICER:  All rise.

4          THE COURT:  Please be seated.

5          Good morning, everyone.

6          I apologize for the slight delay.  There's always

7     a lot of last-minute things to tend to with respect to the

8     instructions, and we're making some final changes to them

9     right now.

10          I reviewed the motion that was filed by SynQor at

11     the close of the Defendant's case yesterday.  I know that a

12     response to it was filed on the docket later in the

13     afternoon or early evening.  I've had an opportunity to

14     read those.  Be happy to hear any arguments the party --

15     parties wish to make now, though.

16          Mr. Rogerson?

17          MR. ROGERSON:  Good morning, Your Honor.

18          THE COURT:  Good morning.

19          MR. ROGERSON:  The premise of our motion

20     fundamentally is that we think Vicor, through the evidence

21     at trial, has not presented a legally sufficient

22     evidentiary basis for a jury to find in its favor on its

23     state law counterclaims.

24          Vicor had the opportunity to try these claims.  It

25     offered proof, and it came up short.

1    Under Massachusetts law, based on the cases we

2    cited in our brief, Vicor needs to show some kind of actual

3    damage that it suffered as an element of both of its

4    claims.  Massachusetts law is clear on that point.

5    Now, if Vicor has proven that there was some kind

6    of actual damage but can't quantify the amount of it, then

7    perhaps it would be entitled to recover nominal damages as

8    a remedy.  But that's only if as an element of the claims,

9    it first proves some kind of actual damages.  Proof of

10   actual damage is an essential element under Massachusetts

11   law.  And the testimony that Vicor offered at trial doesn't

12   establish that.

13   Vicor called its witness, Mr. Davies, and

14   attempted to put some proof in.  But the testimony

15   Mr. Davies offered was brief, speculative, it was

16   conclusory, had no specific facts, concrete proof, and much

17   of it was ultimately excluded by Your Honor as hearsay.

18   This situation is fundamentally what judgment as a

19   matter of law is for when a party presents a claim but

20   fails to offer evidence on an essential element of that

21   claim, and, therefore, a reasonable jury could not find in

22   its favor.

23   And if Your Honor had questions about the parties'

24   briefing, I'd be delighted to answer them.

25   THE COURT:  I don't.  Thank you, Mr. Rogerson.

1          MR. ROGERSON:  And perhaps I'll make one final

2    comment before I sit down.

3          THE COURT:  Yes.

4          MR. ROGERSON:  Which is I believe Vicor in its

5    response noted that there are various types of actual

6    injuries, the party could suffer financial injury,

7    reputation, goodwill.

8          We're not clear from our point of view whether the

9    case law really establishes that, but we just wanted to

10   make clear our view that even full stop crediting that view

11   of what could count as an actual injury, we believe there's

12   been a fundamental failure of proof to establish any of

13   those things based on the record.

14         Thank you, Your Honor.

15         THE COURT:  Thank you, Mr. Rogerson.

16         Mr. Dacus?

17         MR. DACUS:  Thank you, Your Honor.  Since counsel

18   was focused on the damages issue, I'll focus on that, also.

19         The law is clear under Massachusetts for both

20   claims, Your Honor, that reputational harm or what the

21   cases call adverse effect is sufficient, and neither of

22   those must be quantified -- they are quantified here, and

23   I'm going to talk about it, but they need not be quantified

24   for the cause of action to survive.

25         The jury can award nominal damages.  The cases are

1    absolutely clear on that point.  I heard counsel say that

2    they weren't clear on whether or not that's the law.  We

3    cited the Court to multiple cases.  I've seen none from the

4    other side.

5         We absolutely put on evidence, at least through

6    Mr. Davies, directly saying there was reputational harm,

7    that there was adverse effect.

8         This confidential information, which by the way,

9    it's essentially undisputed that Mr. Davies testified this

10   information that was shared was confidential.  Indeed,

11   SynQor's own policies classify this information such as

12   customer lists, pricing, forecasts, trends.  SynQor's own

13   policies identify that information as confidential.

14        That information was shared within SynQor to its

15   salespeople, and then also shared to third parties.

16        Mr. Davies unequivocally testified that there was

17   reputational harm and adverse effect generally, but then he

18   also went on to specifically testify -- and by the way,

19   this testimony was not excluded -- that there was specific

20   discussions with Raytheon, Fujitsu, and Cisco, three

21   specific customers.

22        We put into evidence, and it's undisputed through

23   the OM report, that one tab -- at least one tab of that OM

24   report had potential forecasted customers.  The annual

25   amount of those sales were $29 million, thus quantifying

1    the potential harm.

2          In addition, Mr. Davies's testified and it's

3    unrebutted that in his experience as a long-tenured sales

4    person that somewhere between 1 and 10 percent of that

5    annual $29 million may have been adversely affected by the

6    disclosure of this confidential information.

7          So in the end, Your Honor, the bar for these two

8    claims, both statutory and common law in Massachusetts, is

9    low.  Nominal damages may be awarded.  They're sufficient.

10   Adverse effect and reputational harm is sufficient.

11         But, here, we also have quantifiable damages in

12   the record that are essentially undisputed at this point.

13         And so for that reason, Your Honor, we would ask

14   that the Court deny SynQor's motion.

15         THE COURT:  Thank you, Mr. Dacus.

16         MR. DACUS:  Thank you.

17         THE COURT:  Anything else, Mr. Rogerson?

18         MR. ROGERSON:  Yes, Your Honor.

19         Just a few points, Your Honor, quickly.

20         First of all, I want to be clear, our brief and

21   our position I think is that Massachusetts law is clear

22   that nominal damages may be awarded only if there's proof

23   offered of some actual injury.  It doesn't mean the injury

24   has to be quantified, but it has to be proven that it

25   exists.

1          For example, if a customer was lost and it's

2     proven that a customer was lost and the amount of business

3     that customer might have provided in the future is

4     uncertain or hasn't been quantified, perhaps in that kind

5     of scenario, nominal damages would be available.

6          But if there's no proof of any underlying actual

7     injury in the first place, that's an element of the claims,

8     nominal damages cannot be awarded.

9          On the forms of proof that counsel discussed, I

10    just want to note that even at the podium, its proof is

11    couched in speculative terms, potential loss, customers may

12    have departed.  There's no concrete proof in the record

13    that any customer believe the statements Vicor points to

14    ceased to do business with Vicor as a result of it.

15         If Vicor wanted to prove its case, there are

16    multiple ways to do it.  Could have called the customer to

17    testify, could have taken the deposition of even one

18    customer, done an analysis of any kind, its sales, its

19    business record, put in its own business records into

20    evidence, the way the parties prove their cases -- prove

21    their case for other claims in this case.  None of that has

22    happened here, Your Honor.

23         And, finally, we'll just note in our papers, we

24    think for at least Chapter 93, in particular, there's a

25    fundamental issue of whether Vicor's claims have the

1    necessary connection to the state of Massachusetts, and we

2    believe the papers present that argument.

3            Thank you, Your Honor.

4            THE COURT:  Thank you.

5            MR. DACUS:  Very briefly, Your Honor.

6            I'm confident I probably don't need to say this to

7    the Court, but on this issue of specific harm, Mr. Davies

8    testified specifically that with respect to Raytheon, that

9    they do business -- "they" being Vicor -- does business

10   with Raytheon all over the country except in one particular

11   location, and that is in -- within a Texas division of

12   Raytheon where SynQor actually has that business.  There's

13   specific testimony on that issue.

14           In addition, there was video deposition from

15   Ms. Biskamp, who was the Kruvand third-party seller for

16   SynQor, and she specifically testified that there was a

17   Vicor attack list at Kruvand and that that Vicor attack

18   list was used to target Vicor customers, and that that

19   Vicor attack list came from the confidential OM report.

20           It's hard to imagine more specific testimony and

21   more specific instances of harm.

22           That's all I have on that, Your Honor.  And we

23   certainly believe that we've met the small or evidentiary

24   burden that Massachusetts law requires.

25           THE COURT:  Thank you, Mr. Dacus.

```
 1              MR. DACUS:  Thank you, Your Honor.

 2              THE COURT:  Okay.  As I said, I carefully reviewed

 3    the motion for judgment as a matter of law on the state law

 4    counterclaims.  That was Docket No. 719.  I reviewed the

 5    response filed by Vicor last evening.  That was Docket

 6    No. 722.

 7              In preparation for that motion and in light of the

 8    parties' arguments, I also reread pertinent sections of the

 9    R&R by Judge Baxter denying summary judgment on these

10    issues.  His R&R is found at Docket No. 626.

11              And I want to say just a couple of things.

12              When considering a motion for judgment as a matter

13    of law, I'm required to review all of the evidence that's

14    in the record drawing all reasonable inferences in favor of

15    the non-movant, giving credence to evidence that supports

16    the movant that is uncontradicted and unimpeached.

17              I also have to refrain from making any credibility

18    determinations or weighing the evidence.  Those are

19    functions of the jury, of course.

20              A JMOL should be granted when there's no legally

21    sufficient evidentiary basis for a reasonable jury to find

22    on an issue on which that party has been fully heard.  And

23    that usually happens in one of two types of situations.

24              The first where there is a complete absence of

25    pleading or proof on an issue that is material to the claim
```

1   or the defense, or in the second situation, where there's

2   really no controverted issue of fact on which reasonable

3   persons could differ.

4           If the evidence construed in the light most

5   favorable to the non-moving party allows only one

6   reasonable conclusion, judgment of a -- as a matter of law

7   is proper.  However, if reasonable minds could differ as to

8   the significance or importance of the evidence, JMOL should

9   be denied and the case submitted to the jury.

10          On this motion, having considered the filings by

11  the parties and the arguments made, I am of the opinion

12  that SynQor's motion should be granted.

13          First, regarding Vicor's tortious interference

14  claim, Vicor has not established actual damages.  Vicor has

15  not shown loss of money or property, real or personal, as a

16  result of SynQor's conduct.

17          Instead, in the filings last night -- filing last

18  night and again in argument this morning, Vicor focuses on

19  Mr. Davies's testimony that it would be reasonable to

20  expect that Vicor lost business over SynQor's conduct.  And

21  I don't think that that type of inference is sufficient

22  enough to establish actual damages as required by law.

23          With respect to the 93A claim, Vicor has failed to

24  rebut SynQor's showing that the actions allegedly giving

25  rise to the claim are not primarily and substantially

1   within the commonwealth of Massachusetts.

2          Instead, Vicor's focus has been on the fact that

3   both parties manufacture converters in Massachusetts, and I

4   think that focus is misplaced because it is not the

5   manufacturing or the locus of the manufacturing that gives

6   rise to the claim.

7          In this case, it is the use of allegedly overly

8   aggressive sales tactics, but based on the evidence I

9   recall, all of those actions took place in Texas.

10          So that will be my ruling.  SynQor's judgment --

11   motion for judgment as a matter of law on the state court

12   counterclaims is granted.

13          With respect -- Mr. Dacus?

14          MR. DACUS:  Your Honor, may I say something just

15   for completeness of the record, and I understand the

16   Court's ruling and accept it.

17          With respect to that Section 93 claim, so that the

18   record is clear, the testimony was, at least in part, that

19   Mr. Weeks, who was the purveyor of the confidential

20   information, gave a presentation in Boxborough,

21   Massachusetts.  The Court may recall that there's an email

22   asking him to come to a sales meeting in Boxborough,

23   Massachusetts in order to deliver to the other salespeople

24   within SynQor the confidential information that not only he

25   had given to SynQor but that he was aware of.

1          So I understand the Court saying, you know,
2    there's evidence of manufacturing, but there is additional
3    evidence in the record at least that -- in that particular
4    instance -- and by the way, Mr. Weeks testified by video
5    deposition that he actually attended that meeting and that
6    he actually presented to the sales people at SynQor related
7    to that information.
8          So that is -- those are facts in the record.  I
9    want to make sure that's clear because I understand the
10   basis of the Court's ruling, at least as to the Section 93
11   claim relates to the locus of the accused infraction.  So I
12   wanted to get that on the record, Your Honor.
13         Thank you.
14         THE COURT:  All right.  Very well, Mr. Dacus.
15         With respect to the motion for judgment as a
16   matter of law that I think was filed very, very early this
17   morning, Docket 725, there's not been a response filed to
18   that, obviously.
19         The parties wish to be heard on that motion?
20         MR. SCHMIDT:  Your Honor, we'll respond orally.
21         Docket 725 is SynQor's motion for judgment as a
22   matter of law on the infringement issues.
23         We contend there's substantial evidence for this
24   jury to find non-infringement on the record presented.
25         First, there's evidence that not all elements of

1   the asserted claims have been met.  For example, there were

2   errors in the methodology of SynQor's expert that were

3   highlighted to the jury.  There was a failure of SynQor's

4   expert to test at least three of the five representative

5   products that the parties stipulated to.

6        It's undisputed that the majority of the products

7   did not literally infringe the short transitions

8   limitation, or the products that do not literally infringe

9   the short transitions limitation, SynQor is relying on the

10  Doctrine of Equivalents.

11       However, their expert admitted that the function

12  of the asserted claims is different from the purported

13  function of the accused devices.

14       There's also substantial evidence to find that

15  Vicor did not intend to induce or contribute to the

16  infringing acts.  For example, there's evidence that Vicor

17  held a good faith belief of non-infringement, that Vicor

18  has fundamentally different technology, that Vicor

19  practices its own patents, that SynQor did not believe that

20  Vicor infringed the patents, as shown by its delay in

21  bringing the lawsuit, its exclusion of Vicor from the 497

22  case.

23       There's also evidence in the record that Vicor

24  expressly took actions to avoid infringement, which also

25  negates the intent for infringement, that is embodied in

1  the documents that were sent to Cisco in the lengthening

2  transition times in response to the 497 verdict.

3          So based on all these facts, we think that there

4  is substantial evidence to find non-infringement, and, in

5  fact, we have a cross-motion for our own judgment as a

6  matter of law that no reasonable jury could find

7  infringement on this record.

8          THE COURT:  And has that been filed yet?

9          MR. SCHMIDT:  It has, Your Honor.  I don't have

10  the docket number handy, but I can track it down.

11          THE COURT:  Understood.  That's fine.

12          Any response?

13          MR. HATCHER:  Your Honor, we stand on the papers.

14          THE COURT:  Okay.  I think you all have made your

15  record.  Your filings are in.  I think on this issue,

16  unlike the previous issue, I think that the appropriate

17  ruling here is to carry the motion for judgment as a matter

18  of law.

19          Obviously, depending on how the verdict turns out,

20  the parties, of course, may file renewed motions for

21  judgment as a matter of law under Rule 50, and at that

22  point, a more careful, considered scrutiny of the record

23  will be -- and the transcript of the testimony will be

24  available.

25          So that will be my ruling as to that.

1806

1    Any questions about either of those rulings?

2    MR. PAK:  No, Your Honor.

3    MR. REIN:  No, Your Honor.

4    THE COURT:  Okay.  We have completed jury

5    instructions.  We spent a fair amount of time in the

6    courtroom yesterday afternoon going through jury

7    instructions, have looked through all of those.

8    The parties did attempt to resolve some

9    differences.  I don't think there was any substantial

10   movement to that end.

11   And so I've made decisions based on what I think

12   is the correct instruction on each of the areas where we

13   had disagreement.

14   And we will distribute those now.

15   Mr. Schmidt, Ms. Hausman, Mr. Rogerson, if you all

16   would familiarize yourself with them, you'll see what we've

17   done.  We'll give you plenty of time to look through those.

18   If you want to put objections on the record before

19   we do closings, I think there should be time to do that.

20   We'll just kind of see where we are.

21   So you all take a few minutes, review all those,

22   and when you're ready to go back on the record, we can do

23   that.  Fair enough?

24   MR. PAK:  Thank you, Your Honor.

25   THE COURT:  All right.  Thank you all.

1        (Recess.)

2        THE COURT:  Okay.  We are back on the record.

3        We've distributed copies of the final

4   instructions.  Be happy for the parties to put their

5   objections on the record at this time or any typos, knits,

6   anything like that that we've missed or duplicative

7   sentences or the like.

8        So whoever wishes to go forward, please do so.

9        MR. SCHMIDT:  Your Honor, Vicor generally has

10   three objections, and maybe we could go back and forth.

11   I'm going to start with the one that's most important to

12   us.

13        This is on Page 31 to 32 of the jury instructions.

14   And this is the instruction to the jury that the jury is

15   not to consider any evidence they heard relating to the

16   counterclaims.

17        And I previewed some of this yesterday, Your

18   Honor.  The issue here is that the evidence that the jury

19   heard related to the counterclaims goes to multiple issues

20   in the case, including the intent for indirect infringement

21   and the intent required for willfulness.

22        And let me just put this into context.  The

23   allegation has been made in this case that Vicor was

24   performing competitive analysis on SynQor, and Vicor felt

25   like it was falling behind technologically.  There was an

1   email up there about our 10-plus year technology cannot

2   compete with SynQor products, and because of that, we're

3   motivated to copy their products and intentionally infringe

4   the patents.

5           And the fact that SynQor was doing this sort of

6   activities that were alleged in the counterclaims at this

7   time is relevant to putting that information into context

8   because it begs --

9           THE COURT:  Well, why is that?  Help me understand

10  why.

11          MR. SCHMIDT:  Sure, Your Honor.

12          If it is true that Vicor honestly felt like its

13  10-plus year technology was falling behind and couldn't

14  keep up with SynQor's technology, then why is it that

15  SynQor was doing these activities out in the marketplace?

16  Why is it that they had to take sales information --

17  confidential sales information and use it in the way that

18  they did?

19          If they really -- if SynQor really had a

20  competitive advantage in terms of technology, then we

21  wouldn't see the types of things that we see in the

22  counterclaim evidence.

23          So this is evidence that rebuts at a minimum those

24  sorts of allegations that have been made.  It goes directly

25  to the issues of willfulness.  It goes directly to the

1   issues of intent that's required for indirect infringement.

2          It also goes to issues of witness credibility.

3          THE COURT:  So help me understand how that goes to

4   Vicor's intent.  It may go to SynQor's intent, but how does

5   it go to Vicor's intent?

6          MR. SCHMIDT:  Well, it rebuts their allegation

7   that we had intent to infringe their patent, Your Honor.

8          So their theory is, is that because we were --

9   their theory is because they think we were -- or they think

10  we think that we were falling behind technologically that

11  we were motivated to intentionally infringe their patents.

12         It's simply not true, and all you have to do is to

13  look at their conduct in the marketplace.  Because the way

14  they were behaving in the marketplace is completely

15  inconsistent with the idea that we were technologically

16  inferior, and, therefore, we had to resort to infringing

17  their patents intentionally.

18         So for that reason, this evidence really is

19  intertwined with all of the intent issues in the case.

20         THE COURT:  Well, so I guess the question I would

21  have for you, then, Mr. Schmidt, is there a way to modify

22  that instruction to take those concerns into account?

23         MR. SCHMIDT:  Let me take a look at it, Your

24  Honor.

25         MR. PAK:  Yes, Your Honor, may I approach?

1      THE COURT:  Yes, of course.

2      Maybe adding the word "solely."

3      MR. PAK:  Yes, solely for the --

4      THE COURT:  Between "evidence" and "relating."

5      MR. PAK:  Yes, disregard any evidence -- well, I

6   think you should just say, Your Honor, that the Court has

7   granted judgment as a matter of law in SynQor's favor in

8   these claims.  You should disregard -- you should not

9   consider such evidence only for the purpose relating to the

10  counterclaims, but they may be used for other purposes in

11  your evaluation of the claims.

12     THE COURT:  Okay.  Well, let me --

13     MR. PAK:  Or something like that.

14     THE COURT:  You all think about that.

15     MR. PAK:  Yeah.

16     THE COURT:  Maybe let me hear from SynQor before

17  we --

18     MR. PAK:  Yeah, and also just one more note, Your

19  Honor.

20     Obviously, we're going to be appealing these

21  issues on the counterclaims, Your Honor.  We understand

22  that Your Honor has made a ruling, but we're going to be

23  obviously appealing these issues.

24     THE COURT:  Sure, sure.

25     MR. PAK:  One thing I -- because it may be

1  confusing to the jury, one thing we might say is,

2  accordingly, this issue has been resolved by the Court.

3  However -- so you should, therefore, disregard any evidence

4  relating to these counterclaims for the sole purpose of the

5  counterclaims, but you could consider -- you should -- you

6  may consider such evidence for other purposes in this case.

7          Something along those lines, Your Honor.

8          But I think it is -- given that this issue hasn't

9  been fully resolved and we're going to have to appeal these

10  issues -- and one thing I don't want to do is have to come

11  back and have to retry the case because there was some type

12  of reversal on that issue.

13          And I think that it simply, Your Honor --

14          THE COURT:  Is there a way for the instruction to

15  avoid that --

16          MR. PAK:  Yes.  I --

17          THE COURT:  -- potential result?

18          MR. PAK:  Well, I'm not sure that there's a way to

19  resolve it completely, Your Honor, but I think that at

20  least with respect to the instruction, we do think it would

21  be prejudicial since we don't have final resolution on

22  these claims to say that the Court has granted judgment as

23  a matter of law in SynQor's favor in these claims because

24  they may not understand that there's an appeal process.

25          Instead, it may be more appropriate to say

1    basically that instead of going to this, this issue has

2    been resolved, you may not consider the evidence you heard

3    relating to the counterclaims for the purposes of assessing

4    counterclaims because that issue has been resolved, but you

5    may consider such evidence for other purposes in this case.

6         And I think that would resolve the issues that we

7    have with the instruction.

8         THE COURT:  Okay.  Thank you, Mr. Pak.

9         Let me hear from Mr. Gillam.

10        MR. GILLAM:  Your Honor, the Court has granted

11   judgment as a matter of law on this issue, first of all,

12   and whether or not this is an issue that goes up on appeal

13   or not, here's the problem that we face, and it's not only

14   with this particular instruction, but it goes to what's

15   coming next, and that's the argument in this case, and they

16   are intertwined here.

17        They spent hours, literally hours trying to paint

18   SynQor as an unethical player in this whole relationship

19   between SynQor and Vicor.

20        The conduct of SynQor in this case has nothing to

21   do with any issue now remaining before this jury, none.

22   SynQor's conduct -- SynQor's intent is not at issue in this

23   case.  This evidence that they want to put in is not

24   relevant in any way to willfulness.  Willfulness deals with

25   their conduct, not with the conduct of SynQor.

1          THE COURT:  Well, Mr. Schmidt's argument is that

2     the evidence goes to rebut the -- SynQor's argument about

3     willfulness and the intent that Vicor had.

4          MR. GILLAM:  It is all about SynQor -- sorry, Your

5     Honor, it's all about Vicor's intent.  It doesn't rebut

6     anything.

7          Let's talk about the reality of what they're

8     trying to do here, and it's what they've tried to do since

9     this case began, and that is to try to make it a case of an

10    unethical behavior on the part of one party versus the

11    ethical behavior on the part of another party.

12         They shouldn't be able -- number one, the

13    instruction is correct.  Number two, they shouldn't be able

14    to argue one thing about what you have now taken out of the

15    case, either expressly or by implication.

16         It doesn't rebut anything.  It is their conduct

17    with -- which is at issue with respect to willfulness, not

18    the conduct of SynQor.  It doesn't rebut anything.  It has

19    nothing to do with rebuttal of anything.

20         You want to talk about competition between the

21    parties, that's what happened here.  But they're -- what

22    they want to do now is, even though the Court has taken

23    this issue out of the case, they want to come back in and

24    say, let's argue again, we're going to spend all our time

25    talking about the conduct of SynQor, even though the Court

1  has taken the issue out of the case correctly, and that is

2  simply wrong.

3       The instruction is exactly what it ought to be in

4  this case.  The Court's granted the motion, and they

5  shouldn't consider any evidence.

6       Not only that, you shouldn't hear any argument

7  with respect to this because it is not relevant to any

8  issue in this case.

9       And if the Court allows that type of argument,

10  we're right back to where we were before.  We've got enough

11  of a problem already.  They've already put the skunk in the

12  jury box.  It's already out there, it's there.  They spent

13  hours doing it.

14       Now, whether or not we can pull it back out simply

15  by not having them talk about it, that's something we're

16  just going to have to find -- that's something we're going

17  to have to find out.

18       But this instruction is correct, but I would take

19  it a step further, and they shouldn't be able to talk about

20  it either.

21       THE COURT:  Okay.

22       MR. PAK:  May I respond, Your Honor?

23       THE COURT:  Of course.

24       MR. PAK:  First of all, it is SynQor's burden to

25  prove intent for most, if not all, of the issues of

1815

```
 1   liability, as Your Honor is going to instruct the jury,

 2   whether it's induced infringement, 27(f)(2).

 3           They're also the ones alleging willful

 4   infringement by Vicor.  So they're saying -- they're taking

 5   the same kind of evidence of competitive analysis, of

 6   reverse engineering products, even suggestions that somehow

 7   they were taking information relating to SynQor's products

 8   and using it to compete unfairly.  That is part of their

 9   willfulness allegations.

10           And at a minimum, we should be allowed to put all

11   of that in context, and we would be allowed to do so.

12           But to now -- and, Your Honor, this issue did come

13   up with Judge Baxter, where we made this point to Judge

14   Baxter, that the core evidence -- and this is one of the

15   reasons why he did allow, as a recommendation, to allow the

16   counterclaims issues to be tried together, and that's why

17   we presented the evidence in a cohesive fashion.

18           It is true, Your Honor -- and as I understand

19   Your Honor's ruling on why it's not going to the jury, it's

20   purely on the damages issue with respect to the

21   Massachusetts statutory and counter -- and state law

22   claims.

23           Just because Your Honor is finding today that as a

24   matter of legal sufficiency, that damages may not have been

25   proven with enough facts doesn't discount the relevance of
```

1  all the rest of the evidence that shows that SynQor engaged

2  in the same, if not even more egregious, behavior with

3  respect to Vicor.  They should be able to assess that in

4  the full context of their willfulness and their intent

5  claims against us.

6         And at a minimum, as Mr. Schmidt pointed out, this

7  goes to the credibility of the witnesses and the parties.

8  For SynQor to argue today, as they have done throughout the

9  case, that we somehow willfully infringe their patents,

10 that we somehow intended infringement to occur by simply

11 taking publicly available data sheets, doing publicly

12 available analysis of products, and then to try to fashion

13 an intent and willfulness claim, we should be able to say,

14 wait, SynQor itself engaged in very similar behavior and,

15 if not, took that one step further in trying to obtain

16 price lists and so on.

17        They've already heard the evidence, Your Honor.

18 We're not going to make it a focus of our closing.  You'll

19 see this.

20        THE COURT:  Are you going to make it any part of

21 your closing?

22        MR. PAK:  With respect to the pricing and the

23 damages issues, you're going to hear very little of that.

24 What we are going to be arguing really is about the whole

25 issues in the case, and we understand Your Honor's point

 1   about that.

 2           But, for example, there has been other evidence

 3   that is not related to the counterclaims that obviously we

 4   will present as part of our closing.

 5           But I do think here, this is about the jury

 6   instruction, Your Honor.  The jury instruction is can --

 7   take the issue, the underlying issue and -- out of the

 8   jury's hands because Your Honor has made a finding that

 9   there's no legally-sufficient basis of damages, which is

10   the only issue here because this is to avoid the confusion.

11           We tried the case with the counterclaims in the

12   case.  Your Honor needs to resolve that somehow, and I

13   think that, you know, we can work out some language, Your

14   Honor, for your proposal.

15           THE COURT:  I just -- I -- okay.

16           MR. PAK:  And I do think, certainly, they should

17   be instructed in some fashion that some of the evidence can

18   be considered for other purposes.

19           THE COURT:  Got you.

20           MR. NELSON:  So just let me clear one thing up so

21   there's no -- I'm actually doing that --

22           THE COURT:  Good.  I'm waiting for someone to

23   clear it up, Mr. Nelson.

24           MR. NELSON:  -- that part of the closing, Your

25   Honor, and I have no intention whatsoever of mentioning

1 this Kill Vicor, the OM Associates spreadsheet, which is

2 what that evidence was focused on.  I'm not going to do it.

3 It's not going to happen.

4         THE COURT:  Okay.  Well, that solves that.

5         My concern is, I think the jury has heard it

6 repeatedly for the last week, and, you know, we can't do

7 anything about that, but I do think that some explanation

8 is necessary so that they'll understand what the context

9 is.

10         I just think that's -- I think that goes without

11 saying.  I think they have to be told something.

12         MR. PAK:  Yes, Your Honor.  And we have no

13 problems with that.

14         What we're saying, Your Honor, is that this

15 language -- because so much of the evidence is intertwined,

16 that I think you can make that point, Your Honor, without

17 saying that you should consider -- you should not consider

18 it for any purpose whatsoever.

19         That's just not -- we have to be able to rely on

20 providing a contextual defense against inducement and

21 willfulness allegations in this case.  And we need to be

22 able to contrast their behavior and conduct, and this is --

23 to show that what they have said about willfulness and

24 intent is, in fact, inconsistent with their own behavior

25 and their own conduct.  And that's the point that we're

1    making, Your Honor.

2         And so we understand that we're not asking the

3    jury to make a counterclaim finding.  And as Mr. Nelson

4    said, he's not going to mention that.

5         But I do think that this instruction, as written,

6    is problematic for the reasons I stated, and we would

7    suggest some additional modifications.  I do think they

8    need to hear something about it, but I just don't think

9    this instruction, from our perspective, is the right way to

10   convey what's happened.

11        THE COURT:  Understood, Mr. Pak.

12        MR. PAK:  Thank you.

13        THE COURT:  Mr. Gillam?

14        MR. GILLAM:  Your Honor, Mr. Rein is going to be

15   arguing, I'm not doing any of it.  So if he wants to say

16   something, that's fine as well.

17        The problem is it's not intertwined with anything.

18   The issues before the jury now are the conduct -- the

19   allegations of willfulness, the conduct of these folks, not

20   the conduct of SynQor.

21        And what they want to try to do is exactly --

22   Mr. Pak just said it -- we want to talk about balancing the

23   conduct, we want to talk about conduct between the parties

24   and stuff.  That is not the issue that's now going to be

25   before this jury at all.  It's not intertwined with

1    anything.

2          They should disregard any evidence related to the

3    counterclaims.  Remember what the counterclaims are, that

4    are these state law counterclaims that they filed that the

5    Court has now taken out of the case.  That's the only thing

6    this evidence really goes to.

7          So if Mr. Rein wants to add something to that,

8    that's fine with me.  But that's -- basically, there is no

9    intertwining between the issues.  It is simply an effort to

10   try to do what they've done the whole trial, and it's to

11   throw it right back over there again and talk about it even

12   though they don't have an issue on it anymore.

13         THE COURT:  Mr. Rein?

14         MR. REIN:  Your Honor, it sounds like what Mr. Pak

15   wants to do is imply that Your Honor is going to resolve

16   the issue and that the state law counterclaim issue remains

17   for your resolution.  That's false, and it would continue

18   to put the skunk in the jury box against our interest.

19         Secondly, Your Honor, I think they're

20   mischaracterizing what our intent argument is.  Our

21   argument is that they were put on notice of our lawsuit,

22   put on notice that we were asserting a patent against 11

23   Defendants, and then they buried their head in the sand.

24         As far as responding to their arguments, we were

25   responding to their state law arguments.

1          The evidence that we put in that their products
2    were old, that was responding to their point that their
3    products are so great, so wonderful that we have to commit
4    unfair competition against them.  That was the real genesis
5    of all that.
6          And so what they're basically doing is they're
7    saying, because we had to respond to their legally invalid
8    counterclaims, they should be able to do even more.
9          And respectfully, Your Honor, I think the evidence
10    that they're trying to put in remains just as prejudicial
11    today as it was back then, and that needs to be rectified.
12    They shouldn't be able to argue any further the state law
13    claims and the evidence relating thereto.
14          Thank you.
15          THE COURT:  Thank you, Mr. Rein.
16          MR. PAK:  I think we can just -- so Your Honor has
17    the proposal from us.  If the question is about whether
18    Your Honor is going to resolve it or it's been resolved, I
19    think Your Honor can simply say the Court has resolved the
20    counterclaim issue and just leave it at that.
21          Because the reality is, it wasn't just about the
22    497 case.  Dr. Dickens spent close to, by my count, 30, 40
23    minutes walking through our analysis of data sheets, our
24    reverse engineering of products in his mind, all to try to
25    establish intent and willfulness.

1           So this isn't just about intent, it's about

2     willfulness.  They put all of that evidence in.  We should

3     be able to say that at least in the context of those

4     claims, that SynQor's own conduct was substantially the

5     same.  And that goes to the core of what we're talking

6     about.

7           So I think Your Honor can say simply that you've

8     heard some evidence relating to the counterclaims, the

9     Court has resolved that issue, and just leave it at that,

10    and I think that takes care of all the issues that I have.

11          MR. GILLAM:  If I could be heard on that, Your

12    Honor, briefly.

13          THE COURT:  Yes, sir.

14          MR. GILLAM:  That makes it look like it could have

15    been resolved in Vicor's favor if you do if that way.  What

16    it could say or what it should say is this -- number one,

17    we believe the instruction is exactly right like you've got

18    it written here.

19          But you could say:  Accordingly, the Court has

20    resolved the matter in SynQor's favor on these claims.

21          If they don't like "judgment as a matter of law,"

22    you could say resolved in SynQor's favor on these claims.

23    But to not put the second part in there about disregarding

24    the evidence regarding this lets them do exactly what

25    they've been doing before, and that's talk about all this

1    mess that now has -- that shouldn't have been in there in

2    the first place but now it gives them the ability to do it

3    again.

4              THE COURT:  Mr. Pak, how about resolve these

5    claims in SynQor's favor?

6              MR. PAK:  That's fine, Your Honor.  And I think we

7    should leave the rest of it out, because Your Honor's

8    finding isn't that we had legally insufficient basis on

9    other things, it's about the damages.

10             THE COURT:  So I want you to make your record on

11   this point, Mr. Pak, because I am going to give the

12   instruction.  I do think if we can use language along the

13   lines of "the issue has been resolved in SynQor's favor,"

14   that may alleviate some of your concerns.

15             I am going to instruct the jury that they should

16   disregard any evidence related to the counterclaims, and

17   I'm -- I think it is appropriate to modify that slightly to

18   say:  You should, therefore, disregard any evidence solely

19   related to these counterclaims in rendering your verdict.

20             MR. PAK:  We understand, Your Honor.  Thank you.

21             THE COURT:  And so I'll make the modification.

22             MR. PAK:  And we obviously do object to that, Your

23   Honor, for the lines --

24             THE COURT:  Of course.

25             MR. PAK:  Yes, thank you.

 1          THE COURT:  Of course.

 2          All right.  Mr. Schmidt, you had a couple of other

 3   things.  Can we -- is it something that we can -- the

 4   parties can agree to argue after we've done instructions

 5   and closings?  It's now 10:00 a.m.

 6          MR. SCHMIDT:  So long as that preserves the

 7   record, that's fine.

 8          THE COURT:  Any objection to that, SynQor?

 9          MR. ROGERSON:  No, Your Honor.  Although, there

10   are two -- just two matters we would like to raise before

11   that happens.

12          THE COURT:  I need you to go to the podium,

13   Mr. Rogerson.

14          MR. ROGERSON:  Your Honor, no objection to that

15   procedure from SynQor.  Although, in the same spirit, there

16   are two matters we'd like to raise beforehand, if that's

17   possible.

18          THE COURT:  Is it something that, again, can't be

19   resolved under the same agreement that we've just made with

20   Vicor?

21          MR. ROGERSON:  Yes, Your Honor.  Just two things,

22   we think, before the charge goes to the jury, we'd just

23   like to raise quickly.

24          THE COURT:  Briefly.

25          MR. ROGERSON:  Briefly, yes, Your Honor.

```
 1            Number one -- sorry, could I have the copy of the
 2   instructions?
 3            THE COURT:  Mr. Rogerson, the jury is waiting.  Is
 4   this really not something that we can --
 5            MR. ROGERSON:  I'm sorry, Your Honor, just two
 6   points quickly.
 7            On Page 9, I believe there's a paragraph regarding
 8   the counterclaims that's been inadvertently included in the
 9   instructions.
10            THE COURT:  Ah, you're right.  Thank you.  That
11   needed to be resolved.
12            MR. ROGERSON:  Yes, Your Honor.  Thank you.
13            And then Matter No. 2 is on Page 19.  This is the
14   271(f)(2) instruction, we believe, as written, it doesn't
15   contain a willful blindness element, and we think that's an
16   important and substantial issue.  And so at least to
17   Element 4, willful blindness should be added.
18            THE COURT:  Yes.  Thank you, Mr. Rogerson.
19            MR. PAK:  Your Honor, we did -- our understanding
20   of the law, Your Honor, is that we do need to at least
21   state the objections briefly before the jury instructions
22   are read.  So Mr. Schmidt is going to make that record for
23   us --
24            THE COURT:  That's fine.
25            MR. PAK:  Thank you.
```

1        MR. SCHMIDT:  So the objections, Your Honor, are

2   on Page 18, 19, and 20 of the jury instructions.

3        The mention of Vicor not relying on advice of

4   counsel in relation to the contributory inducement and

5   willfulness claim, Vicor objects to that mention.

6        And then --

7        THE COURT:  Can you cite me to a particular page

8   and paragraph?

9        MR. SCHMIDT:  Yes, Your Honor.  At the very top of

10  Page 18, relating to the inducement instruction, there's

11  some language stating that the jury should consider the

12  totality of the circumstances, including Vicor's -- I'm

13  paraphrasing here, but Vicor's not obtaining the advice of

14  counsel opinion.

15       I mean, we object to any mention of advice of

16  counsel as part of the totality of circumstances in the

17  context of inducement, contributory and willfulness.

18       And then on Page 19 for the 271(f)(2) instruction,

19  we would propose some clarifying language to the intent and

20  knowledge requirements that would make clear that the

21  knowledge and intent that's required is knowledge and

22  intent to actually cause the product to infringe.

23       And like I said, our objections are stated more

24  fulsome in our underlying briefing.

25       THE COURT:  Thank you, Mr. Schmidt.

1    MR. SCHMIDT:  Thank you, Your Honor.

2    MS. HAUSMAN:  And, Your Honor, the parties agree

3  that we believe it's necessary to read in the remaining

4  exhibits for Monday, if I can do that.

5    THE COURT:  Okay.

6    MS. HAUSMAN:  Those exhibits are:  DTX-0275,

7  DTX-0426, DTX-0433, DTX-0465, DTX-0467, DTX-0472, DTX-0480,

8  DTX-030 (sic), DTX-0632, DTX-0634, DTX-0660, DTX-0661,

9  DTX-0860, DTX-0861, DTX-1314, DTX-1443, DTX-1444, DTX-1458,

10  PTX-1520, PTX-1496, and PTX-1499.

11    THE COURT:  Thank you.

12    MR. HATCHER:  And, Your Honor --

13    THE COURT:  Mr. Hatcher, would you go to the

14  podium, please, sir?

15    MR. HATCHER:  Yeah, Your Honor.  My apologies.

16    THE COURT:  No, thank you.

17    MR. HATCHER:  One correction.  I think it's

18  DTX-0630.  At one point, that was said incorrectly.

19    Other than that, we agree, Your Honor.

20    THE COURT:  Okay.  Ms. Hausman, is that right?

21    MS. HAUSMAN:  That is an exhibit.

22    THE COURT:  Okay.  Thank you, Mr. Hatcher.

23    MR. ROGERSON:  I'll be extremely brief, Your

24  Honor.

25    Objections for SynQor on Page -- on Page 17,

1    Element 3, SynQor objects to the language "took deliberate

2    steps to avoid learning of that infringement."

3            And SynQor would propose as an alternative

4    instruction the language "deliberately avoided confirming

5    that belief."

6            Next, Your Honor, on Page 18, SynQor would make

7    the same objection to the same language, "took deliberate

8    actions to avoid learning of the infringement," and propose

9    the same alternative language.

10           On Page 31, Your Honor, SynQor objects to the

11   reasonable royalty license comparability instruction.

12   SynQor believes those instructions are not necessary in

13   this case.

14           On the same page, SynQor objects to the reasonable

15   royalty apportionment instruction and believes that the

16   first sentence of that instruction is adequate.

17           And one last objection, Your Honor, on Page 14,

18   SynQor objects to the sentence:  "The comparison of the

19   accused products to SynQor products or to Vicor patents

20   may, however, be relevant to issues concerning Vicor's

21   intent to infringe."

22           SynQor believes that sentence is not an accurate

23   statement of law.

24           Thank you, Your Honor.

25           THE COURT:  Could I ask you to go back to Page 19?

1829

1    You mentioned --

2              MR. ROGERSON:  Yes, Your Honor.

3              THE COURT:  -- on the 271(f)(2) instruction that

4    there's not an element on willful blindness.  What's your

5    authority?  Can you cite me, what's your support for that?

6    Factor 4?

7              MR. ROGERSON:  Yes, Your Honor.  Sorry, one

8    moment.

9              Yes, Your Honor.  So if you look in our

10   Footnote 37, and in particular the second paragraph of that

11   footnote, we cite a number of cases with prior jury

12   instructions, and I believe if you look at those case,

13   you'll find the elements are similar to the ones that we've

14   proposed.  In each of those cases, a similar instruction

15   was given.

16             THE COURT:  Okay.  All right.  Mr. Schmidt, you

17   want to say anything about that?

18             MR. SCHMIDT:  I don't know if this would resolve

19   the issue, Your Honor, but there's some language at the

20   very end of the inducement and the contributory

21   infringement sections that talk about measuring Vicor's

22   culpability against its knowledge and intent at the time.

23             And then there's a whole paragraph that goes on

24   from there.  I think if we could include an analogous

25   paragraph at the end of the 271(f)(2) section, then that

1 might address the issue that SynQor has, and it would also

2 go partially towards addressing the objection that I stated

3 previously.

4         THE COURT:  Mr. Rogerson?

5         MR. ROGERSON:  Your Honor, I think our challenge

6 there is that for the other two infringement instructions,

7 both inducement and contributory, willful blindness is

8 included in the listed element instructions as part of

9 Vicor's knowledge.  (f)(2) has the same knowledge element,

10 but it doesn't include that instruction.

11         THE COURT:  Well, that --

12         MR. ROGERSON:  We think that's appropriate.

13         THE COURT:  That language is actually not in the

14 statute, is it?

15         MR. ROGERSON:  Willful blindness I think isn't in

16 any of the statutes, Your Honor.

17         THE COURT:  And so in the cases, I'm not -- I

18 don't know which cases you cited, if it was Lone Star or

19 the Papst case or which cases were cited in that footnote

20 that you've referred me to, but I just -- the parties may

21 have agreed to it, I'm just -- I'm concerned about adding

22 that.

23         MR. ROGERSON:  Yeah, I think our concern, Your

24 Honor, is that the willful blindness standard comes from a

25 recent Supreme Court decisions on knowledge and intent, and

1    it's, you know, standardly given in these instructions.

2         It appears in the elements of both (b) and (c),

3    and our concern is that -- if it's not given in this

4    instruction, that's an important issue.

5         You know, and it was actually in both parties'

6    instructions, the entire time, in September, in our Sunday

7    submission, and then I think this was Vicor's submission

8    last night at around 8:00 p.m. for the first time ever took

9    it out, and our concern is if it stays out and goes to the

10   jury.

11        THE COURT:  Okay.  And just to be clear,

12   Mr. Schmidt, does Vicor oppose including that language that

13   Mr. Rogerson has requested?

14        MR. SCHMIDT:  Can I hear the specific language and

15   where it would be placed?

16        MR. ROGERSON:  Yes, I think just roughly what we

17   would have in mind would be -- so we're on Page 19,

18   Element 4:  Vicor knew the component was made or adapted

19   for use in a product that would directly infringe the

20   SynQor patents if it were used in the United States or

21   believed there is a high probability that the component was

22   made or adapted for use in a product that would directly

23   infringe the SynQor patents if it were used in the United

24   States -- and, here, I'm just using the language your Court

25   has already selected for the other instructions to which

```
 1   SynQor has objected -- and took deliberate actions to avoid

 2   learning of the infringement.

 3           THE COURT:  Is that okay with --

 4           MR. SCHMIDT:  We object to that, Your Honor.  It's

 5   not in the statute.

 6           THE COURT:  You do object to that?  Okay.

 7           All right.  Anything else, Mr. Rogerson?

 8           MR. ROGERSON:  Just to preserve our record on that

 9   issue, we also prefer the language we had previously

10   suggested, which we can provide more fulsomely, but we want

11   to focus on that issue.

12           Thank you, Your Honor.

13           THE COURT:  Thank you.

14           Okay.  Anything else?

15           We'll take a short recess.  I want to do a little

16   work on the instruction related to the counterclaim issue.

17   We'll make the change as indicated where the paragraph on

18   the counterclaims was inadvertently left in.  And as soon

19   as we do that, we will be back and go on the record with

20   the jury.

21           All right.  Thank you all.

22           MR. PAK:  Thank you.

23           (Recess.)

24           COURT SECURITY OFFICER:  All rise.

25           THE COURT:  All right.  Please be seated.
```

1          All right.  We have completed work on the

2    instructions.  We're giving each side a copy now.  We're

3    making additional copies as we speak.

4          We'll go ahead and begin with the jury, and as the

5    additional copies are made, we'll bring those in and pass

6    those out so that you'll have multiple copies at your

7    table.

8          Anything before we have the jury brought up?

9          MR. PAK:  Not for the Defendants, Your Honor.

10          MR. GILLAM:  No, Your Honor.

11          THE COURT:  If you would, have the jury brought

12   up, Mr. Latham.

13          COURT SECURITY OFFICER:  All rise.

14          (Jury in.)

15          THE COURT:  Please be seated.

16          Good morning, ladies and gentlemen.  And welcome

17   back.  I think fall has finally arrived.  I hope you

18   enjoyed your early afternoon yesterday.

19          I apologize for the little bit of the late start

20   we're getting this morning.  There are always last-minute

21   issues that I have to resolve with the attorneys outside

22   your presence, and we've been hard at it here in the

23   courtroom, but it just took a little longer than I think

24   certainly I expected.

25          As you know, what remains to be done at this point

1   are the instructions I'm now about to give you on the law

2   that you must follow in your deliberations on your verdict,

3   and then we'll take a short recess.

4         And, actually, depending on what time it is, we

5   probably will have you all go ahead and eat lunch, and once

6   you've finished that, we'll come back and do closing

7   arguments.

8         I'm going to go through the instructions with you

9   now.  It will take a little bit of time.  You all are free

10  to take notes as I go through the instructions if you wish

11  to do so.

12        But I want you to understand that each of you will

13  have a copy of the instructions for your own use when you

14  get back to the jury room.  So feel free to take whatever

15  notes you want, but you'll -- each of you will have your

16  own copy when deliberations begin.

17        Members of the jury, you've heard the evidence in

18  this case.  The parties were given limited time in which to

19  present their cases, and each side received the same amount

20  of time to present their evidence.

21        I am now going to instruct you on the law that you

22  must apply.

23        Each of you, as I said, will have your own

24  personal copy of the final instructions that I am giving

25  you now orally.

1       It's your duty to follow the law as I give it to

2  you.  You should not single out any instruction as alone

3  stating the law, but you should consider my instructions as

4  a whole when you retire to deliberate.

5       On the other hand, you, the jury, are the judges

6  of the facts.  Do not consider any statement that I have

7  made in the course of the trial or make in these

8  instructions as an indication that I have any opinion about

9  the facts of the case.

10      After I instruct you, the attorneys will present

11  their closing arguments.  And as a reminder, as I told you

12  at the beginning of the case, the statements and the

13  arguments made by the attorneys are not evidence and are

14  not instructions on the law.  They are intended only to

15  assist the jury in understanding the evidence and the

16  contentions of the parties.

17      At the beginning of the trial, I gave you some

18  general instructions and definitions, and I'm now going to

19  repeat those to aid you in your deliberations.

20      A verdict form has been prepared for you, and you

21  will take the form with you to the jury room.  And when you

22  have reached a unanimous agreement as to your verdict, the

23  foreperson of the jury will fill in, date, and sign the

24  form.

25      You should answer the question on the verdict form

1    from the facts as you find them.  You should not decide who

2    you think should win and then answer the questions

3    accordingly.

4             Your answer and your verdict must be unanimous.

5             Facts must be proved by a required standard of the

6    evidence that's known as the burden of proof.  And in this

7    case, there are two burdens of proof that apply,

8    preponderance of the evidence and clear and convincing.

9             When a party has the burden of proof on any claim

10   or defense by a preponderance of the evidence, it means

11   that you must be persuaded by the evidence that the claim

12   or affirmative defense is more likely true than not true.

13   And you should base your decision on all of the evidence,

14   regardless of which party presented it.

15            When a party has the burden of proof on any claim

16   or defense by clear and convincing evidence, that means

17   that the evidence must persuade you that it is highly

18   probable that the facts are as the party contends.  In

19   other words, clear and convincing evidence means that the

20   evidence produced is in your mind a firm belief or

21   conviction as to the matter at issue.

22            The clear and convincing evidence standard

23   requires greater proof than is necessary for the

24   preponderance of the evidence standard.

25            Again, you should base your evidence -- your

1   decision on all of the evidence, regardless of which party

2   presented it.

3        The evidence you are to consider includes:  The

4   sworn testimony of any witness; the exhibits received into

5   evidence; and any facts that the parties have stipulated

6   to, which I will go over with you in just a moment.

7        The following items are not evidence, and you

8   should not consider them as evidence in deciding the facts

9   of the case:  The statements and the arguments of the

10  attorneys; questions or objections by the attorneys; any

11  testimony that I've instructed you to disregard; and

12  anything that you may see or hear when the Court's not in

13  session, even if what you see or hear is done or said by

14  one of the parties or by one of the witnesses.

15       While you should consider only the evidence in the

16  case, you are permitted to draw such reasonable inferences

17  from the testimony and exhibits as you feel are justified

18  in light of common experience.

19       In other words, you may make deductions and reach

20  conclusions that reason and common sense lead you to draw

21  from the facts that have been established by the testimony

22  and evidence in the case.

23       The testimony of a single witness may be

24  sufficient to prove any fact, even if a greater number of

25  witnesses may have testified to the contrary, if after

1  considering all of the evidence, you believe that single

2  witness.

3          There are two types of evidence that you may

4  consider in properly finding the truth as to the facts in

5  this case.  One is direct evidence, such as the testimony

6  of an eyewitness; the other is indirect or circumstantial

7  evidence, which is the proof of a chain of circumstances

8  that indicates the existence or nonexistence of certain

9  other facts.

10          As a general rule, the law makes no distinction

11  between direct and circumstantial evidence but simply

12  requires that you find the facts from all of the evidence,

13  both direct and circumstantial, regardless of the burden of

14  proof involved.

15          Do not let bias, prejudice, or sympathy play any

16  part in your deliberations.  A corporation and all other

17  persons are equal before the law and must be treated as

18  equals in a court of justice.

19          The Court has assigned numbers to the trial

20  exhibits, and you should not construe any significance to

21  those exhibit numbers.  Certain exhibits have been shown to

22  you as illustrations, and we call these types of exhibits

23  "demonstrative exhibits."

24          Demonstrative exhibits are a party's description

25  or picture or model to describe something that's involved

1    in the trial.  If your recollection of the evidence differs

2    from the exhibit, you should rely on your recollection.

3           While demonstrative exhibits may have been helpful

4    to you in determining the issues, the demonstrative

5    exhibits of both parties are not evidence or proof of any

6    facts.  And if they do not correctly reflect the evidence

7    in the case, you should disregard these demonstrative

8    exhibits and determine the facts from the underlying

9    evidence.

10          Demonstrative exhibits not admitted into evidence

11   will not be available to you during your deliberations.

12          You are the sole judges of the credibility or

13   believability of each witness and the weight to be given to

14   each witness's testimony.

15          An important part of your job will be making

16   judgments about the testimony of the witnesses.  You should

17   decide whether you believe all or any part of what each

18   person had to say and how important that testimony was.

19          In weighing the testimony of the witnesses, you

20   may consider the witness's manner and demeanor on the

21   witness stand, any feelings or interests they may have had

22   in the case, or any prejudice or bias about the case that

23   he or she may have had, and the consistency or

24   inconsistency of his or her testimony when considered in

25   the light of the circumstances.

1        Has the witness been contradicted by other

2  credible evidence?  Has he or she made statements at other

3  times and places contrary to those made here on the witness

4  stand?

5        You must give the testimony of each witness the

6  credibility that you think it deserves.  Even though a

7  witness may be a party to the action and, therefore,

8  interested in the outcome, the testimony may be accepted if

9  it is not un -- if it is not contradicted by direct

10  evidence or by any inference that may be drawn from the

11  evidence if you believe that testimony.

12        In making up your mind and reaching your verdict,

13  do not make any decisions simply because there were more

14  witnesses on one side than the other.

15        Do not reach a conclusion on a particular point

16  just because there were more witnesses testifying for one

17  side on that point.

18        In determining the weight to give to the testimony

19  of your witness, you should ask yourself whether there was

20  evidence tending to prove that the witness testified

21  falsely about some important fact, or, whether there was

22  evidence that at some other time, the witness said or did

23  something or failed to say or do something that was

24  different from the testimony that he or she gave at trial.

25        You should keep in mind, of course, that a simple

1  mistake by a witness does not necessarily mean that the

2  witness was not telling the truth as he or she remembers

3  it, because people may forget some things or remember other

4  things inaccurately.

5          So if a witness has made a misstatement, you need

6  to consider whether that misstatement was an intentional

7  falsehood or simply an innocent lapse of memory, and the

8  significance of that may depend on whether it has to do

9  with an important fact or with only an unimportant detail.

10          When technical or other specialized knowledge may

11  be helpful to the jury, a person who has special training

12  or experience in that field, called an expert witness, is

13  permitted to state his or her opinion on those matters.

14  However, you're not required to accept that opinion.  As

15  with any other witness, it's up for -- it is up to you to

16  decide whether to rely upon an expert's opinion.

17          Certain testimony was presented to you in the form

18  of a deposition, and a deposition is the sworn, recorded

19  answers to questions that were asked of a witness in

20  advance of the trial.

21          Under certain circumstances, if a witness cannot

22  be present to testify from the witness stand or the parties

23  agree otherwise, those witnesses' testimony may be

24  presented under oath in the form of depositions.

25          And some time before this trial, the attorneys

1   questioned the witness -- witnesses under oath.  A court

2   reporter was present and recorded the testimony.

3          This deposition testimony is entitled to the same

4   consideration and is to be judged by you as to the

5   credibility and weighed and otherwise considered by you

6   insofar as possible in the same way as if the witness had

7   been present here and testifying from the witness stand in

8   court.

9          It's the duty of the attorneys on each side of the

10  case to object when the other side offers testimony or

11  other evidence that the attorney believes is not properly

12  admissible.

13         Upon allowing testimony or other evidence to be

14  admitted over the objection of an attorney, I do not and

15  did not, unless expressly stated, indicate any opinion as

16  to the weight or the effect of such evidence.

17         As I've said before, the jurors are the sole

18  judges of the credibility of all the witnesses and the

19  weight and the effect of all of the evidence.

20         When the Court sustained an objection to a

21  question that was addressed to a witness, the jury must

22  disregard the question entirely and may draw no inference

23  from the wording of it or speculate as to what the witness

24  would have said if permitted to answer the question.

25         If the objection was overruled, you may treat the

1   answer to that question just as you would treat the answer

2   to any other question.

3        During the trial, I may not have let you hear the

4   answers to some of the questions that the lawyers asked, I

5   also may have ruled that you cannot see some of the

6   exhibits that the lawyers wanted you to see.  And sometimes

7   I may have just ordered you to disregard things that you

8   saw or heard.

9        You must completely ignore all of these things as

10  I've instructed you to disregard or to ignore.  Do not

11  speculate about what a witness might have said or what an

12  exhibit might have shown.  These things are not evidence,

13  and you are bound by your oath not to let them influence

14  your decision in any way.

15       At times during the trial, it was necessary for

16  the Court to talk with the lawyers here at the bench

17  outside of your hearing or by calling a recess and talking

18  to them when you were out of the room.

19       This happened because often during a trial,

20  something comes up that does not involve the jury, and you

21  should not speculate on what was said during such

22  discussions that took place outside of your presence.

23       Any notes that you all may have taken during the

24  trial are only aids to your memory.  If your memory should

25  differ from your notes, you should rely on your memory and

1    not on the notes.  Your notes are not evidence.  And a

2    juror who has taken no notes should rely on his or her own

3    independent recollection of the evidence and should not be

4    unduly influenced by the notes of other jurors.

5         Notes are not entitled to any greater weight than

6    the recollection or impression of each juror about the

7    testimony.

8         At the beginning of the trial, I gave you some

9    specific -- at the beginning of the trial, I gave you some

10   general information about patents and the patent system and

11   a brief overview of the patent laws that are relevant to

12   this case.

13        I will now briefly review the contentions of the

14   parties' and give you more detailed instructions about the

15   patent laws that specifically relate to this case.

16        The Plaintiff in this case is SynQor,

17   incorporated, referred to as the "Plaintiff" or "SynQor."

18        The Defendant in the case is Vicor Corporation,

19   referred to as the "Defendant" or "Vicor."

20        SynQor alleges that Vicor induces and contributes

21   to the infringement of certain claims of two SynQor

22   patents, United States Patent No. 7,072,190, which is often

23   referred to as the '190 patent, and United States No. --

24   Patent No. 7,564,702, which is often referred to as the

25   '702 patent.

1          I will refer to these two patents together as the

2    "SynQor patents," the "asserted patents," or the

3    "patents-in-suit."

4          SynQor specifically contends that Vicor induces

5    and contributes to the infringement of Claim 2 of the '190

6    patent and Claims 55 and 67 of the '702 patent.  And I will

7    refer to these claims together as the asserted claims.

8          SynQor alleges that the asserted claims are

9    infringed either literally or through the Doctrine of

10   Equivalents.

11         SynQor alleges that Vicor induces and contributes

12   to the infringement of the asserted claims of the SynQor

13   patents by making, using, offering for sale, and/or selling

14   in the United States unregulated bus converters that its

15   customers use in the claimed invention.

16         More specifically, SynQor alleges that Vicor

17   induces and contributes to infringement of the asserted

18   claims of the SynQor patents by certain of its customers.

19   SynQor alleges that Vicor is liable for the sale of its bus

20   converters, both inside and outside the United States.

21         SynQor alleges that Vicor's infringement has been

22   willful.  SynQor seeks damages in the form of a reasonable

23   royalty to compensate it for the alleged infringement.

24         Vicor denies SynQor's assertions of infringement.

25   Vicor contends that it has not induced or contributed to

1  the infringement of the SynQor patents by supplying bus

2  converters to its customers.  Vicor denies that its bus

3  converters satisfy one or more elements of the asserted

4  claims.  Vicor further denies that it has intentionally

5  induced infringement of the asserted claims of the

6  patents-in-suit.  Vicor also denies that it has

7  intentionally contributed to infringement of the asserted

8  claims of the patents-in-suit.  Vicor further denies that

9  SynQor is entitled to any damages.

10          Vicor further alleges that the asserted claim of

11  the '190 patent is invalid because it is anticipated by the

12  prior art and/or because it would have been obvious to a

13  person of ordinary skill in the field as of January 24,

14  1997.

15          Vicor does not, however, contend that the asserted

16  claims of the '702 patent are invalid.

17          Your job will be to decide whether the asserted

18  claims of the SynQor patents have been infringed and

19  whether the asserted claim of the '190 patent is invalid.

20          If you decide that the asserted claims of the '702

21  patent are not infringed, and that the asserted claim of

22  the '190 patent is either not infringed or invalid, then

23  you do not need to consider damages.

24          If you decide that any asserted claim of the '702

25  patent was infringed or that the asserted claim of the '190

1    is infringed and is not invalid, you will then need to

2    decide the money damages to be awarded to SynQor to

3    compensate it for the infringement, if any.

4         Now, before the trial started, the parties

5    stipulated or agreed that certain facts are true.  These

6    facts are as follows:

7         No. 1, subject matter jurisdiction is proper in

8    this Court.

9         No. 2, the parties don't contest that the Court

10   has personal jurisdiction over the parties for purposes of

11   this litigation.

12        No. 3, the parties agree that venue is proper for

13   this litigation in the United States District Court for the

14   Eastern District of Texas, Marshall Division.

15        No. 4, SynQor owns the two patents-in-suit, the

16   '190 patent and the '702 patent.  Trial exhibits, PTX-1 and

17   PTX-4 are accurate copies of the patents-in-suit.

18        No. 5, SynQor previously sued 11 of its

19   competitors for infringing, among others, its '190 and '702

20   patents.  The parties have referred to this previous case

21   as SynQor I or the 497 case.

22        The previous case -- No. 6, the previous case went

23   to trial in December 2010 here in Marshall.

24        No. 7, the SynQor's competitors in the 497 case

25   supplied parts to Vicor's customers, Cisco and Juniper, for

1  use in some of the same Cisco and Juniper products for

2  which Vicor supplies parts, and such parts -- such products

3  are now at issue in this case.

4         No. 8, in the 497 case, the jury found that the

5  Defendants each infringed certain claims of the five Cisqor

6  (sic) patents that were asserted in that case by selling

7  bus converters to their customers, including Cisco and

8  Juniper.

9         No. 9, two of the five asserted patents include

10 the '190 and the '702 patents, which are also asserted in

11 this case.  And Claim 2 of the '190 patent was specifically

12 asserted in the 497 case as were claims dependent on Claim

13 55 of the '702 patent.

14        No. 10, the jury awarded SynQor damages and lost

15 profits, and the Court entered a permanent injunction.

16        No. 11, all of Vicor's accused bus converters are

17 manufactured in the United States.

18        No. 12, SynQor and Vicor stipulated for purposes

19 of this case as to the public availability of certain prior

20 art references.

21        No. 13, Pressman, Switching and Linear Power

22 Supply, Power Converter Design, published by Hayden Book

23 Company, Incorporated, in 1977 was publicly available prior

24 to January 23rd 1996.

25        No. 14, U.S. Patent No. 5,377,090, the Steigerwald

1849

1    '090 patent, has a priority date of January 19th, 1993.

2            No. 15, U.S. Patent No. 5,274,539, the Steigerwald

3    '539 patent, has a priority date of December 4, 1991.

4            No. 16, the joint stipulation regarding

5    representative products, PTX-2590 and DTX-1444.

6            No. 17, the joint stipulation regarding undisputed

7    issues pertain -- pertaining to accused Vicor bus

8    converters, PTX-2591 and DTX-1445.

9            And, finally, 18, the joint stipulation regarding

10   undisputed claim limitations met by accused products and

11   claim limitations disclosed in the prior art, PTX-2592 and

12   DTX-1446.

13           Before you can decide many of the issues in this

14   case, including infringement and invalidity, you will need

15   to understand the role of patent claims.  The claims of a

16   patent are the numbered sentences at the end of the patent.

17           The SynQor patents are in your notebooks, and the

18   claims describe the invention as what the patent owner owns

19   and what the patent owner may prevent others from doing.

20           The figures and the text in the rest of the patent

21   provides a description and examples of the invention and

22   provide a context for the claims, but the claims define how

23   broad or narrow a patent's coverage is.

24           Each claim is effectively treated as if it were a

25   separate patent, and each claim may cover more or less than

1    another claim.  Therefore, what a patent covers depends on

2    what each of its claims cover.

3            Claims are usually divided into parts or steps

4    that are called "limitations" or "requirements" or

5    "elements."

6            For example, a claim that covers the invention of

7    a table may recite the tabletop, four legs, and the glue

8    that secures the legs to the tabletop.

9            In this example, the tabletop, four legs, and glue

10   are each a separate limitation of the claim, and the claims

11   at issue here are product claims.

12           In deciding whether an accused product infringes a

13   patent claim or whether a claim is invalid, the first step

14   is to understand the meaning of the words used in the

15   claims, and the meaning of the words in the claims is the

16   same for both the infringement and the invalidity

17   determinations.

18           But the standard of proof is different because the

19   clear and convincing standard for invalidity requires

20   greater proof than is necessary for the preponderance of

21   the evidence standard that applies to infringement.

22           It's my job as the judge to determine what the

23   claims mean and to instruct you about that meaning.  You

24   must accept the meanings I give you and use those meanings

25   when you decide whether each claim is infringed and whether

1   each claim is invalid.

2        I've interpreted the meaning of some of the

3   language involved in the case, and my interpretation of

4   those claims appears in your juror notebooks and also in

5   Appendix A to these instructions.

6        The claim language that I have not interpreted for

7   you is to be given its ordinary and accustomed meaning as

8   understood by one of ordinary skill in the field of the

9   invention.  And I will instruct you on what a person of

10  ordinary skill in the art is in more detail shortly.

11       The beginning, or the preamble, of all of the

12  asserted claims of the SynQor patents use the word

13  "comprising," and "comprising" means "including" or

14  "containing but not limited to."

15       Thus, if you decide that an accused product

16  includes all of the requirements, also called limitations

17  or elements, in the claim, then that claim is infringed.

18  And this is true even if the accused products -- product

19  includes components in addition to those requirements.

20       For example, a claim to the table comprising a

21  tabletop, legs, and glue would be infringed by a table --

22  by a table that includes a tabletop, legs, and glue, even

23  if the table also includes wheels on the table's legs.

24       Now, patent claims may exist in two forms referred

25  to as independent claims or dependent claims.  An

1852

1   independent claim sets forth all of the requirements that

2   must be met in order to be covered by the claim and does

3   not refer to any other claim of the -- a patent.  Thus,

4   it's not necessary to look at any other claim to determine

5   whether -- or what an independent claim covers.

6           For example, Claim 55 of the '702 patent is an

7   independent claim.

8           A dependent claim does not itself recite all the

9   requirements of the claim but refers to at least one other

10  claim in the patent for some of its requirements.

11          A dependent claim includes all the requirements of

12  the other claim to which it refers, as well as the

13  requirements recited in the dependent claim.

14          In this way, the claim depends on another claim.

15  And to determine what an independent -- what a dependent

16  claim covers, it's necessary to look both at the dependent

17  claim and the other claim or claims to which it refers.

18          For example, Claim 2 of the '190 patent is a

19  dependent claim, and it includes its requirements plus the

20  requirements of Claim 1 from which it depends.

21          And Claim 67 of the '702 patent is also a

22  dependent claim.  It includes the requirements of Claim 55

23  along with the additional requirements of Claim 67.

24          Several times in these instructions I will refer

25  to a person of ordinary skill in the art or a person of

1    ordinary skill in the field of the invention.

2         It is up to you to decide the level of ordinary

3    skill in the field of the invention.  Someone with ordinary

4    skill in the art is presumed to know all of the pertinent

5    prior art, not just what an inventor may have known.

6         And you should consider all of the evidence

7    introduced at trial in making this decision, including:

8         The level of education and experience of persons

9    working in the field;

10        The types of problems that are encountered in the

11   field;

12        And the sophistication of the technology.

13        A glossary of general patent terms is contained in

14   Appendix B of these instructions.

15        I will now instruct you as to the rules you must

16   follow in deciding whether SynQor has proven that Vicor

17   induced or contributed to the infringement of any of the

18   asserted claims of the asserted patents.

19        Remember that SynQor bears the burden of proving

20   by a preponderance of the evidence that Vicor infringes

21   each of the asserted claims by actively inducing customers

22   to infringe and/or knowingly contributing to their

23   infringement.

24        In other words, SynQor must prove that it is more

25   likely than not that Vicor induced or contributed to the

1854

1    infringement of each of the asserted claims of the asserted

2    patents.

3         It is your job to determine, as to each of the

4    asserted claims, whether SynQor has proven by a

5    preponderance of the evidence that Vicor has separately

6    infringed each of those claims.

7         Infringement is assessed on a claim-by-claim

8    basis, therefore, there may be infringement as to one claim

9    but not infringement as to another.

10        In determining whether an accused product meets

11   the limitations of the claims, you should compare the

12   accused product to the asserted claims and not to any

13   SynQor product.

14        The comparison of the accused products to SynQor

15   products or to Vicor products -- patents may, however, be

16   relevant to issues concerning Vicor's intent to infringe.

17        During the trial, you heard reference to patents

18   that Vicor has received.  A product may be covered by more

19   than one patent, but the existence of an accused

20   infringer's own patent does not constitute a defense to

21   infringement of someone else's patent, even if the product

22   is covered by the accused infringer's patent.

23        Once the patent is issued, the owner of the patent

24   has the right to exclude others from making, using,

25   offering to sell, or selling the patented invention

1    throughout the United States or importing the patented

2    invention into the United States for a term of 20 years.

3         Infringement occurs when a person without the

4    patent owner's permission makes, uses, offers to sell, or

5    sells the patented invention anywhere in the United States

6    or imports the patented invention into the United States

7    while the patent is in force.

8         Vicor is accused of induced infringement,

9    contributory infringement, and infringement through the

10   supply of components from the United States for combination

11   abroad.  SynQor also alleges that Vicor is liable for

12   willful infringement.  Inducement and contributory

13   infringement are referred to as indirect infringement.

14        To prove indirect infringement, SynQor must prove

15   that Vicor's indirect infringement caused direct

16   infringement by one or more of its customers.  Direct

17   infringement can be found either literally or under the

18   Doctrine of Equivalents.

19        Let me start by explaining direct infringement in

20   a little more detail.

21        To show direct infringement of a claim, SynQor

22   must prove by a preponderance of the evidence that the

23   customers' products include every requirement in that

24   claim, literally or equivalently, and as I will explain to

25   you shortly.

1        In order to prove direct infringement, SynQor must

2   prove by a preponderance of the evidence, that is, it's

3   more likely than not, that the alleged infringer made,

4   used, sold, offered for sale within the United States, or

5   imported into the United States a product that meets all of

6   the requirements of a claim.

7        You must compare the accused product with each and

8   every one of the requirements of a claim to determine

9   whether all of the requirements are met.  You must

10  determine separately for each asserted claim whether or not

11  there is infringement.

12       A claim requirement is literally present if it

13  exists in the accused product just as it is described in

14  the claim language, either as I've explained the language

15  to you, or if I did not explain it, as it would be

16  understood by one of ordinary skill in the art.

17       If an accused product omits a claim requirement,

18  then you must find that the claim is not literally

19  infringed as to that product.

20       You must consider each asserted claim of the

21  SynQor patents separately.  If you find that each and every

22  element of the claim is present, then the claim is

23  infringed, even if the accused product may be more or less

24  efficient or may include an additional feature or functions

25  that are not found in the claims.

1857

1       Whether Vicor's customer knew that its product

2   infringed does not matter for your consideration of direct

3   infringement.  The customer may directly infringe a patent

4   even if it believed in good faith that what it was doing

5   was not an infringement of any patent and even if it did

6   not know about the patent.

7       If a company makes, uses, sells, offers to sell

8   within, or imports into the United States a product that

9   does not meet all the requirements of a claim and thus does

10  not literally infringe the claim, there can still be direct

11  infringement if that product satisfies the claim under the

12  Doctrine of Equivalents.

13      Under the Doctrine of Equivalents, a product

14  infringes the claim if the accused product contains

15  elements corresponding to each and every requirement of the

16  claim that it is equivalent to, even though not literally

17  met by the accused product.

18      You may find that an element is equivalent to a

19  requirement of a claim that is not met literally if a

20  person having ordinary skill in the technology of the

21  patent would have considered the differences between them

22  to be insubstantial or would have found that the structure,

23  number one, performs substantially the same function, and,

24  number two, works in substantially the same way, and,

25  number three, to achieve substantially the same result as

1    the requirement of the claim.

2           In order to prove infringement by equivalents,

3    SynQor must prove the equivalency of the structure to a

4    claim element by a preponderance of the evidence.

5           SynQor alleges that Vicor is liable for

6    infringement by inducing others to directly infringe the

7    asserted claims of the SynQor patents.

8           The law provides -- the patent laws provide that

9    one who actively induces infringement of a patent shall be

10   liable as an infringer.

11          As with direct infringement, you must determine

12   whether there has been inducement or induced infringement

13   on a claim-by-claim basis.

14          Vicor is liable for induced infringement of a

15   claim of one of the asserted patents only if SynQor proves

16   by a preponderance of the evidence that:

17          One, the acts are actually carried out by another,

18   such as Vicor's customers, and that the other directly

19   infringes that claim within the United States;

20          Number two, that Vicor took action during the time

21   the patent was in force intending to cause the infringing

22   acts by another; and

23          Number three, that Vicor was aware of the patent

24   and knew that the acts, if taken, would constitute

25   infringement of that patent, or that Vicor believed there

1  was a high probability that the actions taken by others

2  infringed the patent-in-suit and took deliberate steps to

3  avoid learning of that infringement.

4        The mere knowledge of possible infringement by

5  others does not amount to inducement.  Rather, SynQor must

6  prove that Vicor acted with specific intent to cause acts

7  that constitute direct infringement and must have known

8  that its actions would cause the direct infringement or

9  believe that there was a high probability that its actions

10 would cause the direct infringement but deliberately

11 avoided confirming that belief.

12       Vicor's culpability is measured against its

13 knowledge and intent at the time of its conduct.  When

14 considering whether Vicor knew or was willfully blind to a

15 high probability that the induced actions would constitute

16 infringement, you should consider the totality of the

17 circumstances, including whether Vicor is relying on the

18 advice of a competent lawyer.

19       SynQor contends that Vicor is liable for

20 contributory infringement by contributing to the direct

21 infringement of the SynQor patents by certain customers of

22 Vicor.

23       As with direct infringement, you must determine

24 contributory infringement on a claim-by-claim basis.

25       Vicor is liable for contributory infringement of a

1    claim if SynQor proves by a preponderance of the evidence

2    that:

3           One, Vicor sold to a customer within the United

4    States, offered to sell within the United States, or

5    imported into the United States a component of a patented

6    product during the time the patents were in force;

7           Two, that the component had no substantial

8    non-infringing use;

9           Three, that the component constituted a material

10   part of the invention;

11          Four, that Vicor was aware of the SynQor patents

12   and knew that the product for which the component had no

13   substantial non-infringing use was covered by a claim of

14   the patents or believed that there was a high probability

15   that the product for which the component had no substantial

16   non-infringing use was covered by a claim of the patents

17   and took deliberate actions to avoid learning of the

18   infringement; and

19          Number five, that the product directly infringed

20   the claim.

21          Vicor's culpability is measured against its

22   knowledge and intent at the time of its conduct.

23          The mere knowledge of possible infringement by

24   others does not amount to contributory infringement.

25   Rather, SynQor must prove that Vicor knew that the products

1   infringed a claim of SynQor's patents or subjectively

2   believed there was a high probability that they infringed a

3   claim of SynQor's patents and took deliberate actions to

4   avoid confirming this belief.

5          When considering whether Vicor knew that the

6   products infringe a claim of SynQor's patents or believed

7   there was a high probability that the products infringe a

8   claim of SynQor patents and deliberately avoided confirming

9   that belief, you should consider the totality of the

10  circumstances, including whether Vicor is relying on the

11  advice of a competent lawyer.

12         In order to prove contributory infringement,

13  SynQor must prove that each of the above requirements is

14  met.  This proof of each requirement must be by a

15  preponderance of the evidence, that is, more likely than

16  not that each of the above requirements is met.

17         Vicor is liable for Section 271(f)(2) infringement

18  of an asserted claim of a SynQor patent through the supply

19  of bus converters from the United States for a combination

20  abroad if SynQor proves by a preponderance of the evidence

21  that:

22         No. 1, Vicor was aware of the SynQor patents;

23         2, Vicor supplied a component or caused a

24  component to be supplied from the United States to a place

25  outside the United States;

1862

1        No. 3, the component had no substantial

2   non-infringing use;

3        4, that Vicor knew the component was made or

4   adapted for use in a product that would directly infringe

5   the SynQor patents if it were used in the United States or

6   believed there was a high probability that it would

7   infringe and took deliberate actions to avoid learning of

8   the infringement; and

9        5, that Vicor intended for the component to be

10  combined into the product outside of the United States in a

11  manner that would directly infringe the SynQor patents if

12  the combination had been made in the United States.

13       SynQor contends that Vicor willfully infringed the

14  asserted claims of the patents.  Vicor denies that it

15  willfully infringed any of the asserted patents -- any of

16  the asserted claims.

17       And if you find that Vicor induces infringement of

18  or contributes to inducement of or infringes through the

19  supply of bus converters from the United States for

20  combination abroad on at least one asserted claim of the

21  SynQor patents, then you must decide whether that

22  infringement was willful.

23       And willfulness requires SynQor to prove by a

24  preponderance of the evidence that Vicor knew of the SynQor

25  patent and that the infringement by Vicor was intentional.

1          You may not determine that the infringement was

2     willful just because Vicor was aware of the patent and

3     infringed.  Instead, you must also find that Vicor

4     deliberately infringed the patent.

5          To determine whether Vicor acted willfully, you

6     should consider all the facts and assess Vicor's knowledge

7     at the time of the challenged conduct.  Facts that may be

8     considered include, but are not limited to:

9          Whether or not Vicor acted consistently with the

10    standards of behavior for its industry;

11          Whether or not Vicor intentionally copied a

12    product of SynQor that's covered by the patent, the SynQor

13    patent;

14          Whether or not Vicor reasonably believed it did

15    not infringe or that the SynQor patent was invalid;

16          Whether or not Vicor made a good-faith attempt or

17    good-faith effort to avoid infringing the SynQor patent.

18          For example, whether Vicor attempted to design

19    around the SynQor patent; and

20          Whether or not Vicor tried to cover up its

21    infringement.

22          In considering under the totality of the

23    circumstances whether Vicor acted willfully, you may

24    consider as one factor the lack of evidence that Vicor

25    obtained a competent legal opinion.

 1          However, you may not assume that merely because

 2     Vicor did not obtain a legal opinion, the opinion would

 3     have been unfavorable.  The absence of a lawyer's opinion,

 4     by itself, is insufficient to support a finding of

 5     willfulness.

 6          Patent invalidity is a defense to patent

 7     infringement.  Even though the PTO examiner has approved

 8     the claims of a patent, you have the ultimate

 9     responsibility for determining whether the claims are

10     valid.

11          I'm now going to instruct you on the invalidity

12     issues that you should consider.  As you consider these,

13     remember that Vicor bears the burden of proving invalidity

14     by clear and convincing evidence.  In other words, Vicor

15     must prove that it is highly probable that the claims are

16     invalid.

17          The issue of a patent -- the issuance of a patent

18     by the PTO provides a presumption that the patent is valid.

19     And from the issuance of the patent, it is presumed that a

20     claimed invention is novel or new, useful, not obvious, and

21     it satisfies the other legal requirements for a valid U.S.

22     patent.

23          Each claim of a patent is presumed valid,

24     regardless of the validity of the other claims, and the

25     presumption of validity remains in tact throughout the

1   litigation, and the burden of proof remains on Vicor to

2   prove invalidity by clear and convincing evidence.

3         The presumption of validity is not an additional

4   hurdle to be cleared for finding invalidity.  By applying

5   the clear and convincing standard, you're already

6   accounting for that presumption of validity.

7         Now, these instructions have sometimes referred to

8   "prior art," and prior art is technology and information

9   that was publicly available before the date of the

10  invention.  And there is further information in the Court's

11  definition section, the glossary section in Appendix B.

12        As I noted earlier, it's already been determined

13  that the asserted claims of the '702 patent are valid over

14  the prior art.

15        In this case, Vicor contends that Claim 2 of the

16  '190 patent is invalid as obvious.

17        Vicor does not contend that the asserted claims of

18  the '702 patent are invalid as obvious.

19        For Claim 2 of the '190 patent, Vicor contends

20  that the claim is rendered obvious by the following

21  combination of references:

22        1, the Steigerwald '090 patent, the Steigerwald

23  '539 patent and the Pressman article.

24        A patent claim is invalid if the claimed invention

25  would have been obvious to a person of ordinary skill in

1  the field of the invention at the time the invention was

2  made.

3        And this means that even if all the requirements

4  of the claim cannot be found in a single prior art

5  reference that would anticipate the claim, a person of

6  ordinary skill in the field of the invention who knew about

7  all the prior art would have come up with the claimed

8  invention.

9        But a patent claim composed of several

10 requirements is not proved obvious simply by demonstrating

11 that each of the requirements was independently known in

12 the prior art.  And this is so because inventions in most,

13 if not all, instances rely upon building blocks long since

14 uncovered and claimed discoveries, almost of necessity,

15 will be combinations of what, in some sense, is already

16 known.

17       Accordingly, you may evaluate whether there was

18 some teaching, suggestion, or motivation to arrive at the

19 claimed invention before the time of the claimed invention,

20 although proof of this is not a requirement to prove

21 obviousness.

22       Teachings, suggestions, motivations may be found

23 in the written references, including the prior art itself.

24       However, teachings and suggestions and motivations

25 may also be found within the knowledge of a person of

1867

1   ordinary skill of the field of the invention, including

2   references (sic) [inferences] and creative steps that a

3   person of ordinary skill in the field would employ.

4           Additionally, teachings, suggestions, and

5   motivations may be found in the nature of the problem

6   solved by the claimed invention or any need or problem

7   known in the field of the invention at the time of and

8   addressed by the invention.

9           Therefore, in evaluating whether such a claim

10  would have been obvious, you should consider a number of

11  factors:

12          No. 1, whether Vicor has identified a reason that

13  would have prompted a person of ordinary skill in the field

14  of the invention to combine the requirements or concepts

15  from the prior art in the same way as in the claimed

16  invention.

17          There's no single way to define the line between

18  true inventiveness on one hand, which is patentable, and

19  the application of common sense and ordinary skill to solve

20  a problem on the other hand, which is not patentable.

21          For example, market forces may be what forced --

22  what produced a change rather than true inventiveness.

23          No. 2, whether the claimed invention applies a

24  known technique that had been used to improve a similar

25  device or system in a similar way.

1           And, No. 3, whether the claimed invention would

2   have been obvious to try, meaning that the claimed

3   innovation was one of a relatively small number of possible

4   approaches to the problem with a reasonable expectation of

5   success by those of ordinary skill in the art in the

6   field -- of the -- skilled in the art in the field of the

7   invention.

8           But you must be careful not to determine

9   obviousness using hindsight.  Many true inventions can seem

10  obvious after the fact.  You should put yourself in the

11  position of a person of ordinary skill in the field of the

12  invention at the time the claimed invention was made, and

13  you should not consider what is known today or what is

14  learned from the teaching of the patent.

15          The ultimate conclusion of whether a claim is

16  obvious should be based on your determination of several

17  factual issues:

18          1, you must decide the level of the -- of ordinary

19  skill in the field of the invention that someone would have

20  had at the time the claimed invention was made.

21          2, you must decide the scope and the content of

22  the prior art.  And in determining the scope and content of

23  the prior art, you must decide whether a reference is

24  pertinent, or analogous, to the claimed invention.

25          Pertinent or analogous prior art includes prior

art in the same field as the claimed invention, regardless

of the problems addressed by the reference, and prior art

from different fields reasonably pertinent to the

particular problem with which the claimed invention is

concerned.

Remember that prior art is not limited to patents

and public materials, but includes general knowledge that

would have been available to one of ordinary skill in the

field of the invention.

And, No. 3, you must decide what difference, if

any, existed between the claimed invention and the prior

art.

Finally, you should consider any of the following

factors that you find have been shown by the evidence:

A, factors contending -- factors tending to show

obviousness.  And these include:

1, commercial success of a product due to the

merits of the claimed invention;

2, a long-felt but unsolved need for the solution

provided by the claimed invention;

No. 3, unsuccessful attempts by others to find the

solution provided by the claimed invention;

No. 4, copying of the claimed invention by others;

No. 5, unexpected and superior results from the

claimed inventions;

1    6, acceptance by others of the claimed invention

2  as shown by praise from others in the field of the

3  invention or from licensing of the claimed invention;

4    7, disclosures in the prior art that criticized,

5  discredit, or otherwise discourage the claimed invention

6  and would, therefore, tend to show that the invention was

7  not obvious;

8    8, whether the inventor proceeded contrary to

9  accepted wisdom in the field; and

10    9, other evidence tending to show non-obviousness.

11    B, factors tending to show obviousness.

12    No. 1, independent invention of the claimed

13  invention by others before or at about the same time that

14  the named inventors thought of it; and

15    2, other evidence tending to show obviousness.

16    The presence of any of the above factors that tend

17  to show obviousness may be considered by you as an

18  indication that the claimed invention would not have been

19  obvious at the time the claimed invention was made.

20    These factors can be the most probative evidence

21  of non-obviousness and should be used to avoid applying

22  hindsight to the obviousness determination.

23    You may consider any factors that tend to show

24  non-obviousness before reaching an obviousness

25  determination.

1            Conversely, the presence of any of the above

2    factors that tend to show obviousness may be considered by

3    you as an indication that the claimed invention would have

4    been obvious at such time.

5            Although you should consider any evidence of these

6    factors, their relevance and importance to your decision on

7    whether the claimed invention would have been obvious is up

8    to you.

9            Vicor must prove by clear and convincing evidence

10   that a claimed invention was obvious.  And if you find that

11   a claimed invention was obvious, as explained above, you

12   must find that claim invalid.

13           Give me one moment.

14           All right.  The parties disagree about whether the

15   prior art references I have listed are pertinent or

16   analogous, and, therefore, may be considered as prior art

17   used to determine the validity of the asserted claims.

18           In reaching your conclusion about whether or not

19   any of the asserted claims of the SynQor patents would have

20   been obvious at the time the invention was made, you should

21   consider any difference or differences between the

22   references presented by Vicor and the claimed requirements.

23           In considering whether the claimed invention was

24   obvious, you must first determine the scope and content of

25   the prior art before deciding whether the invention was

1  obvious.

2        The scope and content of prior art includes at

3  least prior art in the same field as the claimed invention

4  and prior art from different fields that a person of

5  ordinary skill in the art would have considered when trying

6  to solve the problem that's addressed by the invention.

7        Furthermore, prior art is not limited to patents

8  and published material, but it also includes the general

9  knowledge that would have been available to one of ordinary

10 skill in the field of the invention.

11       In deciding what the level of ordinary skill in

12 the art would have -- of the claimed invention is, you

13 should consider all of the evidence that was introduced at

14 trial, including, but not limited to:

15       The levels of education and experience of the

16 inventor and other persons actively working in the field;

17 and

18       The types of problems encountered in the field;

19       The prior art solutions to those problems;

20       The rapidity with which innovations are made; and

21       Finally, the sophistication of the technology.

22       I will now instruct you on patent damages.

23       If you find that Vicor has infringed one or more

24 valid asserted claims of the SynQor patents, you must

25 determine the amount of money damages, if any, to which

1  Vicor is entitled.

2        By instructing you on damages, I do not suggest

3  that one party or the other -- that one or the other

4  parties should prevail.

5        These instructions are provided to guide you on

6  the calculation of damages in the event that you find

7  infringement of a valid patent claim.

8        If you find that Vicor has not infringed any valid

9  claim of the patents-in-suit, then SynQor is not entitled

10  to any patent damages.

11        The amount of damages, if any, must be adequate to

12  compensate SynQor for any infringement you have found.

13        If you find that Vicor has infringed, in no event

14  may the damages award be less than a reasonable royalty.

15        And I will explain the term "reasonable royalty"

16  in more detail shortly.

17        Your damages determination must not include

18  additional sums to punish Vicor or to set an example.  You

19  may award compensatory damages only for the loss that

20  SynQor proves was more likely than not caused by Vicor's

21  infringement.

22        As I mentioned earlier, any finding of willful

23  infringement is not relevant to your assessment of damages.

24        When a party -- or when the parties dispute a

25  matter concerning patent damages, it is SynQor's burden to

1   prove by a preponderance of the evidence that its version

2   is correct.

3        SynQor must prove the amount of damages with

4   reasonable certainty, but need not prove the amount of

5   damages with mathematical precision.

6        However, SynQor is not entitled to damages that

7   are speculative, that are merely possible, or damages that

8   are based on guesswork.

9        In determining the amount of damages, you must

10  determine when the damages began to accrue.

11       The calculation of damages should begin as of the

12  date the actionable infringement began.

13       To be clear, lost profits and reasonable royalty

14  are alternative measures of damages under the law, and

15  SynQor is not seeking a lost profits calculation of

16  damages.

17       Although SynQor's anticipated lost profits may be

18  considered to determine a reasonable royalty, under several

19  of the reasonable royalty factors that are -- I will

20  describe momentarily, the law does not authorize the direct

21  setting of the reasonable royalty in the amount of SynQor's

22  lost profits.

23       A reasonable -- a royalty is a payment that is

24  made to SynQor in exchange for the rights to make, use,

25  sell, offer to sell, or import the claimed invention.

1           A reasonable royalty is the payment that would
2   have resulted from a negotiation between SynQor and Vicor
3   taking place just before the time when the infringement
4   first began.
5           In considering the nature of this hypothetical
6   negotiation, the focus on what the expectations of SynQor
7   and Vicor would have been had they entered into an
8   agreement at that time and acted reasonably in their
9   negotiations.
10          You must assume that both parties believed the
11  patent was valid and infringed.  You must also assume that
12  SynQor and Vicor were willing to enter into an agreement.
13          Your role is to determine what the agreement would
14  have been.  And the test for damages is what royalty would
15  have resulted from that hypothetical negotiation and not
16  simply what either party would have preferred.
17          The date of the hypothetical negotiation between
18  SynQor and Vicor is the date of the alleged -- is the date
19  the alleged infringement first began.
20          The parties agree that the date of the
21  hypothetical negotiation is July 2006.
22          Evidence of things that happened after the
23  infringement first began can be considered in evaluating
24  the reasonable royalty only to the extent that the evidence
25  aids in assessing what royalty would have resulted from the

1    hypothetical negotiation.

2         Although evidence of the actual profits an alleged

3    infringer made may be used to determine the alleged -- or

4    the anticipated profits at the time of the hypothetical

5    negotiation, the royalty may not be limited or increased

6    based on the actual profits the alleged infringer made.

7         In deciding what is a reasonable royalty that

8    would have resulted from the hypothetical negotiation, you

9    may consider the factors that the patent owner, SynQor, and

10   the alleged infringer, Vicor, would consider in setting the

11   amount the alleged infringer should pay.

12        And I'm going to list for you a number of factors.

13   They are as follows:

14        No. 1, the royalties received by SynQor for the

15   licensing of the asserted patents, proving or tending to

16   prove an established royalty;

17        2, the rates paid by Vicor for the use of other

18   patents comparable to the patents-in-suit;

19        3, the nature and scope of the license, as

20   exclusive or non-exclusive, or as restricted or

21   non-restricted in terms of territory or with respect to

22   whom the manufactured product may be sold;

23        4, SynQor's established policy and marketing

24   program to maintain its patent monopoly by not licensing

25   others to use the invention or by granting licenses under

1   special conditions designed to preserve that monopoly;

2          5, the commercial relationship between SynQor and

3   Vicor, such as whether they are competitors in the same

4   territory in the same line of business, or whether they

5   were inventor and promoter;

6          6, the effect of selling the patented specialty in

7   promoting sales of other products of Vicor, the existing

8   value of the invention to the licensor as a generator of

9   sales of his non-patented items, and the extent of such

10  derivative or convoyed sales;

11         7, the duration of the patents and the term of the

12  license;

13         8, the established profitability of the product

14  made under the patents, its commercial success, and its

15  current popularity;

16         9, the utility and advantages of the patented

17  property over the old modes and devices, if any, that had

18  been used for working out similar results;

19         10, the nature of the patented invention, the

20  character of the commercial embodiment of it as owned or

21  produced by SynQor, and the benefits to those who have used

22  the invention;

23         No. 11, the extent to which the infringer has made

24  use of the invention and any evidence probative of the

25  value of that use;

1878

1    12, the portion of the profit or of the selling

2    price that may be customary in the particular business or

3    in comparable business to allow for the use of the

4    invention or analogous inventions;

5    13, the portion of the realizable profits that

6    should be credited to the invention as distinguished from

7    non-patented elements, the manufacturing process, business

8    risks, or significant features or improvements added by the

9    infringer;

10    14, the opinion and testimony of qualified

11    experts;

12    15, the amount that a licensor, such as SynQor,

13    and a licensee, such as Vicor, would have agreed upon at

14    the time the infringement began if both had been acting --

15    if both had been reasonably and voluntarily trying to reach

16    an agreement; that is, the amount which a prudent

17    licensee -- who desired, as a business proposition, to

18    obtain a license to manufacture and sell a particular

19    article embodying the patented invention -- would have been

20    willing to pay as a royalty and yet be able to make a

21    reasonable profit and which amount would have been

22    acceptable by a prudent patentee who was willing to grant a

23    license.

24    No one factor is dispositive, and you can and

25    should consider the evidence that has been presented to you

1   in this case on each of these factors.

2         You may also consider any other factors which in

3   your mind would have increased or decreased the royalty the

4   infringer would have been willing to pay and the patent

5   owner -- the patent holder would have been willing to

6   accept, acting as normally prudent business people.

7         The final factor establishes the framework which

8   you should use in determining a reasonable royalty, that

9   is, the payment that would have resulted from a negotiation

10  between the patent holder and the infringer taking place at

11  a time prior to when the infringement began.

12        In determining a reasonable royalty, you may also

13  consider whether or not a commercially acceptable

14  non-infringing alternative was available to Vicor at the

15  time of the hypothetical negotiation and whether that would

16  have affected the reasonable royalty the parties would have

17  agreed upon.

18        When determining a reasonable royalty, you may

19  consider evidence concerning the amounts that other parties

20  have paid for rights to the patent in question or for

21  rights to similar technologies.

22        A license agreement need not be perfectly

23  comparable to the hypothetical license that would have been

24  negotiated between SynQor and Vicor in order for you to

25  consider it.

1       However, if you choose to rely upon evidence from

2  any license agreement, you must account for any differences

3  between those licenses and the hypothetically negotiated

4  license between SynQor and Vicor when you make your

5  reasonable royalty determinations, including whether the

6  license contained any value related to a release of

7  liability, the date when the license was entered, the

8  financial or economic conditions of the parties at the time

9  the parties entered into the license, the number of patents

10  involved in the license, and the extent to which litigation

11  may have affected the license.

12       The law requires that any royalty awarded to

13  SynQor correspond to the value of the alleged invention

14  within the infringing product as distinct from other

15  unpatented features of the infringing product.

16       This is particularly true where the infringing

17  product has multiple features and multiple components not

18  covered by the patent or where the accused product works in

19  conjunction with other non-patented components.

20       If unpatented features contribute to an infringing

21  product, you must apportion that value to exclude any value

22  attributable to unpatented features.

23       You must determine an appropriate royalty rate and

24  an appropriate royalty base that reflect the value

25  attributable to the patented invention alone.

1          During this trial, you heard evidence relating to

2     Vicor's counterclaims for unfair competition under

3     Massachusetts general law, Chapter 93A and tortious

4     interference with prospective economic advantage.  The

5     Court has resolved these claims in SynQor's favor.

6          You should, therefore, disregard any evidence

7     solely related to these counterclaims in rendering your

8     verdict.

9          It is your sworn duty as jurors to discuss the

10    case with one another in an effort to reach agreement if

11    you can do so.

12         Each of you must decide the case for yourself, but

13    only after full consideration of the evidence with the

14    other members of the jury.

15         While you are discussing the case, do not hesitate

16    to re-examine your own opinion and change your mind if you

17    become convinced that you are wrong.

18         However, do not give up your honest beliefs solely

19    because the others think differently or merely to finish

20    the case.

21         Remember, in a very real way, you are the judges,

22    judges of the facts, and your only interest is to seek the

23    truth from the evidence in the case.

24         When you retire to your -- to the jury room to

25    begin your deliberations, each of you will have a copy of

1    the instructions, and the exhibits will be provided to you.

2          The first thing you should do is to select one

3    among your number to serve as your foreperson who will

4    guide your deliberations and speak for you here in the

5    courtroom.

6          If at any time you recess during your

7    deliberations, you should follow all of the instructions I

8    have given you throughout the trial about your conduct.

9          After you have reached a unanimous verdict, your

10   foreperson should fill in the verdict form and answer the

11   questions.

12         You should not reveal your answers until such time

13   as you are discharged unless otherwise directed by me, and

14   you should never disclose to anyone, not even to me, your

15   numerical division on any question.

16         If for any reason you have to communicate with me

17   at any time during your deliberations, please give a

18   written message or question to the bailiff who will bring

19   it to me, and then I will respond in writing or by having

20   you brought into the courtroom so that I can address you

21   orally.  I will always first disclose to the attorneys your

22   question and my response before I answer your question.

23         And after you have reached a verdict, you are not

24   required to talk with anyone about the case unless for some

25   reason I order otherwise.

```
 1              All right.  That completes the reading of the

 2      Court's charge.

 3              Mr. Pak?

 4              MR. PAK:  Your Honor, may I approach the bench?

 5              THE COURT:  Of course, yes.

 6              (Bench conference.)

 7              MR. PAK:  Your Honor, there might have been a

 8      transcription error, but I think you meant to say

 9      "inferences" and you misstated as "references."

10              THE COURT:  Okay.

11              MR. PAK:  And that was on 22.

12              THE COURT:  On 22.

13              You agree, Mr. Rein?

14              MR. REIN:  I didn't hear it, but I have no reason

15      to disagree.

16              THE COURT:  Okay.  I may have just misspoken.

17              The footnotes throughout, not many, but a couple

18      would cite cases, like think beginning on Page 24.

19              I think -- I don't know whether you all had

20      intended to leave those out.

21              MR. REIN:  I would normally take them out.

22              THE COURT:  I would normally take them out, too.

23              Mr. Rein, you agree with that?

24              MR. PAK:  I do agree.

25              THE COURT:  Okay.  So I have that as Pages 24, 27,
```

1884

```
 1   30, and that's it.

 2            MR. PAK:  All right.

 3            THE COURT:  So we'll make that change.  We'll

 4   double-check those, the only ones, and you'll want me to

 5   make the change.

 6            Do you want me want me to do anything about that

 7   other than to make the change?

 8            MR. PAK:  No, Your Honor, if you could just make

 9   the correction.

10            THE COURT:  We'll make that correction.

11            MR. REIN:  And I take it, the instructions will go

12   back with the jury?

13            THE COURT:  They will.  We'll have to make the

14   changes, so there will be some delay.

15            But at this point, I'm going to have -- let them

16   have their lunch, we'll break for an hour, and come back

17   and do our closings.

18            MR. PAK:  Thank you.

19            MR. REIN:  Works for us.

20            THE COURT:  Thanks.

21            (Bench conference concluded.)

22            THE COURT:  All right.  Ladies and gentlemen, as I

23   said, that completes the reading of the instructions on the

24   law that you will follow once you begin your deliberations.

25            Your lunch is here, and I think the thing that
```

```
 1   makes the most sense in order to avoid having the parties
 2   split their closings is we'll have you all have your lunch
 3   now, and you'll come back, and you'll hear from the
 4   Plaintiff, and then you'll hear from the Defendant, and
 5   then the Plaintiff will have a short opportunity to provide
 6   rebuttal after that, and then you'll go back to the jury
 7   room and begin your deliberations.
 8          So our plan is to start back here in the courtroom
 9   about an hour from now.  So somewhere in the neighborhood
10   of 12:45, we'll have you back in the courtroom to begin
11   closing arguments.
12          So at this time, Mr. Latham, if you would escort
13   the jury back to the jury room.
14          COURT SECURITY OFFICER:  All rise.
15          (Jury out.)
16          THE COURT:  Okay.  We're removing the footnotes
17   pursuant to the conversation we had at the bench.
18          And making sure the word is correct there,
19   Mr. Pak --
20          MR. PAK:  Thank you.
21          THE COURT:  -- that you pointed out to us.
22          And we will plan to reconvene here about an hour
23   from now.
24          Any issues from either side before we recess?
25          MR. REIN:  Not from Plaintiffs.
```

```
1          MR. PAK:  None from the Defendant.

2          THE COURT:  Okay.  See you in about an hour.

3          (Recess.)

4          (Jury out.)

5          COURT SECURITY OFFICER:  All rise.

6          THE COURT:  All right.  Are the parties ready to

7   proceed?

8          MR. GILLAM:  Yes, Your Honor.

9          MR. PAK:  Yes, Your Honor.

10         THE COURT:  Does anyone want a warning at the --

11  at some point in your closing?

12         MR. PAK:  Yes, Your Honor, if I get a 15-minute

13  warning on mine.

14         THE COURT:  Okay.  You're starting --

15         MR. PAK:  Yeah, I'm starting first, Your Honor.

16         THE COURT:  Okay.  15 minutes in --

17         MR. PAK:  Left.

18         THE COURT:  -- or left?

19         MR. PAK:  Left.

20         THE COURT:  So 15 minutes out of the hour?

21         MR. PAK:  No, 15 minutes, that'd be towards the

22  end, 15 minutes left.

23         THE COURT:  So how much time are you planning on

24  using?

25         MR. PAK:  45 minutes.
```

1887

```
 1              THE COURT:  45.

 2         Okay.  So when you've used 30 minutes, I'll give

 3    you a warning.

 4              MR. PAK:  Thank you.

 5              THE COURT:  All right.  On the Plaintiff's side?

 6              MR. REIN:  Your Honor, if you could give me a

 7    five-minute warning during the rebuttal only, not during

 8    the initial.

 9              THE COURT:  Okay.  Are you doing all of the

10    closing?

11              MR. REIN:  No, Ms. Koh is going to do part of it.

12              THE COURT:  Ms. Koh is going to do part.

13         So you want five minutes at the -- at minute 55?

14              MR. REIN:  Yes.

15              THE COURT:  Okay.  If you would, have the jury

16    brought up.

17              MR. DACUS:  Mrs. Schroeder, would you turn this on

18    our side?  He's trying to test.  Thank you.

19              MR. PAK:  Thank you.

20         (Jury in.)

21              THE COURT:  Please be seated.

22         Okay.  Ladies and gentlemen of the jury, welcome

23    back from lunch.

24         At this time, we'll begin the parties' closing

25    arguments.
```

```
 1              SynQor may proceed.
 2              MR. REIN:  Thank you, Your Honor.
 3              Ladies and gentlemen, we heard at the beginning of
 4    the case -- actually, we heard from Vicor's counsel that we
 5    are here to protect the integrity of the patent system.  I
 6    couldn't agree more.
 7              But here's where the parties disagree.  Vicor
 8    thinks that because it has made many contributions to the
 9    industry and has many patents of its own, it doesn't have
10    to respect the patents of SynQor or anyone else.
11              SynQor, on the other hand, believes in the patent
12    system and respects the patents of everyone.
13              As you heard, Vicor and SynQor have vigorously
14    competed against each other in various market segments over
15    the years, but SynQor still respects the technical
16    contributions of Dr. Vinciarelli and Vicor that have been
17    made over the years.
18              You heard Mr. Born say that Dr. Schlecht has
19    admiration for Vicor, but what is more important is that
20    SynQor has respected the boundaries of Vicor's patents,
21    which is why you did not hear any suggestion that SynQor
22    violated any of Vicor's many patents.
23              The problem here is that Dr. Vinciarelli and Vicor
24    think that, because they have put their patented technology
25    into their own products, they are above everyone else's
```

1    patents.

2         You heard Dr. Vinciarelli tell me when I

3    cross-examined him that he doesn't even have to look at the

4    claims of SynQor's patents or the patents of any other

5    company in the world.  He just thinks his technology can't

6    infringe because he has his own patents.

7         You were instructed by the Court that to determine

8    infringement, you do need to compare the accused products

9    with the claims of SynQor's patents.  You don't get a pass

10   because you have your own patents, and you were

11   specifically instructed, if you recall, that the existence

12   of an accused infringer's own patent does not constitute a

13   defense to infringement of somebody else's patent.

14        But Dr. Vinciarelli, he thinks he doesn't even

15   have to look at the claims of anyone's patents.

16        It was also striking how little respect

17   Dr. Vinciarelli had for Dr. Schlecht's patented invention

18   and the contributions that IBA has made to the industry.

19        This builds on some of the things that Vicor told

20   you during its opening.  SynQor doesn't even claim now to

21   have invented IBA technology, Mr. Pak said.

22        That is completely false.

23        Mr. Pak then said, SynQor admits now that -- that

24   that was all in the work that was done by another gentleman

25   named Dr. Steigerwald.  And they -- and he said, you will

1   see his video testimony.

2          False again, which no doubt is why they did not

3   show you or play that testimony.

4          And then Mr. Pak said, Dr. Schlecht worked for

5   Dr. Steigerwald.

6          Also false.  One untruth after another.

7          As you saw, Vicor does not even challenge the

8   validity of the two claims of the '702 patent, which we

9   heard described, and claim unregulated IBA.  So how can

10  Vicor tell you that Dr. Schlecht did not invent unregulated

11  IBA?  That makes no sense.

12         And Vicor also trivializes what unregulated IBA

13  has meant to the industry.

14         For that, we only need to look at what major

15  customers, IBM and Cisco, had to say.  IBA was the only

16  option for IBM, and Cisco selected it because of its great

17  value.

18         And, of course, we also learned that the industry

19  has paid SynQor approximately $150 million because of the

20  great value of this invention.

21         Vicor is ignoring an important chapter in the

22  power electronics industry that was spear-headed by

23  Dr. Schlecht and his patented invention.

24         That brings me to the first question that you will

25  be asked on the verdict form.

1        Has Vicor induced or contributed to the

2   infringement of SynQor's patent claims?

3        And there are several things you'll need to

4   consider here.

5        First, do the end products that are accused of

6   infringement, do they meet the various claim limitations

7   that are present in the end products?  We heard them called

8   the end product limitations.

9        Dr. Dickens went through that in great detail.

10  And Vicor had no response.  None.  There is no dispute that

11  those end product limitations are met, and there's no

12  serious dispute that Vicor's accused bus converters are

13  always used in those end products.  Again, Dr. Dickens gave

14  you all that evidence.  And we heard nothing from Vicor on

15  that.

16       The second question is:  Do Vicor's accused bus

17  converters meet all of the bus converter limitations?

18       And there are a few disputes there, but it's just

19  about two requirements, what you heard called "in sync" and

20  what you heard called "short transitions."  And I'm going

21  to talk about both.

22       On in sync, Vicor's defense evaporated at trial.

23  It disappeared.

24       Dr. Dickens provided you with the waveforms that

25  you see here.  He explained how the limitation is met in

1    all of Vicor's accused bus converters under the Court's

2    construction of what that means.  He tested many

3    converters, and the waveforms were very consistent, as he

4    explained to you.

5            What about Dr. Habetler?  He didn't dispute the

6    showing at all.  He presented no technical presentation

7    whatsoever on this.  Instead, he told you that it is

8    SynQor's burden to show the in synchronization requirement

9    has been met.

10           Well, SynQor more than met that burden, and

11   Dr. Habetler completely punted on the issue.  This

12   non-infringement defense should never have been raised in

13   the first place.

14           So let's now talk about short transitions.  There

15   are two issues here.

16           First is the question of whether three parts -- I

17   know it's hard to keep these part numbers in your head, but

18   you've heard them referred to as the VIZ0002, the 2C, and

19   the 0014.  These are all BCMs.

20           And the first question is whether those three

21   parts were fairly represented by a part that both parties

22   agree has transitions that are less than 20 percent.

23           If so, these parts would literally satisfy the

24   short transitions requirement.  Equivalents is not even an

25   issue.

1         On that, Dr. Dickens's testimony was, again,

2    unrebutted.  Dr. Habetler has no opinion on the

3    representativeness of the part.  He was asked that.  No

4    opinion.

5         And the part SynQor's experts tested used the same

6    components and schematic as used by those three parts.  The

7    only difference, as Dr. Dickens explained, was the

8    underfill glue.  And both parties agree that underfill glue

9    does not affect transition times.

10        SynQor's measurement was 17.52 percent for this

11   representative product.  Vicor's expert measured that same

12   bus converter, and he came up with transition times that

13   were even shorter.  Both are indisputably short transitions

14   under the Court's claim construction.

15        And, in fact, this is undisputed, Vicor stipulated

16   to all of SynQor's calculated transition times except for

17   the three parts we've heard so much about.  It didn't

18   dispute the time for this representative product, only

19   whether it was representative.

20        And based on these measurements and the

21   commonality of the schematics and components, Dr. Dickens

22   concluded that the VIZ0002, 2C, and 0014 bus converters

23   would have the same measurements.

24        And he told you he was confident in this.  SynQor

25   thought that that would be the end of it since Dr. Habetler

1    did not contest representativeness.

2            But, at trial, Vicor's attorneys tried to make

3    something out of the fact that SynQor would not pay $18,000

4    to have Vicor specially make a VIZ0002 product for SynQor

5    to measure.  Vicor said it was SynQor's burden to do more

6    testing.

7            That is not the law.  It is SynQor's burden to

8    present evidence that makes it more likely than not that

9    these three bus converters, the VIZ0002, 2C, and 014, based

10   on all the evidence that you've heard, had transition times

11   beneath 20 percent.

12           And the evidence here also included

13   Dr. Vinciarelli's testimony on cross-examination, which you

14   can see on the screen.  He said that the Vicor BCM products

15   that were sold prior to his 2011 deposition had rise and

16   fall times that are typically less than 20 percent of the

17   overall switching cycle.

18           And that's short, under the Court's claim

19   construction.

20           The VIZ002 -- 0002, 2C, and 0014 bus converters,

21   they were all sold as of the time that Dr. Vinciarelli gave

22   that testimony.

23           But when Vicor's attorneys pressed Dr. Dickens on

24   why SynQor would not just pay Vicor $18,000 for yet -- for

25   another part to measure, Dr. Dickens explained that he

1   would not pay that kind of money for the part because

2   SynQor already had an identical one.

3          And consider also this, this part was

4   discontinued, as you heard.  SynQor couldn't know to what

5   extent any of the components that Vicor would use to make

6   one would be new, and you heard that different components

7   can affect things like transition times.

8          So the best measurement -- or the best evidence of

9   what the result would be was the identical part that SynQor

10  already had, same components, same circuit diagram, and the

11  one that both parties' experts had measured and the one

12  that was agreed to be representative, or at least there was

13  no dispute from Dr. Habetler that it was representative.

14         Given all this evidence, it is certainly more

15  likely than not that all three of these parts that we've

16  heard so much about have short transitions, literally have

17  short transitions, under 20 percent, just as

18  Dr. Vinciarelli's testimony indicated.  They all literally

19  infringe.

20         And that brings me to the second short transitions

21  question.  Do the accused IBCs and some of the BCMs that

22  have transitions between 20 percent and around 27 percent,

23  do they infringe under what you were told is the Doctrine

24  of Equivalents?

25         As Dr. Vinciarelli indicated at trial, he

1  increased the transition times in some of Vicor's products.

2  But after learning that, SynQor advised Vicor that they

3  still infringe under the Doctrine of Equivalents.

4       Let's talk about what the law is on this before

5  we -- I walk through the evidence.

6       Remember how Mr. Pak during his opening told you

7  that there was a fence, and once that fence is put up, the

8  patent holder can -- cannot prevent anything beyond the

9  fence.

10       Well, as you just heard, that is not the law.  It

11  ignores the Doctrine of Equivalents and what that doctrine

12  allows a patentee to protect, beyond the fence.

13       Remember, also, how on cross-examination of

14  Dr. Schlecht, Vicor's counsel suggested that if you were in

15  school and a teacher says that you have the numbers 5, 7,

16  and 26, and you're supposed to pick a number under 20, then

17  26 would be a wrong answer.

18       But this isn't an arithmetic class in elementary

19  school.  Judge Schroeder wouldn't be instructing you about

20  the Doctrine of Equivalents if there was no number above

21  20 percent that could be equivalent for purposes of the

22  short transitions limitation.

23       This is not about numbers in the abstract.  It's

24  also about waveforms, it's technical, as Dr. Dickens

25  explained, both times that he testified.

1            And let's take a look at what the Court just told

2    you about the Doctrine of Equivalents.

3            As Dr. Dickens explained during his direct, the

4    first test is whether the difference would be

5    insubstantial.

6            The second test is whether the bus converter

7    performs substantially the same function in substantially

8    the same way to achieve substantially the same result.

9            You only have to meet one of these two tests, but

10   Dr. Dickens, he explained to you that both are met.  The

11   entire purpose of the Doctrine of Equivalents is to prevent

12   someone from avoiding infringement by making an

13   insubstantial change that gets them just outside of that

14   fence or that gets them just above the number that is

15   provided.

16           And that's what happened here.  As I just said,

17   equivalents is not just a matter of numbers, it's a matter

18   of waveforms.

19           Recall when I cross-examined Dr. Vinciarelli, he

20   acknowledged that square wave converters have short

21   transitions.  You can see that on the screen.

22           And then recall also when I presented

23   Dr. Vinciarelli with his deposition testimony, where he

24   acknowledged that the waveform of Vicor's primary winding

25   is substantially a square wave.  We saw that again

1    yesterday.

2          And now let's take a look at why Dr. Vinciarelli

3    had to acknowledge that his bus converters have these

4    square waves.

5          Yesterday, Dr. Dickens showed you a second time

6    the waveform of Vicor's accused converters.  The one on the

7    right, that one literally infringes because the transition

8    time is 17 percent.  The one on the left is one where the

9    transitions were increased to around 27 percent.

10         As Dr. Dickens explained, both of these have

11   square waves.  You can see the shape yourself.  And they

12   both look remarkably similar.

13         Remember, Dr. Vinciarelli told us the square wave

14   converters inherently have short transitions.  Well, these

15   two have square waves.  They, thus, have short transitions.

16   The first literally infringes, and the second infringes

17   because it is equivalent.

18         That's not all.  Dr. Dickens further explained

19   that the ones with 20 to 27 percent transitions, they also

20   meet the function-way-result test, as we can see on

21   Dr. Dickens's slide.

22         Vicor wants you to ignore all this because it says

23   its converters implement what you heard was zero-voltage

24   switching.

25         But how can that be a get-out-of-jail card when

1    some of his bus converters literally have short

2    transitions?  That necessarily means that zero-voltage

3    switching does not tell you one way or the other whether

4    the converters literally or equivalently have short

5    transitions.

6         Moreover, Dr. Habetler acknowledged on

7    cross-examination that Vicor's bus converters do not

8    perfectly implement zero-current switching.  They come

9    close.  But they still have some switching losses, which he

10   said were insignificant.

11        As Dr. Dickens went on to explain, though, short

12   transitions do limit these switching losses even further,

13   and this is part of the reason that Vicor did not make its

14   transitions much longer than the 27 percent point.

15        So all of the end products incorporating Vicor's

16   accused bus converters, they all directly infringe, some

17   literally and others by equivalents.

18        And that's really the technical issues involving

19   infringement here.

20        As you heard, Vicor isn't accused of direct

21   infringement; it is accused of inducing and contributing to

22   the infringement of its customers.

23        As I mentioned during my opening, Vicor could, in

24   theory, get off the hook if it had a reasonable and a

25   good-faith belief that it was not infringing SynQor's

 1    patents at the time it was making its sales.  But Vicor has

 2    failed to demonstrate that here.  In fact, the evidence

 3    shows exactly the opposite.

 4         The evidence shows that Vicor willfully blinded

 5    itself to a high probability that it was infringing

 6    SynQor's patents.  Let's take a look at that evidence.

 7         We saw PTX-1198, that's on the screen now, at

 8    trial several times.  It is the email that Vicor wildly

 9    circulated one day after SynQor filed its prior patent

10    infringement suit in November of 2007.  And this states

11    that SynQor had charged several of its competitors with

12    infringement.

13         And the announcement specifically identified

14    SynQor's '190 patent, one of the two patents here.  Despite

15    its wide circulation, including to Vicor's VP of marketing

16    and VP of sales, Vicor said, to all of you, that it did not

17    as much as look at SynQor's patents for three or more

18    years.

19         And you heard from Dr. Vinciarelli why that was

20    the case.  Vicor has no procedure for clearing new

21    products, no procedure to make sure that Vicor's products

22    don't infringe someone else's patents before introducing

23    those products.  And you also heard why that's the case.

24         As I noted earlier, and you can see again on the

25    screen, Dr. Vinciarelli and Vicor just think that they're

1    above the patent system, at least when it comes to other

2    people's patents.  They think their products are so

3    advanced that they don't even need to look at anyone's

4    patent claims, including SynQor's here.

5         This is also presumably why they did not come

6    forward with an opinion of counsel that they relied on.

7    Why get an opinion from an expert on patent law when you

8    think that you're above the patent system?

9         And that brings me to an important instruction

10   that you receive from Judge Schroeder, it's on willful

11   blindness.

12        Here's what he told you:  When considering whether

13   Vicor knew or was willfully blind to a high probability

14   that the induced actions would constitute infringement, you

15   should consider the totality of the circumstances,

16   including whether Vicor is relying on the advice of a

17   competent lawyer.

18        As you can now -- if we move to the next slide.

19        As you can now see on the screen, Dr. Vinciarelli

20   knows that the claims of a patent are what define the scope

21   of one's patent, the metes and bounds of the invention.

22        But despite nearly 30 employees, 30 Vicor

23   employees, including two vice presidents, knowing back in

24   November of 2007 of SynQor's lawsuit against 11 different

25   bus converter suppliers, which was said to involve the

1 assertion of the '190 patent, Vicor claims it did not as

2 much as look at the patent for three years.

3        And then Dr. Vinciarelli tells us he had no need

4 for a claim analysis or the advice of a patent attorney.

5 Vicor blinded itself to a known risk.

6        As I said before, for Vicor, these opportunities

7 to build business with important customers was just too

8 valuable to pass up.

9        The last part of inducement is really simple.  Did

10 Vicor intend to cause the acts that resulted in

11 infringement?

12        Of course, they did.  Vicor sold its bus

13 converters to Cisco, IBM, and other customers knowing and

14 intending that they would be used in IBA.

15        Let's look at the evidence on that.

16        Vicor says that customers can do what they want

17 with Vicor's products and that Vicor promotes FPA, not IBA.

18 But customers use these accused bus converters, the ones

19 before you, where the parts are qualified to be used.  And

20 Vicor knew they were qualified for use in IBA systems when

21 it sold BCMs to IBM and when it sold IBCs to Cisco and

22 other customers.

23        The evidence is really clear on that.

24        You did not hear of IBM qualifying the BCMs for

25 anything else.  Rather, as Mr. Covi testified, each and

1   every BCM was used by IBM in an IBA system.  It's right on

2   the screen.

3          And when the bus converters were qualified for use

4   in an IBA system, that is where they are used.  Vicor knows

5   that, and it encourages that.  And the same is true of the

6   IBCs.

7          Let's look at some of the testimony you saw from

8   Mr. Marchetti on that.

9          He acknowledged, when discussing some of Vicor's

10  bus converters, that they are intended to be used in an IBA

11  architecture.  As he said here, that's where you logically

12  use something like that.

13         And that's not all.  Vicor encourages, promotes,

14  and instructs the infringing uses of its bus converters.

15  It publishes application notes and data sheets, among other

16  things.

17         Let's now take a look at the testimony of Vicor's

18  corporate representative on this issue, Mr. Yeaman.  You

19  saw his videotaped testimony.  Let me just read what he

20  says here.

21         Question:  Does Vicor advertise, instruct, or any

22  way encourage its customers to use its bus converters in

23  IBA?

24         Answer:  Yes.

25         This is an admission that Vicor induced the acts

1    that resulted in infringement.  There can be no real

2    dispute about that.  This was Vicor's corporate

3    representative on this issue.  And that's all you need to

4    consider to determine that Vicor has induced infringement.

5         Now, for contributory infringement, there are

6    somewhat different requirements that you need to consider.

7    And it's important to keep in mind that SynQor is only

8    accusing Vicor of contributory infringement for its

9    high-voltage BCMs and its IBCs, not the low-voltage IBCs.

10        That's not included in part of Mr. Reed's damage

11   calculation for foreign sales, as you'll hear.

12        For contributory infringement, you have to

13   consider whether Vicor's bus converters are a material or

14   substantial component in the directly infringing IBA

15   systems.

16        As you learned, the bus converter is

17   unquestionably a material or substantial component in the

18   infringing IBA systems.  They provide the isolation

19   function.  All of the load power passes through them.

20        And the next question is whether the high-voltage

21   BCMs and the IBCs have substantial non-infringing uses.

22        You heard that term thrown around a lot, but I

23   want to walk you -- through the evidence with you on that

24   so you don't get confused.

25        Vicor first argued that IBM had a substantial

1    non-infringing use for high-voltage BCMs with the Yeaman

2    topology.  But Mr. Covi testified that all of the accused

3    high-voltage BCMs were used, every one of them, in IBA

4    systems.  And, obviously, IBM should know better than

5    anyone how it used these BCMs.

6            Vicor also tries to confuse things by injecting a

7    different part, a 350-volt converter that puts out 44 volts

8    instead of 11 or 12, like the accused ones.  And that's a

9    part that IBM used in its factorized power implementation,

10   in its next-generation Power 7 product.

11           But, again, as Mr. Covi explained, IBM used all of

12   Vicor's 350 to 11 or 12-volt BCMs in an IBA arrangement.

13   And those are the accused bus converters, not the 350 to 44

14   volt converters.

15           There were no different uses for the high-voltage

16   BCMs that are accused in this case.

17           Now, Vicor also said its accused bus converters

18   were used in what was referred to as a MicroPAC

19   application.  You heard that name.

20           So we asked Vicor's corporate representative,

21   Mr. Yeaman, about that.  And you saw his video testimony.

22   He had zero knowledge on this supposed use, as you can see

23   on the screen.  And the alleged use was small anyway, just

24   a few hundred sales.

25           He was Vicor's corporate representative on this

1   subject.

2           Now, at trial, Dr. Habetler also referenced the

3   NYC Transit and Raytheon applications, as if those

4   mattered, but then he conceded on cross-examination that

5   these weren't high-voltage BCMs or IBCs.

6           They, therefore, are irrelevant to the

7   contributory infringement issue that you need to decide.

8   They can't be a contributory -- they can't be a

9   non-infringing alternative for these converters, not for

10  the high-voltage BCMs and not for the IBCs.

11          And, finally, Dr. Habetler showed you a data

12  sheet, as if to suggest that that data sheet alone tells

13  you how the customers use the BCMs or the IBCs.

14          But when you qualify a part for a customer, you

15  know how it's used.  Merely putting a potential use on a

16  data sheet, that doesn't mean it has been used that way,

17  and it certainly doesn't tell you that anyone who used it

18  that way did so in a substantial way.

19          And we know they were not used that way because

20  Mr. Covi told us that.  Again, he said that all of the

21  high-voltage BCMs were used by IBM in an IBA system, and we

22  know the same for the IBCs because they were drop-in

23  replacements for the product found to infringe -- the

24  products found to infringe in the last lawsuit.  That means

25  that Vicor contributorily infringes SynQor's patents.

1          So, in summary, when you're answering the first

2   infringement question on the verdict form, the answer is,

3   yes, Vicor induces and contributes to the infringements

4   that occurred.

5          When you answer the second question on the verdict

6   form, the answer is also, yes, Vicor is liable for

7   infringing the asserted claims by supplying high-voltage

8   BCMs and IBCs from the United States for combination

9   outside the United States into the customers' directly

10  infringing IBA systems.

11         As you already heard, Vicor's high-voltage BCMs

12  and IBCs, they have no substantial non-infringing use.  And

13  Vicor knew it.  And Vicor intended that those BCMs and IBCs

14  would be combined outside the United States into infringing

15  IBA systems.  That is why you should check "yes."

16         Now, that brings me to the third question you'll

17  have to answer, whether Claim 2 of the '190 patent is

18  valid.

19         We saw at trial that Vicor presented a

20  half-hearted invalidity defense.  This case has two claims

21  of the '702 patent and one claim of the '190 patent.  All

22  these claims, as you were told, are directed at the use of

23  unregulated bus converters with particular characteristics

24  in an IBA system.

25         And Vicor did not even argue that the prior art

1    invalidates the two claims of SynQor's '702 patent.  Those

2    claims are valid, indisputably so.

3         But Vicor did not want to concede the same for

4    Claim 2 of the '190 patent.  Its entire argument, though,

5    is based on improper hindsight, and you'll read the

6    instruction, and it talks about avoiding hindsight.

7         When Dr. Schlecht presented his bus converters and

8    IBA ideas to Cisco, HP, and other companies in 2000,

9    companies with highly trained engineers schooled in power

10   electronics, the approach was new to them.  And they were

11   initially skeptical, as you heard.  There was nothing

12   obvious about what Dr. Schlecht taught the industry and

13   claimed in his IBA patents.

14        Ignoring what happened in the real world, Vicor

15   tried to tell a fictitious hindsight tale that IBA was

16   invented by Dr. Steigerwald and not by Dr. Schlecht.

17        And, as I mentioned earlier, despite promising

18   that they would present video testimony from

19   Dr. Steigerwald, Vicor did not do so.

20        We only needed to ask Dr. Giesselmann one question

21   on cross-examination.  His position, as he acknowledged,

22   was contrary to what Vicor itself has said to the Patent

23   Office about this patent claim.  Dr. Schlecht and

24   Dr. Dickens both explained why one of skill would not have

25   made the fundamental changes to the Steigerwald system that

1    Vicor said one would make.

2            There is nothing obvious about Claim 2 of the '190

3    patent, so you should answer this question "no."

4            That brings me to the last question you will need

5    to answer before getting to damages, and that question is:

6    Was Vicor's infringement willful?

7            Well, it was.  You should answer this question

8    "yes."

9            After the Court entered an injunction in the last

10   patent infringement suit, Vicor jumped in, to appropriate

11   for its own gain, the market opportunity that SynQor worked

12   so hard to create.

13           But, also, numerous Vicor employees, including two

14   vice presidents, knew in November of 2007 that SynQor was

15   suing 11 other bus converter suppliers and asserting the

16   '190 patent.

17           You would think Vicor would at least look at

18   SynQor's patents.  But, as we can see again,

19   Dr. Vinciarelli thinks he is above worrying about other

20   people's patents.  No reason for him to do a claim

21   analysis.

22           Vicor blinded itself to a known risk.  That is

23   willful infringement.

24           Now, at this point, I'm going to hand things over

25   to the very capable Ms. Koh, who will discuss damages with

1   you.

2        I look forward to talking to you again during the

3   rebuttal.

4        Thank you.

5        MS. KOH:  Good afternoon, ladies and gentlemen.

6   It's my honor to be able to address you on behalf of SynQor

7   on the question of damages in this case.

8        If we could turn to the next slide.

9        This is the damages question you'll be asked to

10  answer on the verdict form.  And, unfortunately, because

11  the patents have expired, SynQor cannot regain the market

12  that it created.  But you were instructed that if you find

13  Vicor liable for infringement, the minimum compensation

14  that a patent holder like SynQor should recover is a

15  reasonable royalty.

16       Remember, a royalty is determined by taking a

17  reasonable rate and multiplying it by the number of accused

18  products that Vicor sold to the seven customers at issue

19  here during the damages period.

20       And Mr. Reed told you exactly how to determine

21  that reasonable royalty.  Depending on the product, he

22  explained you take either $60 or $80 and you multiply it by

23  the number of applicable units.

24       And this is done by applying the facts to a

25  concept called the "hypothetical negotiation."  You've

1    heard a lot about that here.

2         And this simply means, assuming infringement and

3    validity, what a reasonable royalty -- what reasonable

4    royalty would the parties have negotiated had they sat down

5    and worked out a deal, aided by knowledge of key future

6    events.

7         And here was the evidence.  Let's take a look.

8         Through licenses, settlements, or Court decisions,

9    the patented IBA technology has resulted in payments of

10   $150 million to SynQor.

11        The authorization license agreements done to date

12   include 16 companies who paid an average of $64 per unit to

13   SynQor for its patented technology.

14        Cisco settled its lawsuit with SynQor paying $60

15   per unit for a total of $22.25 million.

16        Other end customers, like HP, Fujitsu, and others,

17   paid similar per-unit amounts.

18        Cray paid SynQor $65 per unit for a Vicor bus

19   converter.  Vicor tried to explain that Cray deal away

20   yesterday by saying this wasn't an accused part, but that's

21   because Cray had already paid for Vicor's infringement

22   through its license with SynQor.

23        All of this evidence tells you the value of the

24   patented technology to the companies who needed it.  These

25   are all facts that SynQor and Vicor would have had at the

1    hypothetical negotiation.

2          Both Mr. Reed and Mr. Ratliff told you that future

3    events could be considered, and you can and should consider

4    these facts when determining the reasonable royalty.

5          What else did we hear?  You heard Mr. Hofmann tell

6    you that it was SynQor's licensing policy not to license

7    anyone else for less than what SynQor would expect to make

8    in profits if it had made the sales itself.  That's what

9    SynQor really wanted to be doing.

10          These are all deals that SynQor did that included

11    the actual patents at issue in this case, and the royalty

12    rates determined by Mr. Reed are consistent with the profit

13    SynQor made when it sold its own unregulated bus

14    converters.

15          What did Mr. Ratliff, Vicor's damages witness,

16    have to say?  He said, ignore all of these deals, ignore

17    all of the SynQor deals, and focus instead on deals that

18    Vicor did that are about completely different patents and

19    technology different from what's at issue in this case.

20          And what did Mr. Ratliff conclude?  He concluded

21    that the appropriate rate would be 7.5 percent.

22          You know what that works out to on even the most

23    expensive products that Vicor sold?  We did the math, and

24    it works out to about $4.50 a unit.  No one paid that in

25    the real world, and SynQor would never ever do that deal.

1           Mr. Ratliff then claimed that SynQor only got

2    these real-world rates because it had all of these

3    companies over a barrel.  You heard that.

4           This is, frankly, nonsense.  SynQor needed to

5    prove infringement and the value of its technology in

6    court, and it did that.  SynQor would have absolutely no

7    incentive to give Vicor a better deal at the hypothetical

8    negotiation than what the end customers, including Cisco

9    itself, got.

10          Vicor would be negotiating on behalf of customers,

11   like IBM and Cisco, who really needed the patented IBA

12   technology.

13          As we've seen in this case, Dr. Schlecht's

14   technology was hugely important to IBM, Cisco, and others;

15   and all SynQor wanted was its normal profit from the sale

16   of its own bus converters, 60 to $80 a converter.

17          It preferred to make the sales itself.  That's

18   what it has wanted all along.  But, at the very least, it

19   was entitled to a royalty to compensate it for the profits

20   it missed out on.  These rates are fair, based on all the

21   evidence we've seen.

22          To determine the total damages, you simply

23   multiply these reasonable rates by the total number of

24   units that Vicor sold for over a decade.  It's over 1.5

25   million units, which comes straight from Vicor's sales

1    records.

2         So when you're doing this calculation on the

3    verdict form, SynQor is asking you to award $71,292,000,

4    because it is based on a fair rate supported by the

5    real-world evidence in this case.

6         If infringers like Vicor could get away with

7    paying only a very modest amount for all the damages that

8    they have caused, as SynQor -- as Vicor would have you

9    award, why have a patent system at all?

10        Why should companies invest in research and

11   development if other companies can take patented inventions

12   for their own use and then force the patent holder, who

13   prefers to commercialize it himself to grow his business,

14   to license the invention away on terms that provide no real

15   compensation at all?

16        Juries, like you, are truly indispensable to our

17   patent system.  Only you have the power and authority to

18   compensate SynQor for the damage caused by Vicor's

19   infringement.

20        We're going to reserve the rest of our time for

21   rebuttal after Vicor presents their closing arguments, and

22   we look forward to speaking with you again shortly.

23        Thank you very much, ladies and gentlemen.

24        THE COURT:  Mr. Pak?

25        MR. PAK:  Thank you, Your Honor.  If I could just

1    have a few minutes to set up.

2              THE COURT:  Of course.

3              MR. PAK:  Thank you.

4              May I proceed, Your Honor?

5              THE COURT:  Yes.

6              MR. PAK:  Good afternoon, ladies and gentlemen of

7    the jury.

8              First of all, I'd like to thank all of you for

9    paying very close attention to all of the evidence that

10   came in.  And, as I told you, it's very important to us

11   that we have your honest opinion and feedback at the end of

12   this system.

13             Now, I want to make one thing very clear, this

14   case is not about me or any of the lawyers in the room.

15   This case is about the evidence, and it's about your job to

16   assess all of the evidence in this case and come to the

17   right conclusion.  And I'd like to commend Mr. Rein and

18   Ms. Koh for their closing arguments, as well.

19             At the beginning of the case, I told you that

20   we're here for two reasons.  We're here to clear our name

21   and protect the integrity of the work of Dr. Vinciarelli

22   and the thousand employees of Vicor who stood behind him

23   over 40 decade -- four decades of innovation.

24             We also told you that we want to protect the

25   integrity of the patent system, which is about promoting

1    science, promoting true innovation.  And every right given

2    under the Constitution, including patent rights, has limits

3    and bounds.  I'm going to ask all of you to take that into

4    consideration.

5           The other thing that I asked you to consider, as

6    you heard all the evidence, is:  Who is doing the leading

7    and who is doing the following?

8           And there is no question now, having heard all of

9    the evidence, that it's been Dr. Vinciarelli and Vicor that

10   has led the entire industry every step of the way.

11          You heard from His Honor that two of the most

12   important tools that you will use in making your decision

13   at the end of the day is common sense.  If something

14   doesn't sound right to you, it's probably not the right

15   answer.

16          Credibility of the witnesses.  What have they said

17   in the courtroom that is different than what they said

18   before?  What did they say on direct examination versus

19   what they said on cross-examination?

20          Those are very important tools that I ask all of

21   you to exercise.

22          I also want to make this very clear, I'm not going

23   to be filling out any boxes here today for you.  I'm just

24   here to guide you through the evidence, ask you to consider

25   some of the important instructions from His Honor.  We

1    trust you to make the right decisions, and that's why

2    you're here.

3           We've been waiting for a long time for this day to

4    have jurors like you make a declaration that we do not

5    infringe the SynQor patent claims.

6           You heard some about the 497 case.  You heard a

7    lot about it during this trial.  I just want to say a few

8    words about that.

9           This case is not about knock-off products from

10   companies that were following SynQor.  This case is about

11   Vicor and its patented technology that was 6 times,

12   sometimes 10 times, better than anything that SynQor could

13   produce.

14          Whatever that jury decided is not the issue before

15   you, ladies and gentlemen of the jury.  We're asking you to

16   consider all of the evidence, all of the arguments, and

17   make a decision for all of us here today.  That's why we're

18   here.

19          If you remember, I quoted Mr. Robert Frost at the

20   beginning of my opening statement, and I think this

21   metaphor still holds true today after hearing all of the

22   evidence:  Two roads diverge in a wood, and I took the one

23   less traveled by.

24          And that has been the story of Dr. Vinciarelli all

25   along.  He and his company developed ground-breaking

1  technology that many thought was impossible to eliminate

2  switching losses, not just reduce them, but virtually

3  eliminate them, allowing them to go faster and smaller,

4  even to this day, than any other competing products.

5         And I want to make something very clear to you,

6  this is from the jury instruction at Page 14, you will find

7  this.  His Honor told you that the comparison of the

8  accused products to SynQor's -- comparison of the accused

9  products to SynQor's products or to the Vicor patents may,

10 however, be relevant to issues concerning Vicor's intent to

11 infringe.

12         That's very important, because, as you've heard,

13 none of our products actually has all of the elements of

14 any claim.  This is not a direct infringement case against

15 Vicor.  This is a case about whether Vicor and

16 Dr. Vinciarelli intended others, intended others to build

17 infringing designs.

18         Intent is going to be a core element of every one

19 of the questions you will have to decide on liability.  You

20 heard it from His Honor.  I'm going to walk you through

21 some of those instructions.

22         So all of this evidence that you've heard about

23 Vicor's patents about the relative superiority of our

24 products, is highly relevant to the issue of whether

25 Dr. Vinciarelli intended to copy or use SynQor's patents.

1   And if he didn't, that means there was no intent.

2          And at the end of the day, it is SynQor's burden

3   to prove intent, and I don't think you've heard anything to

4   dissuade you otherwise.

5          Just on that one point, I think you heard just now

6   that somehow if there was no intent, Vicor would get off

7   the hook.  I think what was meant by that is this issue,

8   that intent is very, very important to questions of

9   infringement before all of you, as you think about the

10  verdict form.

11         So what evidence have we seen?  What evidence that

12  is not even disputed that all of the accused products come

13  from our patented SAC, Sine Amplitude Conversion (sic),

14  technology, that was so ground-breaking that it won the

15  Product of the Year when it was released, and it allowed

16  Dr. Vinciarelli to be inducted into the Hall of Fame and

17  receive the new award.

18         This was a hard path.  It took hundreds of

19  engineers years of research and development to accomplish

20  this, and no one else had.  And that's the reason why this

21  is relevant to this case.  Common sense tells you if you

22  have far superior technology, why would you look backwards

23  and try to use someone else's patents or try to copy

24  someone else's technology?

25         It doesn't add up.

1          We saw proof that has never been disputed that

2   Vicor's patented technology, their Sine Amplitude

3   Conversion (sic) technology, allowed Vicor's products to be

4   far superior than anything that SynQor ever built.

5          In fact, when Dr. Habetler did an apple-to-apple

6   comparison in 2014, what did he find and present to you?

7   Six times better in power density.

8          That's what customers care about, how much power

9   can you deliver in what form factor.  Six times better.

10  That tells you, again, why would Vicor copy a technology

11  that is six times worse, six times worse?

12          You also heard from Dr. Dickens, admit to you,

13  when Dr. Vinciarelli received his award and also when he

14  received these patents, the SynQor patent -- the original

15  SynQor patents, that Dr. Schlecht wrote to describe his

16  invention was before the Patent Office.

17          The Patent Office had a chance to consider

18  SynQor's patented technology and compare it to Vicor's, and

19  they still issued Vicor its numerous patents on the Sine

20  Amplitude Conversion (sic) technology.

21          And not only that, you heard evidence from

22  Mr. Covi that the reason why they were buying the VI Chips

23  back in 2004 all the way through 2014 was because of the

24  significant power density in Vicor's products through the

25  use of its patented technology.

1        So, again, we have customers telling us this

2   technology is ground-breaking.  This is the reason why we

3   are buying chips.

4        One thing you've heard a little bit about in the

5   closing statements was IBA.  And, just to be clear, we have

6   testimony from Dr. Schlecht, you heard him testify over and

7   over again that the concept of intermediate bus

8   architecture, all the limitations in the claims that talk

9   about having an intermediate voltage from a high voltage

10  and providing it through regulation stages, was not new.

11  It had been described in Steigerwald's patents long before

12  SynQor filed its patents.

13       That technology does not belong to SynQor.  So

14  whether we intended our products to be used in IBA or not,

15  has no bearing on whether we intended to infringe their

16  patents.

17       IBA is old.  IBA cannot be patented by SynQor, and

18  it was not the basis for why they claim that their

19  invention is new.

20       That's a hard road we took.  What evidence have we

21  seen from SynQor on the path they took?

22       My partner, Mr. Nelson, is going to talk to you a

23  lot more about the prior art side of the case, but the only

24  thing I'll say here is that everything that has been grayed

25  out by stipulation, by stipulation has been found to be in

1  the Steigerwald reference, which means that the only thing

2  that SynQor can claim new is this short transitions time

3  limitation.

4        Now, you'll hear from Mr. Nelson that that is also

5  in the prior art and would have been obvious to do so.  But

6  where it's missing is in virtually all of the products

7  through the stipulations you saw.  Virtually all of the

8  products have transition times that are greater than

9  20 percent, not less.

10        In other ways, we see SynQor taking the easy road

11  here.  How?  We heard Dr. Habetler talk about the benefits

12  of SynQor's claimed invention as stated in their patent,

13  which was to use his cross-coupling architecture that

14  eliminated the need to have sophisticated controllers to

15  decide when to turn on and to turn off these transistors.

16        That is exactly what Dr. Vinciarelli focused his

17  invention on, how do you create more sophisticated

18  controllers that can turn the transistors on and off when

19  there are no power losses.

20        Instead, what we see in their patent is, we're

21  going to make these transition times smaller.  Why?

22  Because they can't eliminate all the switching losses, but

23  we can try to minimize it or reduce it to lower the impact

24  on efficiency.

25        So, just to make it clear, they got rid of the

1    secondary controller in their examples in the patent.  Why?

2    Because it was too complex to build.  And, instead, they're

3    relying on these short transitions in order to reduce, but

4    not eliminate, switching losses.

5         What did the evidence illustrate to us?  That the

6    easy road of getting rid of these secondary controllers

7    ultimately didn't pan out for SynQor.

8         And we can see it in their own files.  This is

9    SynQor's Steve Mathis, SynQor regional sales manager, in

10   2004, just after we had come out with our VI Chip

11   technology using SAC.

12        And what did he say in that email?  He said, we're

13   very concerned about the VI Chip.  Were they concerned

14   because they were infringing SynQor's patents?  No, they

15   were very concerned because Vicor's technology was far

16   superior.  And it's exactly what the customers wanted.  And

17   he was concerned because they were about to lose two sales,

18   two sales.

19        So, again, sometimes the best evidence in the

20   courtroom is what people said and wrote before they ended

21   up testifying here, and that's exactly the kind of evidence

22   that we presented to you.

23        Now, Mr. Rein talked about the integrity of the

24   patent system.  We absolutely agree.  I told you that is

25   the reason why we're here.

1        Remember, the Constitution provides the patent

2   system to promote science.  To promote science.  Not to

3   block other people's innovations.  It is to promote science

4   by patenting the inventions that you have.

5        THE COURT:  Mr. Pak, when you get to a good

6   stopping place --

7        MR. PAK:  Sure.

8        THE COURT:  -- we just need to take a short break.

9        MR. PAK:  Oh, sure.  I think I can pause right

10  here.  This will be fine.

11        THE COURT:  Is now good?

12        MR. PAK:  Yes, Your Honor.

13        THE COURT:  Okay.  Ladies and gentlemen, we'll be

14  in recess about 10 minutes.

15        COURT SECURITY OFFICER:  All rise.

16        (Jury out.)

17        THE COURT:  My apologies, Mr. Pak.  I got passed a

18  note that one of the jurors needed to use the restroom.

19        MR. PAK:  Absolutely, Your Honor.  No problem.

20        THE COURT:  All right.  We'll resume in just a

21  minute.

22        (Recess.)

23        (Jury out.)

24        COURT SECURITY OFFICER:  All rise.

25        THE COURT:  All right.  Mr. Mitchell, if you would

1925

```
 1    have the jury brought up.
 2              (Jury in.)
 3              THE COURT:  Please be seated.
 4              Mr. Pak, you may continue.
 5              MR. PAK:  Thank you, Your Honor.
 6              So we were talking about respect for intellectual
 7    property of others.  To have respect, as Mr. Rein mentioned
 8    to you, for other people's patents and the contributions
 9    that they made to science.
10              And we saw some disturbing things in the fall of
11    1997 in a business plan authored by Dr. Schlecht.  And this
12    is DTX-93.  So I'll have some exhibit numbers.  These are
13    all exhibits going back to you.
14              He not only stated that SynQor has detailed
15    knowledge about the technical design of competitors, their
16    revenues, and patent positions; but he says:  On
17    intellectual property -- the very first sentence -- besides
18    patenting its own inventive creations, SynQor will keep
19    abreast of its competitors' inventive work, inventive work,
20    and develop blocking patents where possible.
21              So this is Dr. Schlecht's business plan saying not
22    only are we going to patent our inventions, we're going to
23    try to develop blocking patents to cover and block other
24    people's inventions, inventions such as the Sine Amplitude
25    Converter technology that Dr. Vinciarelli invented and
```

1926

1    patented.

2         And we'll go through this a lot more in detail,

3    but that is the reason why they're asking you to move the

4    fence and to capture what they told the world is not their

5    invention.

6         Less than 20 percent is not the same as 20 percent

7    or more.

8         To make this very clear, the reason why we're

9    talking about intent is this is an indirect infringement

10   case.  It means, everything in blue here, Vicor does not

11   sell for the accused applications.

12        All of that in blue, including a DC power source,

13   two or more non-isolating regulation switches or stages,

14   which are switching regulators, all of that is done by the

15   customers at their choice.  The customers decide how to

16   take our bus converters and put it into any configuration

17   that they like.  We don't tell customers how to build their

18   products.

19        And we saw evidence of that.  You saw the Lego

20   building block ad that Vicor ran many years ago talking

21   about we provide components for your solutions, for your

22   solutions, for solutions that IBM, Ciscos in the world

23   decide on their own to make.

24        Dr. Habetler provided you with numerous examples,

25   numerous examples when you directly tie the bus converter

1    to the load, or use just one regulation stage instead of

2    two more, as well as the FPA architecture.  All of these

3    things are possible choices that customers can make.

4            And he presented you with technical evidence of,

5    not only how they work, but the fact that customers have

6    actually purchased those types of converters for those

7    types of applications.

8            And please don't be confused.  This is not whether

9    the end customers have non-infringing uses.  It's whether

10   our bus converters have substantial non-infringing uses.

11           And it's SynQor's burden to prove that there are

12   no substantial non-infringing uses.  And we think the

13   evidence shows that, in fact, there are many non-infringing

14   uses.  And all of these things that Dr. Habetler went

15   through are applications that even SynQor is not accusing

16   in this case.

17           Now, going back to the 497 case, after that case

18   resolved and impacted the customers, what did the customers

19   come to Vicor looking for?  They were looking for a

20   non-infringing solution, a better non-infringing solution.

21   You saw emails from Cisco to that effect.

22           You heard Dr. Vinciarelli's testimony that he

23   collected technical information to share with those

24   customers to assure them that his solutions do not

25   infringe.

1    And, in fact, when he did the testing and looked

2  at products that had transition times of 25 percent or

3  more, which he ensured for everything that was being sold

4  to Cisco at the time, it actually improved the efficiency,

5  he understood what the SynQor patents were about, and he

6  took action to ensure that his products do not infringe.

7    That is the opposite of willful blindness that

8  Mr. Rein talked to you about.  Willful blindness is putting

9  your head in the sand and not taking any action to

10  eliminate risk.

11    Here, Dr. Vinciarelli did the opposite.  He

12  collected technical evidence.  He compared what he knew

13  about his products to the SynQor patents, and explained

14  clearly to Cisco and every other customer that was

15  interested, we have a non-infringing solution based on our

16  own patented technology, which proves that he had a

17  good-faith and well-rounded, well-supported belief of

18  non-infringement.

19    And if that is true, ladies and gentlemen, that

20  means there was no intent to build infringing devices,

21  which is a critical element of every question of

22  infringement that you'll be asked to decide.

23    And Dr. Dickens admitted that.  When he showed you

24  all these data sheets, the competitive analysis, all the

25  things that you heard about during his original part of the

1   presentation, when I asked him on cross-examination, he

2   said:  I have no specific evidence, no specific evidence of

3   intent to infringe.

4           All those things were competitive benchmarking,

5   looking at how other companies provide their products to

6   benchmark Vicor's products and ensure that we were better.

7   No specific evidence of intent or infringement.

8           Why?  For all the reasons you've heard about,

9   Dr. Vinciarelli invented zero-voltage and zero-current

10  switching, which eliminated all switching losses.  He

11  obtained many patents.  We've shown you the '186 patent

12  that specifically covers his inventions long before the 497

13  was even filed.

14          In fact, the entire industry understood this.  You

15  saw all of the evidence, not only the electronic products

16  of the year, but his induction into the Hall of Fame.  The

17  entire industry understood that his technology was

18  different, it was different than anything that existed

19  before it, including what was being described in SynQor's

20  patents.

21          And Dr. Schlecht admitted that.  He said that

22  Vicor innovates.

23          So, again, I ask you to consider who is the true

24  innovator in the courtroom?  Who is doing the leading, and

25  who is doing the following?

1             And Dr. Schlecht admitted to you that there is

2    admiration here, that he agrees Vicor innovates and

3    continues to this day.

4             I had Dr. Vinciarelli sit right there and look you

5    in the eye after considering all of the evidence, he's been

6    here throughout the whole trial, and I asked you to -- I

7    asked him to tell you point blank whether he had any intent

8    to infringe any of these specific asserted claims from

9    SynQor.

10            And he told you that will be nonsense because --

11   not because he didn't respect their intellectual property,

12   but because he understands what those claims are about.

13   And he knew that they were about setting these short

14   transitions and using an in synchronization technology to

15   reduce, but not eliminate, switching losses.  And he told

16   you that his technology was far, far ahead and different.

17            And as you heard from His Honor's instruction, you

18   don't need written counsel's opinion; you don't need a

19   letter from a lawyer.

20            If you have somebody with Dr. Vinciarelli's

21   experience and he can collect technical information to

22   confirm his belief of non-infringement, which he shared

23   with Cisco's and the other customers, that is sufficient to

24   establish good-faith belief of non-infringement.  That's

25   exactly what the record shows here.

1           And Dr. Dickens confirmed that, that nothing that

2   he looked at provided any type of evidence of specific

3   intent to infringe with respect to competitive analysis,

4   the reverse engineering, the data sheets, all of that that

5   you heard so much about during his direct examination.

6           So on this question of intent, I want to focus on

7   Question No. 1, which is the first question that you'll be

8   asked to decide, which is on induced or contributory

9   infringement.  And you can see that there'll be claims

10  listed for the two patents at issue.

11          And the jury instruction at Page 17 will tell you

12  the legal guidance from this Court.

13          And what I want to point out here is the mere

14  knowledge of possible infringement by others does not

15  amount to infringement (sic).  SynQor must prove that Vicor

16  acted with specific intent to cause acts that constitute

17  direct infringement and must have known, must have known

18  that its actions would cause direct infringement or high

19  probability of having that type of result.

20          And you saw the opposite.  You saw Dr. Vinciarelli

21  sharing technical information based on his own

22  understanding of SynQor's patents and Vicor's products,

23  believing that he never infringed those claims and those

24  patents, and sharing that technical information with

25  customers.

1        There is nothing wrong with selling a

2   non-infringing better solution to customers where in need.

3   And that's precisely what Vicor did.

4        And if you find that, then that means that SynQor

5   has not satisfied its element of proving indirect

6   infringement either through inducement or through

7   contributory infringement, which is at Page 18 of the jury

8   instructions.

9        Furthermore, on contributory infringement, they

10  have the burden to show that these types of components had

11  no substantial non-infringing uses.  They simply can't

12  prove that.  Why?  Because off this intermediate bus, for

13  example, you could directly link it to a link -- to a load

14  or you could use just one isolation regulate --

15  non-isolating regulation stage, which means that you're

16  outside the claims.

17       And we've seen evidence presented to you of those

18  types of applications.  And at the end of the day, it's the

19  customer's choice, not Vicor's.

20       If you remember when Mr. Reed presented to you his

21  damages number, a big portion of that was foreign sales, so

22  sales that occur outside the United States.

23       And there's a specific instruction on that, as

24  well, which is on Page 19.  And you will see, that in order

25  to capture foreign sales that are happening outside the

1    United States, they have to show no substantial

2    non-infringing use, and Vicor knew that its product would

3    directly infringe the SynQor's patents.

4            So everything I presented to you and everything

5    you've considered on that point, if SynQor hasn't met the

6    burden of intent, they're not entitled to foreign sales.

7            And, finally, Vicor -- they need to show that

8    Vicor intended those combinations to occur, what they say

9    infringe, outside the United States.

10           That's purely the customer's choice whether they

11   assemble those outside the United States or inside the

12   United States.  No proof of these intent elements being

13   satisfied here.

14           Finally, just a little bit on willful

15   infringement.  That's an even higher burden that SynQor

16   would have to prove to show that our actions were willful

17   in terms of infringing their patents.

18           And His Honor has already told you at Pages 19 and

19   20, that the infringement by Vicor must be intentional.

20   You may not determine that the infringement was willful

21   just because Vicor was aware of the patent and infringed

22   it.  You must find that Vicor deliberately infringed the

23   patent.

24           And for all the reasons I shared with you and the

25   evidence you've seen, there is no evidence of willful

1    intent.

2         Mr. Nelson is going to talk to you more about the

3    damages claim in this case.  But I do want to point out

4    that they're asking for $71.2 million for money damages.

5    And I'm going to walk you through how they're trying to

6    support each slice of the $71.3 million pie, as it were.

7         So this is their reasonable royalty ask, they're

8    asking you to award $71.3 million to SynQor.

9         Now, for the three products that we've heard so

10   much about, 002, 2C, and 14, which were sold to IBM, they

11   constitute $33.7 million of that, products that were never

12   tested, that were never analyzed, no waveforms shown.

13        And what did Mr. Montminy tell you?  That those

14   products were tuned, tuned -- or, actually, the later

15   versions of the VIZ, two products were tuned to be just

16   like these and use a tuning capacitor to accomplish that.

17   And those later products for which we have test results,

18   all show transition times that were greater than 20

19   percent.

20        And so without actual waveforms, without testing

21   results, how does SynQor try to categorize these VIZ2, 2C

22   products -- 14 products to be in the category of less than

23   20 percent?

24        Well, they rely on Dr. Leeb's testing and

25   hypothesis.  Remember, Dr. Leeb never tested these parts.

1935

1          And, instead, they say Dr. Leeb grouped these

2     together because they happen to have the same bill of

3     materials, a list of parts, and the same schematics.

4          And then using that, they have now linked it to

5     another product, I'll just call it the B352 product, which

6     had no sales during the damages period.

7          So they're grouping the products that had the

8     largest amount of sales with a product that did not have

9     sales during the damages relevant period.

10          How do they do that?  Well, we will never know

11     because Dr. Leeb chose not to testify.

12          The expert that actually did the grouping, the

13     expert that actually did all of the testing, he did not

14     testify.  Voluntarily he chose not to come here.

15          So we'll never be able to know through

16     cross-examining -- cross-examination exactly why he grouped

17     it this way or what happened with respect to the testing.

18     He chose not to testify here.

19          Instead, the evidence that we did present to you

20     through the cross-examination of Dr. Dickens proved that

21     Dr. Leeb's hypothesis was wrong.  Why?  Because, remember,

22     they were saying just because you have the same bill of

23     materials, the same schematics, you would expect to have

24     the same exact transition times.

25          And what did the evidence show you?  That you have

1  two products for which they were tested, and those products

2  had transition times that were 14 percent different,

3  14 percent different, not exactly the same, despite having

4  the same bill of materials and the same schematics.

5          And Dr. Dickens told you that if the hypothesis

6  was wrong, he would have to revise it or come up with

7  something new.  But he never did that, despite the fact

8  that he had all this evidence in his possession, which

9  showed that Dr. Leeb's methodology or hypothesis was simply

10  wrong.

11          And, just to be clear, I want to remind the jury

12  what he said when he took the stand the first time.  He

13  said the reason why you say these three parts, VIZ2, 2C,

14  and 14, would have exactly the same transition time that

15  was measured for the B352F11T30 is because they have the

16  same bill of materials and the same schematics?

17          Answer:  That's part of my analysis, that's

18  correct.

19          Answer (sic):  That's what you presented to the

20  jury, correct?

21          Well, that's what I presented.  That was part of

22  my analysis.

23          So he told you when he took the stand when I was

24  asking him, that's exactly the same, down to point --

25  17.6 percent.  Exactly the same.  That's what he said the

1 first time he took the stand.

2          And when confronted with all of this evidence of

3 the methodology variations and that the hypothesis was

4 wrong, what did he say in response to Mr. Nelson's

5 questions at the end?

6          Well, there is a variation, so it's not exactly

7 the same.  In fact, that 14 percent means that there's an

8 absolutely difference of 3.4 percent.

9          And Dr. -- Mr. Nelson pointed out that if you take

10 that 17.52 percent difference -- that transition time and

11 add 3.4, that would take you beyond 20 percent, which means

12 even that product that they claim is below 17 -- below

13 20 percent, if you add this variation, you will no longer

14 be below 20 percent.

15          The hypothesis was simply wrong.  That is not

16 reliable, not scientific, it's not a valid basis to group

17 together products that were never tested when SynQor had

18 the opportunity to do that.

19          THE COURT:  Mr. Pak.

20          MR. PAK:  Yes.

21          THE COURT:  You've used 30 minutes.

22          MR. PAK:  Thank you.

23          So we talked about that big chunk of the pie,

24 33.2 million.

25          Let's talk about the remaining slice of their

1   damages ask, that is purely based on Doctrine of

2   Equivalents.

3       So they admit that none of these products infringe

4   literally the claims.  They're asking you, the jury, to

5   apply what's called "Doctrine of Equivalents."

6       But that Doctrine of Equivalents has very specific

7   requirements, and if they're not satisfied, they're not

8   entitled to move that fence.  And that constitutes

9   $37.5 million of the damages ask.

10      And, on this point, Dr. Dickens actually used a

11  function-way-result test.  The function, he said, is

12  minimizing switching losses but not eliminating them

13  completely.

14      And what do we find even in the deposition

15  transcript that Dr. Dickens relies on?  We, Vicor, don't

16  have any switching losses.  So their patent function is

17  about reducing, but not eliminating, switching losses.  Our

18  products eliminate them altogether.

19      And I asked Dr. Dickens exactly this question:

20  Having some switching loss that cannot be eliminated but

21  reducing them is different, different than not having

22  switching losses at all, correct?

23      He said:  Yes.

24      This means that his claimed function does not even

25  apply to the accused products that have no switching

 1    losses.  He admitted this.

 2           And if the function is missing, you don't even get

 3    to the rest of the Doctrine of Equivalents.

 4           Mr. Nelson also had a chance to ask Dr. Schlecht,

 5    the inventor and CEO of SynQor, this exact question.  And

 6    I'm showing you on the left what I asked Dr. Dickens.

 7           So according to the SynQor patent, you have the

 8    short transitions -- that's the only thing that we're

 9    talking about here -- relative to the on and off-state,

10    while you're switching the synchronous rectifier, you're

11    burning power.  So the reason why you have short

12    transitions is to reduce the power that is being burned or

13    wasted while you switch?

14           At first he said:  In some of the embodiments,

15    that's absolutely true.

16           And then I asked him:  That is, in fact, the

17    function of the minimizing switching losses that you're

18    talking about here in the DOE analysis?

19           And he said:  Yes, that's correct.

20           But when Mr. -- Dr. Schlecht was asked, he said:

21           Question:  So the reason why you have the short

22    transitions in terms of the relative to the on and off

23    state is, because while you're switching the synchronous

24    rectifier, you're burning power, right?

25           No, that's not the reason for the language.

1  That's not the reason for the language.

2       So Dr. Dickens used the function that Dr. Schlecht

3  says is not the reason for his invention.

4       So setting aside the fact that we don't do this

5  function, what this shows is that, under Dr. Schlecht's

6  view of his invention, Dr. Dickens just got the function

7  wrong.

8       And, again, they can't agree on the function, and

9  whatever function that may be is different than eliminating

10 switching losses altogether.

11      And whose burden is it to prove DOE for that big

12 chunk of the pie?  That's SynQor's.

13      In terms of the way, we had Dr. Dickens say that

14 he hasn't seen any of their products use Sine Amplitude

15 Conversion technology to eliminate zero -- to eliminate

16 switching losses.  And yet we presented you significant

17 evidence in this case, and Dr. Dickens admitted that all of

18 the accused products use SAC to accomplish zero-voltage and

19 zero-current switching.

20      And don't be confused by what -- what's shown to

21 you about there may be some tiny loss that is not

22 eliminated.  That's true with every product.  You can't get

23 down to zero exactly.  But, for all practical purposes,

24 it's zero-voltage and zero-current switching.

25      Dr. Dickens admitted that, and I asked him again:

1    Let's talk about that.  Minimizing and having none is

2    different?

3             He said:  Yes.

4             So using SAC technology to eliminate switching

5    losses is a different way of operating converters than the

6    claimed function and way of reducing but not eliminating

7    the losses.

8             Again, they fail on the way test as well.

9             On the results, the testimony couldn't be clearer,

10   Dr. Dickens said that, according to his result, what he

11   would expect to see is that as you increase the transition

12   time, you would have more losses, more switching losses,

13   and, therefore, the efficiency number would go down.

14   That's what he said during trial.

15            But we heard from Dr. Vinciarelli testimony that

16   Dr. Dickens adopts and says that's true.  Dr. Vinciarelli

17   made the transition times longer in his products, made it

18   25 percent or more, and his efficiency numbers went up.

19            So we have opposite result.  According to their

20   patent, you reduce the switching losses by making those

21   transition times shorter.  When Dr. Vinciarelli increased

22   the transition time, our efficiency numbers went up.

23   Totally different results.

24            And, just to remind you, according to His Honor's

25   legal instruction, even if any one of these elements,

 1    function-way-result, is missing, SynQor has not met its

 2    burden under the Doctrine of Equivalents.

 3          Dr. Dickens also did what he called insubstantial

 4    difference test, and this is the only slide he presented to

 5    you on that.  And he basically said, for all the same

 6    reasons I talked to you about before, it's insubstantially

 7    different.  And we went through how his DOE analysis

 8    doesn't work.

 9          Furthermore, he just did the wrong math.  He

10    pointed you to the 6.25 percent difference.  But as

11    Dr. Habetler explained, what he was describing was the

12    comparison of non-transition times to other non-transition

13    times, while the claim language is focused on the

14    transition times themselves.

15          Dr. Habetler did the right math, 25 percent

16    transition time compared to 20 percent transition times,

17    that's a 25 percent difference.  That is not insubstantial.

18    No one, whether we're talking about taxes or the cost of

19    gasoline, is going to say that 25 percent increase is the

20    same as having no increase.

21          But that is the entirety of Dr. Dickens's case on

22    DOE.

23          The patent system was created to promote science.

24    That's written into the Constitution.

25          We saw that, when confronted with the evidence of

1   the business plan, Mr. Hofmann said the exact opposite.  He

2   said, I don't believe that is the function.  To keep

3   abreast of competitor's inventive work and write patents on

4   that, he didn't see a problem with that.

5        We respectfully disagree.  The Constitution did

6   not create the patent system to allow other people to

7   monitor other people's inventive work and draft patent

8   claims to block them.

9        Dr. Vinciarelli respects intellectual property.

10  He obtained patents on his own work.  And he actually

11  disclosed as part of that process SynQor's older patents --

12  patent applications that actually described the technology

13  at issue.  Despite that, the Patent Office granted a patent

14  to Dr. Vinciarelli.

15       Just to remember some of the testimony from

16  Mr. Nelson's cross-examination, Dr. Schlecht wrote the

17  patent description, the specification.

18       Remember, it was the lawyers who drafted the

19  claims.  And that's the reason why the '190 and the '702

20  patent issued so much later than the original patent,

21  because the lawyers wrote the claims, Dr. Schlecht wrote

22  the specification.

23       It's not us asking you to disrespect the

24  intellectual property system of this country.  It is SynQor

25  that is asking you to move the fence and ensnare

1    Dr. Vinciarelli's patented technology, even though

2    virtually all of the products that were actually tested and

3    stipulated to had transition times greater than 20 percent.

4         And the only way they can move that fence was

5    through a DOE analysis that does not add up and contradicts

6    the sworn testimony of Dr. Schlecht.

7         We were entitled to rely on that fence.  They said

8    that our invention is about less than 20 percent.  And

9    there's been no evidence presented that would suggest that

10   that fence should now be moved so -- to support a patent

11   damages verdict in excess of $72 million.

12        So, really, once you take the three products that

13   were never tested, you take out the products that they're

14   claiming under DOE, you're down to $236,478.

15        That's what Mr. Reed testified to during

16   cross-examination, that even by his royalty rates, if you

17   take out those two categories, we're down to $236,478.

18        And even on that slice of the pie, they still had

19   the burden of proof to prove to you that the in

20   synchronization limitation is satisfied for all the

21   products, including that slice.

22        And this is in His Honor's claim construction

23   order to you.  It says the CRs -- those are the power

24   switches or MOSFETs that we're talking about on the

25   secondary side -- they are on when their gate voltage

1    crosses the threshold voltage.  The threshold voltage.

2            And we saw testimony from Dr. Schlecht describing

3    this.  Dr. Schlecht, in response to questions from

4    Mr. Nelson, said:  So as you raise the gate voltage up to

5    the threshold and start going above it, the transistor's

6    channel starts to turn on at that point.

7            It starts to turn on.  And he says:  Until you get

8    to the threshold voltage, the channel is off.

9            And that's exactly what Dr. Habetler was

10   describing to you with the cattle fence analogy, as

11   reflected in the claim construction order.

12           You don't start the process of turning on until

13   you cross the threshold voltage.  And it is SynQor's burden

14   to show you where that start -- that process starts, by

15   pointing out the specific threshold voltages in each of

16   these products.

17           And there's a complete failure of proof here.  Of

18   the five categories of representative products that you

19   will see in the stipulation, three of them, they never

20   showed you any actual waveforms.

21           For two of them, where they showed you the

22   waveforms, he never identified -- Dr. Dickens never

23   identified any threshold voltages.  Despite the fact that

24   these threshold voltages are published in data sheets that

25   anyone can obtain, he didn't show you any threshold

1  voltages.  They failed to meet their burden of showing in

2  synchronization.

3          So, with that, ladies and gentlemen, I'm going to

4  turn over to my partner, Mr. Nelson, who is going to talk

5  to you about some of the other issues in this case.

6          THE COURT:  18 minutes.

7          MR. NELSON:  18 minutes.  Thank you very much.

8          Good afternoon, everybody.

9          So let me talk to you about the invalidity in this

10 case.  That's where I want to start.

11         You heard from Dr. Giesselmann on this.  And we're

12 talking about Claim 2.  That's what we're focused on, Claim

13 2 of the '190 patent.

14         And this is an interesting case, right, because,

15 typically, you go through and there's a lot of disputes and

16 everybody is saying, well, this isn't here, that's not

17 there.  We're really only talking about -- and, remember,

18 this -- one thing.  That's it, one thing, and that's the

19 short transitions.

20         So you're going to have this when you go back.

21 You're going to have DTX-1078 and 1080, that's the

22 Steigerwald reference.  We have a stipulation.  That's all

23 one reference, you look at that.

24         Go back, you look at Figure 9, Dr. Giesselmann

25 walked you through all of that.  He told you, he told you

1  how somebody of ordinary skill in the art, told you what

2  that was, his students.  This man teaches this every day.

3  This is his life.  That's what he does.  He's very familiar

4  with what people of ordinary skill in the art would know at

5  that time.

6          And he walked you through, and he told you how

7  they'd look at it, how he taught them to do it, and what

8  kind of things they would know.

9          He also talked to you about the Pressman reference

10 and showed you Figure 3.4(B), right?  That's on Page 97 of

11 the exhibit.  You'll have that back there.  It's DTX-28.

12 It's Page 82 of the textbook.  One is a PDF, so the

13 numbering is a little bit off, but you'll have that back

14 there.

15         And you'll see in that, as Dr. Giesselmann told

16 you, is that shows the intermediate bus architecture right

17 there.

18         So, now, what's our question?  The question that

19 we have, the only thing that SynQor doesn't agree is, does

20 Steigerwald show the short transitions?

21         That's it.  That's the only thing that they say is

22 new.  And that's what we're talking about in this

23 obviousness analysis.

24         And I was listening carefully as the Judge read

25 his instructions, and I'm sure you all were, as well.

 1    You'll have those back there.  The Judge will give those to

 2    you.  You'll have them back there.

 3          The obviousness instruction goes from Page 21 to

 4    26, right at the top of 26.  I invite you to look at that,

 5    read that.  Because what you'll see is the things that

 6    you're supposed to consider are exactly what

 7    Dr. Giesselmann did, what he walked through.

 8          He told you what's in the prior art, what's there,

 9    what do people of ordinary skill in the art know, how would

10    they view this, talking about Figure 9, when they looked at

11    it.

12          So when you go back there, think about that

13    testimony and think about what you heard.

14          The other thing I want you to think about is,

15    there was one question on cross-examination.  I think

16    counsel for SynQor addressed that in their part of the

17    opening statement.  One question.  What was that one

18    question?

19          That one question asked you, this jury, to defer

20    to the Patent Office.  Patent Office already found it, you

21    know.  They've already determined that Steigerwald doesn't

22    have the short transitions.  They said Vicor said this.

23          You know what?  They're talking about the other

24    embodiments.  That's what they showed you, those questions.

25    And remember when Dr. Giesselmann told you that you don't

1   have to have all embodiments that meet the claims, you only

2   need one.

3           So rather than come up here and ask

4   Dr. Giesselmann about -- cross-examination questions about

5   what he was presenting, they asked him cross-examination

6   questions about what he wasn't presenting.

7           It's an attempt to confuse.  It's an attempt to

8   ask you not to do your jobs here.  And that's what our job

9   is as lawyers is to bring you the facts.  His Honor gives

10  you the law, and you go back and apply those.

11          It's not our job to try to obscure things.  It's

12  not our job to try to confuse you.  It's not our job to

13  tell you what box to check.  It's our job to bring you

14  those things so that you can make those decisions, and

15  that's what we tried to do here.

16          So we know short transitions is all we're talking

17  about.

18          Now, again, Dr. Giesselmann explained exactly why

19  even that is disclosed in the Steigerwald reference.

20  Square waves, that's the most straightforward way to drive

21  this.  People would know that.  They would do it, right?

22          And, in fact, let me just pause for a moment.  So

23  what does that tell us and what does this stipulation tell

24  us?

25          It tells us that, even SynQor agrees that

1    everything in that claim -- we're talking about Claim 1,

2    first of all, because that's the first thing we have to get

3    through -- is old, except for the short transitions.

4    Right?

5           Everything's disclosed.  That's what Dr. Dickens

6    says.  But then later, during the questioning, where I was

7    asking him questions yesterday, he actually told me that

8    short transitions are not even new.  So even those are old.

9    Right?

10          And you'll see in the Judge's instruction when you

11   go back for obviousness, you're not left to just look at

12   exactly the words of these references.  You can consider

13   the knowledge of one of ordinary skill in the art, right?

14   You can consider what they would know, what they would

15   understand when they look at these things.

16          Dr. Giesselmann teaches these kind of people every

17   day.  He sat in that witness stand and he took an oath and

18   he told you exactly what they would understand when they

19   looked at this.  They didn't ask him any questions about

20   that, not a single question.  Instead, they only asked you

21   to defer.

22          Now, what else do we know is not new?  Switching

23   regulators, that's not even a serious debate, whether you

24   use switching regulators or linear regulators.  Everyone

25   agreed, Dr. Schlecht agreed the very first day.  That's

1    just a design choice.

2           And you'll see in that obviousness instruction,

3    design choice isn't patentable.  That doesn't give you the

4    right to a patent and exclude others.

5           Now, what else did we learn that first day?  So

6    remember, His Honor said at the very beginning that that

7    specification of the patent is supposed to teach someone

8    what the invention is, how to do it, and how to make it,

9    right?  We heard that.  And that'll be in your definitions,

10   the glossary at the end in your jury instructions again.

11          And when I walked Dr. Schlecht through his

12   specification, you remember I went through every single

13   figure, and he told me, this doesn't show IBA, this doesn't

14   show IBA.  We got through all 10 figures.  Nothing was

15   there.

16          We went through the patent, the description.  You

17   know what we found?  We found two sentences, and I -- we

18   went through this a long time.  Remember, I asked him a lot

19   of questions, and maybe at the time, we didn't really

20   understand why.  That's why.

21          And what did he say?  I only -- you don't need

22   much because it's -- one of ordinary skill in the art knows

23   these things.  So if you don't need much to describe it, it

24   can't be that hard, right?  If it's not that hard, that's

25   the definition of obviousness.

1           Now, where does that leave us?  See, I'm here, I
2   have to talk about damages, as well, not because I want to.
3   I'm the Defendant.  You know what I think the damages
4   should be in this case.  But that's not my job, right?
5           My job is to bring you the facts.  That's my
6   opportunity to do it, and this is what I'm going to do.
7   I'm going to try to put this into some context now.
8           You know what the other thing -- and I think
9   Mr. Dacus made this point when we were asking questions to
10  select the jury the first day.  Sometimes when you look at
11  what people ask for in damages, you can use that to judge
12  their credibility.  How far will they go to make that
13  number as big as they can make it, right?
14          Now, there's going to be an instruction -- this is
15  at 31.  This is apportionment.  And the way I like to think
16  of this instruction is you got to separate out what's old
17  from what's new.
18          In other words, here, what is -- you can do
19  everything that is in that patent.  We all agree.  And if
20  you don't do the short transitions, you don't infringe,
21  right?
22          So you have to figure out what's the value of that
23  short transition versus something that doesn't have the
24  short transition.
25          Now, here, with their infringement claim, it

1  doesn't seem like the short transitions are a big deal

2  because they're saying, awe, if it doesn't have short

3  transitions, meaning less than 20 percent, it's all the

4  same, right?

5        So when we're looking at this with this

6  apportionment, we got to factor all that out.  He doesn't

7  get paid for IBA.  He doesn't get paid for this switching

8  regulation.  You get paid only on the improvement that you

9  brought.  That's what this instruction is.

10        And we didn't hear any testimony about that at

11  all.  We heard nothing.  Instead, what we heard was

12  Mr. Reed, $71.3 million.

13        And what did he base that $71.3 million on?  I

14  don't think anybody has a disagreement on it.  We heard it

15  from counsel during their part of the closing argument.

16  What did they say?  That's based on the profits SynQor

17  would have made if they made all those sales.  That's what

18  they said.  $60 and $80.

19        Now, we know they gave you those agreements when

20  there was an injunction and those kinds of things, and

21  people were over a barrel.  They needed to deliver, right?

22  But what does His Honor's instruction say about whether we

23  can -- that's even a proper measure?

24        Here it is.  This is at Page 27.  And you'll see

25  right here:  Although SynQor's anticipated lost profits may

1   be considered to determine a reasonable royalty under

2   several of the reasonable royalty factors -- and you'll

3   have those in your instructions, and you can go back and

4   look at those, and I invite you to look at all of these

5   instructions, but what does it say explicitly -- the law

6   does not authorize the direct setting of the reasonable

7   royalty in the amount of SynQor's lost profits.

8         It doesn't allow it.  So when they brought

9   Mr. Reed here, they put him up on the stand.  They gave you

10  testimony about what these damages are based -- and said

11  over and over and over again, this is what SynQor's lost

12  profits would be.

13        Can't do that.  His Honor said we can't do that.

14  So we know what they brought you is wrong.

15        And what else do we know?  Because, remember --

16  what are we supposed to do here with this?

17        And before I go too much further, I just want to

18  reiterate with this, I don't like this part, but I don't

19  get to check the box.  That's not my job.  I don't get to

20  tell you what you should do.  I only get to arm you with

21  the facts that you may or may not need.

22        I hope you never get to this question, but if you

23  do, I want to give you some context.

24        So what do we have here?  We have a hypothetical

25  negotiation.  You heard that term a lot of times, but let

1   me just explain what that basically is.

2          That means you have you a willing person that

3   holds the patents, we call that the licensor, and you have

4   a willing person that sells products that wants to take a

5   license, we call that the licensee.  And they're going to

6   sit down at a table, and they're going to negotiate a

7   reasonable deal.

8          Now, you have all those factors, and you'll have

9   those in your jury instruction.  I think there were 15, and

10  they talked about it.  But that's basically, here are

11  things that you would consider, but it's got to be

12  reasonable.  All these things are reasonable, right?

13         We know from His Honor's instruction it can't just

14  be you need to give me whatever money I would have made.

15  That's just wrong, right?

16         But what else do we know about this?  These fact

17  are undisputed.

18         So Mr. Reed says $71.3 million, that's what SynQor

19  is asking you for.  We know that the total that Vicor sold

20  these products for, the accused products, 58 million.  And

21  we know the total profit on those was 13.2 million.  Those

22  are the things we know.  These are not disputed.

23         So what SynQor is telling you and what Mr. Reed

24  told you, aside from telling you something that His Honor

25  has said is absolutely not allowed by the law, he's telling

1   you that Vicor would have sat down at the table with SynQor

2   and said, you know what, I'll pay you $71.3 million for the

3   privilege of making 13.2 million, right?

4           I don't think that's reasonable.  I don't think

5   anybody would do that, pay more to make less.  It does not

6   make sense.

7           And when you're going back and you're judging the

8   credibility, you got to think about these things, right?

9   Is the goal to get the number as big as you can, or is the

10  goal to give you the facts and the evidence that you need

11  to do your job?

12          So with that, you've heard from our side, and

13  you've heard the facts.  At least I've tried to present you

14  the facts.  Maybe some of my questions were not as clear as

15  they might be, but I tried.  Mr. Pak tried.

16          We respect your job, right?  We filed this case

17  initially, right?  You heard that.  We wanted to come and

18  clear our name.  It's important to us.  We wanted to come

19  and protect the integrity of the patent system, right?

20          Now, you've heard, well, we're not challenging the

21  '702 validity.  But you know what, His Honor said we have

22  limited time, and you know what's important about the

23  validity challenge that we've made here, aside from the

24  fact that that patent -- Claim 2 of the -- that '190 patent

25  never should have issued, it shows you they told you those

1    claims in the '702 patent, they're basically the same.

2    It's all the same.

3            So it shows you the value there.  It shows you

4    what's not new.  It shows you what they can't be paid on.

5    It shows you what they've stipulated and said, it's not

6    new.

7            So when you go back, think about these things,

8    look at those instructions, think about the facts that

9    we've brought to you, and think about Dr. Vinciarelli,

10   right?

11           Dr. Vinciarelli has sat here the entire time.  And

12   he sat up on that witness stand, and he told you about how

13   he started this company.  He told you about all the things

14   he did to build this company.  He told you that he didn't

15   rest on his laurels, that he kept pedaling because he

16   always wants to be ahead.

17           And you've heard the undisputed facts, how Vicor

18   has taken this thing that was at about 1-watt per cubic

19   inch when he got into it up to 30,000 in some products now.

20   That's incredible innovation.

21           So that's something, when you go back there, I

22   hope you think about and I hope you consider because that's

23   relevant to so many of the questions that you need to

24   answer, but it's also relevant to the process and why we're

25   here.

 1           We've tried to respect this process.  We've tried

 2    to bring you what it is you need.  We've tried to tell you

 3    the context for the facts and how they fit into the law,

 4    and it's important.

 5           And when you go back there -- I'm not going to be

 6    able to get back up.  Mr. Pak is not going to be able to

 7    get back up.  We don't get to talk anymore.

 8           Now, at some point, that has to end, right?  We

 9    all -- we all understand that, and y'all have your lives

10    that you need to get back to.  But don't think that we

11    don't have a response.  Don't think that we don't have

12    something to say.

13           And when you go back there, think about what we've

14    done, think about how we've conducted ourselves, think

15    about the facts that we've tried to bring you and the

16    arguments that we've tried to make.

17           And when you go back in that jury room, this is

18    your decision, right?  This is something that in the United

19    States of America we have the privilege of doing.  They

20    don't do these in any countries anymore, jury trials like

21    this.  They don't do them.  We do them.  It's right there

22    in our Constitution.

23           This is important to us.  It's important to the

24    process.  It's important to Dr. Vinciarelli.  And we trust

25    the decision you make.

1           And thank you very much for your time.

2           THE COURT:  Thank you, Mr. Nelson.

3           Mr. Rein?

4           MR. REIN:  Thank you, Your Honor.

5           They said that they wanted to bring you the facts.

6    If that is what they wanted, why did they fight so hard to

7    keep us from giving you a summary of all the tests and the

8    proofs?  Remember, they wanted us to read part numbers to

9    you, read them out loud and not provide you a summary?

10   That was a waste of time.  They just wanted to take up --

11   have us consume our time reading parts to you.

12          And why -- if they were sharing the facts with

13   you, why didn't Vicor share with you a single test of the

14   products and test results?  Not one.  They all came from

15   SynQor.

16          They don't want to share the facts.  And by the

17   way, Mr. Pak just tried to explain -- argue to you when the

18   process for turning on controlled rectifiers begins.

19          They had an expert on the stand.  They didn't even

20   ask him.  He wouldn't have agreed with Mr. Pak.  You will

21   see that there's an instruction that what the attorneys say

22   is not evidence.  You need to follow the evidence.

23          And Dr. Dickens, he explained to you that the

24   process for turning on the controlled rectifiers starts

25   when the voltage rises above zero and starts working its

1   way up to the gate voltage.  Mr. Pak just made that up.

2   There's nothing in the record to support what he just said.

3           They're not trying to share facts with you.

4   They're desperate.

5           Invalidity, Vicor's attorney just made an

6   incredible argument.  He suggested that Dr. Giesselmann

7   could explain away the inconsistent positions that he and

8   Vicor have taken in different forms, one to the Patent

9   Office where the opposite position was taken and one to

10  you.

11          And what he said was that, Dr. Giesselmann, he

12  could have explained that away if we had just asked another

13  question.

14          Well, guess what?  Their own attorneys had the

15  opportunity to follow up and ask another question on

16  redirect if they thought it could be cleared up.  It

17  couldn't.  So instead, they just argue about it in front of

18  you.  No facts, no testimony.

19          Now, this is really a damage case.  They really

20  have no defense to liability.  And I'm going to come back

21  to that in a minute.  But because it is a damage case, I'm

22  going to spend a few moments to talk to you about damages.

23          Vicor makes much of Mr. Reed's royalty rate being

24  higher than the revenue that Vicor made off of its bus

25  converters, but they are conveniently leaving out some very

1    important facts.

2          The patented invention here is not just about

3    Vicor's bus converter.  It is a load board with Vicor's bus

4    converter installed on it using an IBA architecture.  The

5    IBA system includes a power source that powers the bus

6    converter and downstream switching regulators that are

7    powered by the bus converter.

8          All that has to be combined on the customer's load

9    board, and that is done and induced by Vicor.  But the

10   complete IBA system includes these other components.  Vicor

11   just sells one part, and it induces the customer to then

12   use it in an IBA system, which is why they're liable for

13   infringement.

14         Without this IBA system, the end customers would

15   have been unable to sell their extremely high-priced

16   products without sacrificing space for all the logic

17   circuitry that was needed.

18         It's the space savings that was extremely valuable

19   to them.  You heard about that.  The value of this

20   invention, the patented invention, is not just a part of

21   the profit that -- on Vicor's bus converter.  The value was

22   related to the space savings that it proved efficiency

23   gives more value to the end customer.

24         And remember, Vicor would be paying not only for

25   the benefit it gets from the patented invention but also

1    the benefit that its end customers get, customers like IBM

2    and Cisco who are the ones that really need IBA in their

3    products.

4          These customers, as they told you, would have no

5    choice but to pay the increased price.

6          And why do I say that?  They had no options.  IBM

7    said it needed IBA.  It was critical.  They had no

8    alternative in the p6 products.  Eventually they moved to

9    something else, but they also continued to use IBA even in

10   that other product, the p7 product.

11         And Cisco has paid the increased price when buying

12   bus converters from Cisco.  Remember, SynQor sells it to

13   Cisco, they've paid our price.

14         And Cisco has also paid SynQor for using other

15   infringing bus converters, and they had to pay for that

16   use.  That was the settlement agreement you saw, $60 a unit

17   there.

18         And there are also a couple of other reasons that

19   a proper royalty is higher than the profit on Vicor's bus

20   converter.  Recall, when Vicor said that the prior case was

21   about low-cost or low-priced knock-offs, well, that is how

22   Vicor priced its products in order to try to take the

23   market after the injunction.

24         Vicor wanted that -- you heard it -- second bite

25   at the apple with Cisco and others.  By pricing low, Vicor

1   was able to ensure that Cisco would go with them instead of

2   with SynQor.

3          The sales to IBM were no different.  Vicor decided

4   to price its BCMs to IB -- to IBM to establish a

5   relationship and earn future business.  It was a

6   loss-leader.  And that future IBM business, it turned out

7   to be incredibly valuable to Vicor.

8          Vicor was willing to lose money on its bus

9   converters to gain a valuable relationship with its large

10  customers.  It could have charged more.  It could have

11  passed that additional cost on to the customers.

12         Vicor points out that its customers asked for

13  lower prices.  Does that surprise you?  Customers always

14  ask for lower prices.

15         But where, as here, they had no real choice to

16  obtain the benefits that they needed, that valuable board

17  space savings, they would pay the increase.  It is a tiny

18  fraction of the price of the expensive load boards.

19         And IBM and Cisco both told you that they had no

20  other option at the time they employed their IBA systems.

21         And we know, as I said, that customers like Cisco,

22  they paid SynQor's prices, which were admittedly higher,

23  but at the same time, we saw their scorecard.  They graded

24  SynQor as one of their top suppliers.

25         Let's take a look at that.  The proof is right

1    here in the scorecard from Cisco.

2           I'm not sure if you can pull it up, Dan, Mr. Bupp,

3    the Cisco scorecard.  Oh, I --

4           Your Honor, I think we're on their -- there we go.

5           THE COURT:  There we go.

6           MR. REIN:  Remember the scorecard?

7           If Cisco would pay SynQor's prices even though

8    they were higher, there could be no doubt that they would

9    pay Vicor's price that could -- if it just passed the

10   royalty on.

11          And let me also remind you of the Court's

12   instruction on the parties' profits.  With respect to

13   Vicor's profits, you were told -- and if we could put that

14   on the screen, Mr. Bupp -- the royalty may not be limited

15   or increased based on the actual profits the alleged

16   infringer made.  You're not supposed to limit the royalty

17   based on Vicor's profits.

18          And as for SynQor's profits, let's look at that.

19   You were instructed that although SynQor's anticipated lost

20   profits may be considered to determine a reasonable

21   royalty, and then -- it also then says that the law does

22   not authorize the direct setting of the reasonable royalty

23   in the amount of SynQor's lost profits.  So not the direct

24   setting, but it can be considered -- the anticipated lost

25   profits may be considered to determine a reasonable

1    royalty.

2            If the parties had sat down to negotiate a royalty

3    in 2006, they would have negotiated a royalty in line with

4    the profits that SynQor expected if it had gone on to sell

5    its own bus converters.

6            SynQor would not have wanted to cut itself out,

7    and all the authorization royalty agreements and the Cisco

8    settlement bear that out.  You are entitled to consider

9    those prices and those royalties, and you should.  They are

10   the best evidence that you have of an appropriate rate.

11           And you are also entitled and you should consider

12   that Vicor would be able to use these patent rights to open

13   up a huge customer relationship with IBM.  They couldn't do

14   it without access to the patents.  With the access to the

15   patents, they have the opportunity then legitimately to

16   open up a relationship with IBM.

17           And the same is true with Cisco and others.  These

18   patents, patent rights, would have given Vicor an entry

19   point.  They were critically important.  They would have

20   permitted, for example, Vicor to have a second bite at the

21   apple.

22           And Vicor eventually projected that that second

23   bite at the apple would be worth $100 million to Vicor.

24   Remember, we saw that in their own document, their

25   anticipated forecast of the value?

1        These factors would justify the royalty rates and

2   total amounts that SynQor is seeking here.  It is a fair

3   amount, and it is in line with what others have paid.

4        Now, I told you I was going to circle back to

5   liability.

6        Judge Schroeder told you that a product can be

7   covered by more than one patent.  He gave an example of a

8   patent on a table with legs, a top, and glue, then he said

9   a table with wheels could still infringe.

10       And in this case, Vicor's SAC technology, its SAC

11  topology, it is just the wheels on the table, an added

12  feature that even if patented does not change the fact that

13  Vicor committed patent infringement.

14       Let's look at a couple of instructions.

15       THE COURT:  Mr. Rein, you have five minutes

16  remaining.

17       MR. REIN:  Thank you.

18       If we could turn to -- well, I have the

19  instructions in front of me.  They're not going to be on

20  the screen.

21       But I would call your attention to an instruction

22  on Page 14:  A product may be covered by more than one

23  patent.

24       That's what you're told in these instructions.

25       But the existence of someone else's patent, even

1    if the product is covered by the -- I'm sorry, the

2    existence of an accused infringer's own patent does not

3    constitute a defense to infringement of someone else's

4    patent, even if the product is covered by the accused

5    infringer's patent.

6           That's an instruction -- it's an important

7    instruction in this case, and it makes you wonder why does

8    Vicor keep talking about its own patents?  Why didn't it

9    look at SynQor's patents?

10          And then I would also direct your attention to

11   the -- an instruction on Page 15:  If you find that each

12   and every requirement of a claim is present, then the claim

13   is infringed.

14          And then it goes on:  That's true even if the

15   accused product may be more or less efficient or may

16   include additional features or functions not found in the

17   claims.

18          But Vicor keeps trying to suggest to you that its

19   added efficiency makes it exempt from these patent claims.

20   That's just not the law.

21          Now, as for the intent evidence, Vicor just --

22   SynQor marks its products to identify its patents.  So in

23   doing the competitive benchmarking that Vicor did, Vicor

24   would see that SynQor's products are patented -- are

25   patent-protected, and specifically be made aware of

1968

1    SynQor's '190 and '702 patents.

2        Vicor also had SynQor's data sheets, which also

3    indicate that SynQor's bus converters are patent-protected

4    and, again, call out the '190 and '702 patents.

5        The data sheets do more, they also indicate that

6    SynQor's bus converters are unregulated, employ synchronous

7    rectification, and are intended to be used in IBA systems.

8        All this should have been made -- should have made

9    Vicor aware that if it went on to sell bus converters with

10   these features for use in an IBA system, it was taking a

11   big risk.

12       And this, as you heard, is part of what triggers

13   Vicor's willful blindness, this in Vicor's awareness in

14   November of 2007 of SynQor's suit against the industry.

15       With all that information, Vicor should have taken

16   a look at these patents, but Vicor didn't.  It buried its

17   head in the sand for at least three years.  The deliberate

18   steps Vicor took to avoid learning of the infringement was

19   declining to look at the patent claims.

20       Dr. Vinciarelli doesn't think he has to look at

21   patent claims.  This technology is so advanced.

22       And as you were also told to -- you need to

23   consider the totality of the circumstances, including

24   whether Vicor was relying on the advice of a competent

25   lawyer.

1    As Dr. Vinciarelli confirmed at trial, he and
Vicor did not rely on any such legal advice.  Vicor
willfully blinded itself to a known risk.

4    Now, you just heard Vicor says that it had a
good-faith belief of non-infringement when it moved its
transition times to 25 percent for the IBCs.

7    That is no defense for the earlier ones that were
being sold.  Dr. Vinciarelli acknowledged he didn't go back
and change the transition times of those.

10    And it is also no defense for the IBCs because we
told them that we thought those products infringe under the
Doctrine of Equivalents, a legal doctrine.

13    And did they come forward with an opinion of
counsel?  No, they didn't rely on an opinion of counsel.
They just buried their head in the sand.

16    And you also heard Mr. Pak try to fill in some
gaps in Dr. Vinciarelli's testimony, testimony that was not
provided to you during trial.

19    He suggested that Dr. Vinciarelli had these
non-infringement defenses in his head, like in
synchronization.  He didn't provide -- Dr. Vinciarelli
didn't provide that testimony to you.  Just Mr. Pak.

23    They had no defenses in mind because, as
Dr. Vinciarelli told you, he didn't look at the claims.  He
couldn't have a defense in mind.

1           This is just made up during closing arguments.

2           And the last thing I want to close on is the

3    testing that they're -- they continue to say we should have

4    done more testing to make sure that those earlier parts had

5    transition times less than 20 percent, they point to a

6    later part with different components, and they said they

7    tried to make those -- that bus converter track the earlier

8    products.

9           I think they were trying to suggest that because

10   it had transition times that were higher, they tuned it,

11   and that meant that the earlier products had shorter

12   transitions times.

13          How do you tune to earlier converters without

14   having the test results on those converters?  They didn't

15   present those test results to you on the earlier

16   converters?  How do you tune then?  That makes no sense.

17          And also keep this in mind, these are Vicor's own

18   bus converters.  If it thought that the transition times

19   were really more than 20 percent, don't you think they

20   would have tested it?  They criticize us for testing

21   something that's identical with the same schematic and the

22   same components.  But they didn't make one for themselves.

23   They didn't test it.  They didn't present you with any, any

24   evidence of testing.

25          And now, I just want to close with one thing, and

1    that's some questions.

2           When you go back to the jury room, I want you to

3    ask yourself -- I want you to use your common sense and ask

4    yourself these questions.

5           Why didn't Vicor present you any testing of their

6    own parts at all?

7           Why not increase the transition times to 30 or 40

8    percent to avoid the Doctrine of Equivalents if the length

9    of the transition times is as unimportant as Vicor wants

10   you to believe?

11          Why not challenge the validity of the '702 patent?

12          Why wait three years to read the claims of the

13   '190 patent despite learning about it in 2007?

14          And, finally, why should Vicor get a better deal

15   and pay less than everyone else in the industry when they

16   were the last company left and refused to respect SynQor's

17   patents?

18          Let me conclude by thanking each and every one of

19   you from the bottom of my heart.  We really appreciate the

20   careful attention that you paid to the evidence.  I know it

21   was technical.  But jurors like you, juries like you are a

22   critical part of this patent system.

23          So we very much appreciate your time.  Thank you.

24          THE COURT:  Thank you, Mr. Rein.

25          Ladies and gentlemen of the jury, it's time for

```
 1   you all to be -- return to the jury room to begin your

 2   deliberations on your verdict.  Each of you will have a

 3   copy of the charge that I've -- I gave you earlier this

 4   afternoon and late morning.

 5        The first -- the first thing you should do is to

 6   select one among your number to serve as your foreperson

 7   who will guide your deliberations and speak for you here in

 8   the courtroom.

 9        If at any time you need to recess during the

10   deliberations, please follow all of the instructions that I

11   have previously given you about your conduct during the

12   trial.

13        After you have reached your unanimous verdict,

14   your foreperson should fill in on the form your answers to

15   the questions and sign and date on the last page.

16        You should not reveal your answers until such time

17   as you are discharged unless otherwise directed by me, and

18   you should never disclose to anyone, including to me, your

19   numerical division on any question.

20        So -- and the final instruction is if at any time

21   you need to communicate with me for any reason during your

22   deliberations, please give a written message or question on

23   the paper that will be provided in the jury room and hand

24   it to the CSO outside the door.  I will then respond as

25   promptly as I can either by doing so in writing or by
```

1   having you brought back into the courtroom so that I can

2   address you orally.

3           So at this time, Mr. Mitchell, if you would,

4   escort the jury to the jury room.

5           COURT SECURITY OFFICER:  All rise.

6           (Jury out.)

7           THE COURT:  Okay.  Just a comment or two.

8           Did everybody get everything on the record they

9   wanted to before we had the jury in and began with

10  instructions?  We were moving at a pretty fast clip there,

11  and I want to make sure everyone got everything protected.

12          Mr. Rogerson?

13          Y'all can be seated.

14          MR. ROGERSON:  Yes, Your Honor.  I just wanted to

15  make sure there's one objection.  We noted -- I couldn't

16  recall if we made it this morning or not.  But just for the

17  record, we wanted to maintain our objection, which I think

18  we made before, to the giving of an instruction on lost

19  profits.

20          THE COURT:  Okay.

21          MR. ROGERSON:  To make sure that's noted for the

22  record.

23          Thank you, Your Honor.

24          THE COURT:  Okay.  Good.  Thank you, Mr. Rogerson.

25          Anything, Mr. Pak, from the Defendant?

1        MR. PAK:  Nothing from the Defendant, Your Honor.

2        THE COURT:  Okay.  Good.  All right.

3        All right.  So we'll wait for the jury.  You all

4    go -- don't get terribly far.  You're welcome to leave the

5    building, though.  Just leave a cell phone with

6    Mrs. Schroeder in the event we get a question or a verdict.

7        So we'll stand in recess until we hear.

8        MR. PAK:  Thank you.

9        COURT SECURITY OFFICER:  All rise.

10       (Recess.)

11       (Jury out.)

12       THE COURT:  Okay.  We are on the record at 4:55.

13       Counsel for Plaintiff and Defendant are here

14   present in the courtroom.

15       We received a note timed -- what's the time on

16   that note, does it say?  Sorry.

17       MR. PAK:  It doesn't have the time, Your Honor.

18       THE COURT:  And indicating that the jurors wish to

19   understand how to view a thumb drive, 14-CV-287, which is

20   the case number, native PTX.

21       Mrs. Schroeder, our courtroom deputy, along with

22   the Court's IT specialist have gone to the jury room to

23   make sure they are doing it correctly.  And if there's

24   something wrong with the laptop that's in there, we'll make

25   arrangements to get it replaced so that the jurors can see

1    what is contained on the thumb drive.

2         I've notified the parties that in receiving the

3    note that I just described, the jurors did ask whether they

4    would be permitted to go on home this evening, given the

5    hour, and return in the morning to begin their

6    deliberations.

7         And I discussed with the parties my normal

8    practice in this regard once deliberations have begun.

9    We're all on the jury's schedule.  So if they want to

10   deliberate a little later into the evening, we can provide

11   dinner for them.  If they need to go home at a certain time

12   and want to come back in the morning, that is certainly

13   fine with me.

14        So having discussed that with the parties, I think

15   that it is the agreement of both the Plaintiff and the

16   Defendant that we will just proceed according to our normal

17   practice in that regard.  And so if they want to go home

18   now, they're welcome to go home now.

19        Did I correctly -- accurately state our

20   discussion?

21        MR. GILLAM:  Yes, Your Honor.

22        MR. REIN:  Yes, Your Honor.

23        THE COURT:  Okay.  Again, my normal practice in

24   situations like this is I don't see the need to bring the

25   jury back in from the jury room to explain.  They remain

1    under the rules previously set forth about their conduct

2    during the course of the trial.  Those were contained in

3    the final instructions, and I don't think they need to be

4    reminded of that.

5            So unless the parties disagree with that, we will

6    go ahead and release them at this time and have them come

7    back at 9:00 o'clock in the morning.

8            When they return, I will ask Mrs. Schroeder to

9    inform them that deliberations should not begin until all

10   jurors are present in the jury room and that they should

11   send a note up when all jurors have arrived and

12   deliberations have begun.

13           Any comments from either side?  Questions?

14   Concern?  Anything of that nature?

15           MR. PAK:  No.

16           MR. GILLAM:  No, Your Honor.

17           THE COURT:  Okay.  We'll be in recess.

18           MR. DACUS:  Thank you, Your Honor.

19           MR. HATCHER:  Thank you.

20           (Court concluded at 4:59 p.m.)

21

22

23

24

25

1                              CERTIFICATION

2

3           I HEREBY CERTIFY that the foregoing is a true and

4    correct transcript from the stenographic notes of the

5    proceedings in the above-entitled matter to the best of my

6    ability.

7

8

9     /S/ Shelly Holmes_____          10/25/22___
     SHELLY HOLMES, CSR, TCRR               Date
10   CERTIFIED SHORTHAND REPORTER
     State of Texas No.: 7804
11   Expiration Date: 10/31/2023

12

13

14

15

16

17

18

19

20

21

22

23

24

25